# Exhibit 1



ASSOCIATION OF AIR MEDICAL SERVICES

**Board of Directors**

**Deborah Boudreaux, MSN, RN, CCRN, C-NPT, LP, CMTE**
**Chair and Region IV Director**
Teddy Bear Transport

**Mike Griffiths, RN, CFRN, CEN**
**Vice Chair and Region I Director**
Life Flight Network, LLC

**Susan Rivers, RN, BSN, MBA, CMTE**
**Secretary and Region VI Director**
Carilion Clinic Life-Guard

**Rene Borghese, MSN, RN, CMTE**
**Director-At-Large**
Duke Life Flight

**Frankie Toon, RN, CFRN, CMTE, MBA, MSN**
**Treasurer and Director-At-Large**
AirMed

**Douglas Garretson**
**Immediate Past Chair**
STAT MedEvac

**Dustin Windle, RN, CMTE**
**Region II Director**
Guardian Air Transport

**Kolby L. Kolbet RN, MSN, CFRN**
**Region III Director**
Life Link III

**Anthony Pellicone**
**Region V Director**
Northwell Health/ Southside Hospital

**Russell MacDonald, MD, MPH, FRCPC**
**Region VII Director**
Ornge

**Graeme Field**
**Region VIII Director**
NSW Air Ambulance Service

**James Houser MSN, APRN, FNP-C, NRP, CFRN**
**Director-At-Large**
STAT MedEvac

**Martin Arkus, CMTE**
**Director-At-Large**
Global Medical Response

**Guy Barber**
**Director-At-Large**
Air Methods Corporation

**Edward Eroe, LFACHE, CAE, CMTE**
**Public Member**

**Denise Treadwell, CRNP, MSN, CFRN, CEN, CMTE**
**CAMTS Representative**
AirMed International, LLC

**Cameron Curtis, CMM, CAE**
**President and CEO**
Association of Air Medical Services

June 15, 2021

The Honorable Xavier Becerra
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

The Honorable Martin Walsh
Secretary
U.S. Department of Labor
200 Constitution Ave N.W.
Washington, DC 20210

The Honorable Janet Yellen
Secretary
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, DC 20220

Dear Secretaries Becerra, Walsh and Yellen:

I write to offer the views of the Association of Air Medical Services (AAMS) on the tri-departmental rulemakings prescribed by the No Surprises Act, Pub. L. No. 116-260 (2020) (the "Act"). AAMS is the international trade association that represents over 93 percent of air ambulance providers in the U.S. Together, our 300 members operate more than 1,000 helicopter air ambulances and 200 fixed wing air ambulance services across the United States. AAMS represents every emergency air ambulance care model, including hospital-based aircraft, independent aircraft at bases in rural areas far from hospitals, and many hybrid variations.

AAMS strongly supports the goal of the Act, which is removing patients from payment negotiations between healthcare providers, and insurers and group health plan sponsors, through an independent dispute resolution process (IDR). We believe the implementation of the Act will succeed if air ambulance providers, insurers, group health plan sponsors, and IDR entities receive the information they need to resolve payment questions efficiently and fairly. It is critical that the tri-departmental rulemakings promote transparent disclosures of air ambulance cost information, in-network rate information, and out-of-network payment information.

Fair payments that cover the costs of delivering air ambulance services will help ensure that air ambulances can continue to sustain operations in rural and underserved areas and preserve the emergency medical system that saves American lives every day. The preservation of the emergency medical system is especially important to Americans in underserved and rural communities who lack access to definitive care, *e.g.*, trauma centers and other tertiary care providers.[i] In this regard, fair payment for air ambulance services enables the equitable delivery of definitive care to all Americans.

AAMS recognizes that the tri-departmental rulemakings will unfold over the course of 2021 and address relevant policy issues.  We look forward to partnering with the Departments throughout the year to help the Administration advance the purposes of the Act and the policy of health equity.  For now, AAMS offers its views on two threshold issues in the rulemakings: the Qualifying Payment Amount (QPA) and the information considered in the IDR process.  We also provide additional background about the air ambulance industry that informs our views on both issues.

**I. The Air Ambulance Industry is Unique in Ways Important to the Rulemakings**

AAMS believes that Congress included specific language regarding air ambulance providers in the Act because the air ambulance industry is unique.  The industry is an integral part of the emergency medical system, first responders (*e.g.*, local police and fire departments) and community physicians determine the utilization of the services, the service has both healthcare and aviation components, many air ambulance providers operate on a standalone basis (that is, they are not affiliated with a hospital), the fixed and variable costs of delivering a heavily-regulated healthcare and aviation service are high, and insurers and group health plan sponsors have historically paid for most of the services on an out-of-network basis.  No other industry within the health sector shares all of these characteristics with the air ambulance industry.

Air medical services are often the only lifeline that critically ill and injured patients may have to definitive care, especially in rural areas. Without helicopter air ambulances, eighty-five million Americans cannot reach a Level 1 or 2 Trauma Center within one hour. Traumas, strokes, heart attacks, burns, and high-risk neonatal/pediatric cases account for 90 percent of all helicopter air ambulance transports.  All of those conditions are emergent and require a higher level of care than what is typically found at a community hospital.

Air ambulance providers play no role in deciding whether or when to transport a patient. They respond to calls from first responders (in accordance with state and local protocols) and treating physicians, and closely adhere to the treatment plan the physician prescribes. When helicopter air ambulance services are requested, air ambulance providers determine only whether the aviation conditions are safe to fly the patient. They do not question a first responder's or physician's request for services (in many states a "duty to respond" is a condition of EMS licensure) and are never aware of the patient's ability to pay or their health insurance status. The goal is to provide the highest quality of transport safety and patient care efficiently and do so by responding to transport requests within minutes.

Air ambulances operate under a more complex regulatory regime than most providers, including multiple federal and state agencies. In addition to Federal program enrollment, air ambulances frequently must obtain two additional levels of authorization: (i) an air carrier certificate from the Federal Aviation Administration (FAA) to conduct on-demand operations under 14 C.F.R. Part 135 (*i.e.,* Part 135 certificate) and (ii) a state-issued ambulance license. A Part 135 certificate is required for conducting air transportation, while the state ambulance license is necessary for providing medical ambulance operations and billing for the services rendered.
This federal and state regulatory overlay is important, as more than 33 percent of helicopter air ambulance flights will cross a state border and nearly all will cross a county or municipal boundary. Nearly all fixed wing air ambulances cross state borders.  The unfettered interstate delivery of services is possible partly because the Airline Deregulation Act preempts many state laws.
The delivery model for air ambulance services may vary depending on whether the federal and state authorizations are held by a hospital, a community organization, or a standalone air ambulance provider, or split between two different entities.  While delivery models vary, a majority of air ambulance providers are standalone operators that hold both federal and state authorizations and are not affiliated with a single hospital or community organization.
The delivery of on-demand, heavily-regulated, life-saving air ambulance services in emergencies requires investments in specialized aircraft, air bases, technology, personnel, and regulatory compliance systems.  Those investments involve substantial fixed costs.  The Act requires air ambulance providers to report their costs to the Departments to inform policymaking and regulation.  As stated previously, AAMS supports the reporting of cost data to the Departments because it will help them assess the fairness of payments for air ambulance services.

AAMS also supports the consideration of payment data because insurers and group health plans have historically paid for air ambulance services on an out-of-network basis instead of entering into network contracts with air ambulance providers.  In particular, we support a regulation that requires IDR entities to request and consider payment data, and assess the fairness of the air ambulance provider's and the payor's offers against the backdrop of the QPA (which reflects in-network rates), and out-of-network payments to providers.

We note these points to illustrate how the air ambulance industry is different from other industries within the health sector. Congress acknowledged this when it established provisions specific to air ambulance providers and chose to address their services separately from others. We urge the Departments to keep these differences in mind and account for them in the rulemakings.

**II. Qualifying Payment Amount (QPA)**

### A. Median Contracted Rate for Comparable Services

***The median rate should be based on fair market rates for services that are comparable in terms of transport type (emergency vs. non-emergency), vehicle type (fixed-wing vs. rotor-wing), transport distance, geographic region, and provider type (providers that bill through a hospital system vs. those that do not).*** The QPA is defined as the median of the contract rates recognized by the plan or insurer as the total maximum amount in 2019 for the same or similar item or service provided by a provider in the same or similar specialty in the geographic region. In determining the median amount, we believe it is critical to define "same or similar item or service" based on comparable services. Comparable services should be those that are provided by the same transport type (*e.g.,* emergency or non-emergency), vehicle type (*e.g.,* fixed wing or rotary wing), transport distance (*e.g.,* the distance from the air base to the drop-off point), and geographic region (*e.g.,* for rotor wing transports, the interstate or intrastate service area of the aircraft; for fixed wing transports, the international or interstate service area of the aircraft). Because all of these factors may impact the rates paid for the services, the Departments should determine the median based on the rates for "like" claims that take the same factors into consideration. The median rate should derive from a broad range of contracts so that any outliers do not skew the final amount. Additionally, we urge the Departments to consider the following concepts in interpreting the phrase "same or similar item or service."

### *i. Health Equity for Vulnerable Communities*

***The implementation of the Act should enable emergency air ambulances to continue serving rural populations that otherwise lack access to definitive care.*** In many rural communities, air ambulances are an increasingly important service due to the lack of access to the definitive care that is readily available to the rest of the population. Most hospital systems and high-level tertiary centers are located in urban and suburban areas. And, over the past 10 years, many rural hospitals have closed or reduced services, leaving many communities with few options for definitive care.[ii] In these areas, air ambulance services are more critical than ever and may be patients' only option connecting them to timely definitive care.

Unfortunately, the volume of emergent and unplanned transports rendered in rural communities can vary greatly across both geography and time for reasons that are outside the control of the air ambulance provider.  The emergent and unplanned nature of the transports also means that insurers and group health plan sponsors cannot steer patient volume to air ambulance providers in exchange for discounted rates.  These structural features of air ambulance services are natural disincentives for insurers and group health plan sponsors to contract with air ambulance providers.

We urge the Departments to keep in mind that the volume of services rendered is not an indication of a community's need for the service. A rural community without a hospital may only need a helicopter on an infrequent basis, but when the need arises, it is most often critical.  The rulemakings should advance health equity by promoting fair payments to air ambulance providers that preserve rural access to definitive care in life-or-death situations.

3

*ii. Differences in Negotiated Rates*

***Stand-alone entities and entities that bill through, for example, a hospital system should not be compared to one another when calculating a median.*** Comparable services should also reflect differences in organizations' structures, which can influence how entities arrive at their negotiated rates. For instance, entities that bill through a hospital system may enter a network agreement with an insurer based on the universe of services that the hospital system offers and may look at this entire universe of hospital services when negotiating payment. In some cases, they may not have the resources to focus on a discrete service-line such as air ambulance. These agreements may include rates for services that the entities themselves do not offer but that are folded into the larger contract with no discussion or negotiation; they may also include rates for a service the hospital used to offer but no longer provides. As a result, air ambulance transport rates in these contracts may be far lower than the true cost of providing care in the area. If air ambulance transports are not a service the hospital system provides, the hospital system has little or no incentive to negotiate a fair rate because it is not an amount for which the hospital system will ever seek payment. In contrast, a stand-alone entity that conducts its own billing will typically ensure that contract rates reflect only the services offered. For the vast majority of standalone entities, the final rates must be sufficient to offset the costs of rendering the services in the community. These entities typically negotiate an adequate rate that will sustain their operations.

Given the differences in how these types of organizations approach rate negotiations for individual services, the two entity structures should not be compared to one another nor these rates blended into one median amount. Furthermore, the number of claims actually paid at the median amounts should be made available to the IDR entities.

*iii. Geographic Regions*

***Geographic regions should align with the actual service areas of air ambulances.*** The QPA takes into account the "geographic region in which the item or service is furnished," and the National Association of Insurance Commissioners ("NAIC") has proposed the use of Individual and Small Group Market Geographic Rating Areas provided for by the Market Rules and Rate Review Final Rule (45 C.F.R. pt. 147), which includes a mix of county-level, 3-digit ZIP code-level, or MSA+1 level regions within each individual state as the geographic regions for determining QPAs for all emergency services under the Act. These regions are inappropriate for air ambulances for two reasons. First, the number of in-network air ambulance contracts in some areas may be too small to derive a QPA that represents contract rates for the same or similar services. Second, the service areas of air ambulances do not align with the borders of those areas. Air ambulances move patients across state borders over 33 percent of the time.

The guiding principles for determining the geographic region for the QPA should be fair payment to healthcare providers and health equity for rural communities, not administrative convenience. The geographic region should be tailored to the actual service area of the specific air ambulance provider (which affects the costs the air ambulance provider incurs in delivering the services). A tailored approach is fairer because it is more likely to yield a QPA that represents any contract rates that air ambulance providers have accepted for the actual service area.

**B. Database Default**

***The Departments should request and begin to collect paid claims amounts for establishing a reliable database default.*** When there is insufficient information to calculate a median of the contracted rates, the rate for an item or service will be determined "through use of any database that is determined . . . to not have any conflicts of interest and to have sufficient information reflecting allowed amounts paid" to providers and facilities. We appreciate the Departments' efforts to identify a reliable data source and the acknowledgement that there may not always be sufficient information for calculating a median contract rate. However, currently, no reliable database exists for air ambulance services.

4

AAMS is interested in establishing such a database and welcomes the opportunity to partner with the Departments on how to achieve this. As an initial step to obtaining this data, we offer two suggestions on how the Departments may request and begin to collect paid claims data. First, as a condition of certification, IDR entities are required to submit to the Secretary of Health and Human Services "such information as the Secretary determines necessary to carry out" the public reporting of information on IDR. One piece of information the Secretary could require IDR entities to report is the average actual non-contracted paid claims amount. These amounts would not be made public, but could be used to develop a national database to serve as a back-up when there is insufficient information to calculate the median. The Secretary could establish a fee for access to the database to support its creation and operation.  Second, the Departments could require insurers to report this information to the Secretary, and to the public, through the Transparency in Coverage regulations.  Both approaches are within the Departments' statutory authority and could go a long way towards creating a meaningful database on air ambulance service payments.

## III. Independent Dispute Resolution

### A. Initial Payment & Denial of Payment

***If an insurer or health plan fails to respond to a provider's claim submission within the 30-day period, it should be deemed a denial.*** Within 30 days of a provider or facility submitting a bill for services, a health plan or insurer must issue an initial payment or notice of denial of payment. Following this decision, the negotiation period and subsequent IDR process begin. While the Act makes clear that insurers must take action within 30 days, we are concerned that insurers may fail to meet this requirement, which would prevent providers from advancing to the negotiation phase. Any delays in responses from group health plans or issuers only prolong the time to reach a final resolution, contrary to Congress's vision for the "timely and efficient provision of determinations [.]"

If the health plan or insurer fails to respond within 30 days of the original claim submission, the Departments should deem this a denial that triggers the negotiation process, and starts the clock on the IDR process.

### B. IDR Entity Certification

***The Departments should require that IDR entities request average non-contracted paid claims amounts from the parties.*** The Departments are charged with establishing a process for certifying IDR entities that ensures that they carry out their responsibilities. The Act authorizes the Departments to revoke an IDR entity's certification if it demonstrates a pattern or practice of noncompliance. Separately, the Act requires the parties to submit to the IDR entity (i) an offer for a payment amount, and (ii) "such information as requested by the certified IDR entity." Together, these provisions authorize the Departments to require IDR entities to request specific information from parties in IDR as a condition of IDR certification.

We recommend that the Departments require IDR entities to request that, with respect to a dispute regarding calendar year 2022, the provider submit the average non-contracted paid claims amount during calendar year 2020 (to be updated by an inflation factor with respect to a dispute regarding a future calendar year). This information is important because it reflects the amounts that health plans and insurers were willing to pay before the Act was implemented.  The information will provide the parties and the IDR entity with a more complete and transparent factual basis for assessing the dispute.  The increased transparency should incentivize negotiated resolutions that save both the parties and the public time and money.

The failure to request this information should result in decertification of the IDR entity.

### C. Weighing of Factors

***IDR entities should give primary weight to the average actual non-contracted paid claims amount submitted by the provider, and have the discretion to discount or reduce the weight of the median contracted rate.***  In selecting the final payment amount, the IDR entity must consider the (i) QPA, (ii) the additional circumstances enumerated in the Act (*e.g.*, quality and outcomes measurements), and (iii) any additional information that the

5

parties provided. Congress did not specify how IDR entities must weigh these factors. We believe the Departments should require IDR entities to give primary weight to the average actual non-contracted paid claims amount submitted by the provider. IDR should be an avenue for reaching a fair payment that covers the costs of delivering air ambulance services and thereby advances health equity for vulnerable communities. The amounts that group health plans and insurers previously paid for services should be the starting point for this discussion.

We do not believe that contract rates alone are a reasonable guidepost for the IDR process. As previously discussed, the structural features of air ambulance services are disincentives for network contracting. Those disincentives have been compounded by consolidation in the insurance industry, which has increased the market power of insurers and made it even more challenging for air ambulance providers to negotiate fair payments for their services. AAMS members continue to work with insurers to reach in-network agreements but are having less and less success in doing so. In fact, AAMS members have found that some of the largest health insurers have no in-network agreements with providers. It would be unfair for IDR entities to consider only contract rates when air ambulance providers are actively working to reach agreements with insurers without success. If IDR entities consider only contract rates, they will incentivize insurers and group health plans to terminate their most reasonable provider contracts, reduce their engagement in good faith negotiations with the terminated providers, and insist on widespread acceptance of unfair contract rates imposed on small numbers of providers through the exercise of market power. Unfortunately, we have already seen these consequences emerge, with insurers terminating reasonable provider contracts in an attempt to drive down contract rates in advance of the rulemakings.

A fairer approach would be for the Departments to account for the history of out-of-network payments for air ambulance services by requiring that IDR entities give primary weight to the average actual non-contracted paid claims amount. In service areas with little or no network contracting, the average actual non-contracted paid claims amount represents what insurers and group health plans will pay, and what air ambulance providers will accept short of initiating litigation. The primary weighting of that amount will strengthen the incentive for efficient negotiated resolutions that save the parties and the public time and money.

### D. Complete Payment Denials; Coverage Based Denials

***The Departments should acknowledge in the final rule that the Act reaches disputes where the group health plan sponsor or insurer offers the air ambulance provider a payment of $0.00 (including for medical necessity denials).*** The Act reaches any dispute where the group health plan or group or individual health insurance coverage covers air ambulance services provided by a participating provider, the nonparticipating air ambulance provider bills for a transport, and the group health plan sponsor or insurer pays or offers to pay $0.00 to the provider (the Act uses the term "notice of denial of payment," which means that no payment is or will be made to the provider). While the Act is unambiguous, insurers and group health plan sponsors may nonetheless try to circumvent the IDR process by unilaterally declaring that the services were medically unnecessary, non-emergent (and therefore not a covered emergency service), or otherwise beyond the reach of the Act. To mitigate the potential gaming of the IDR process, the Departments should acknowledge in the preamble to any final rule that the Act does exactly what it says, and reaches disputes where the group health plan sponsor or insurer pays or offers to pay the air ambulance provider a payment amount of $0.00 for any reason.

If insurers and group health plan sponsors can game the system by deciding unilaterally that air ambulance transports are medically unnecessary or non-emergent, then patients will receive balance bills and the Act will not achieve its purpose. The tri-departmental rulemakings should maintain the integrity of the IDR process and vindicate the purpose of the Act.

In addition, the Departments should align the rulemakings with other federal laws by requiring that IDR entities apply a prudent layperson standard when adjudicating payment disputes that present medical necessity questions.

***

...

Thank you for the opportunity to provide these initial comments. We believe it is critical to protect patients' use of air ambulance services, both in emergency situations or when requested by a physician, patient, or family member in a non-emergency situation. Air ambulance services are vital to our healthcare system and there must be a reliable mechanism in place to financially support these operations. We look forward to working with the Departments on these important issues. If you have any questions, please contact AAMS Vice President of Public Affairs Christopher Eastlee at ceastlee@aams.org.

Sincerely,

Cameron Curtis, CMM, CAE
President & CEO
Association of Air Medical Services

Deborah Boudreaux, MSN, RN, CCRN, C-NPT, LP, CMTE
Chairman and Region IV Director, AAMS
Teddy Bear Transport, Cooks Children Medical Center

---

[i] Branas, C.C., E.J. MacKenzie, J.C. Williams, H.M. Teeter, M.C. Flanigan, A.J. Blatt and C.S. ReVelle. "Access to Trauma Centers in the United States." JAMA: Journal of American Medical Association vol. 293 no. 21 (2005): 2,626-2,633.

[ii] Government Accountability Office, "RURAL HOSPITAL CLOSURES Number and Characteristics of Affected Hospitals and Contributing Factors"; GAO-18-634; August 2018