# Exhibit 3



# No Surprises Act Interim Final Rule – Part I

Association of Air Medical Services (AAMS)

September 3, 2021

# Introductions

- Christopher Eastlee, Vice President of Government Affairs, AAMS
  - AAMS represents over 93 percent of air ambulance providers in the U.S., with 300 members operating more than 1,000 helicopter air ambulances and 200 fixed wing air ambulance services.

- Jason B. Caron, Partner, McDermott Will & Emery, LLP, Counsel to AAMS

- Brian Stimson, Partner, McDermott Will & Emery, LLP, Counsel to AAMS



# Air Ambulance Industry & Historic Market Conditions

- **Integral Role in the Emergency Medical System**: Air ambulances are often the only lifeline critically ill and injured patients have to care, especially in rural areas.

- **AAMS Members Regularly Seek In-Network Agreements with Payers**: Air ambulance providers succeed in reaching agreements in many cases, but struggle to secure agreements with some payers due to their market dominance and business strategies.

- **The Market Has Not Provided Incentives for Payers to Reach Solutions**, but the need for air ambulance services remains critical.



3

# Addressing Flaws with the Qualifying Payment Amount (QPA)

## The QPA Will Have Unintended Consequences

- **Lumps Air Ambulance Providers Together**: The QPA fails to distinguish between:
    - Independent and hospital-based providers;
    - Emergency rotor-wing and emergency and non-emergency fixed wing providers; and
    - Active and shuttered providers.

- **Excludes Relevant Data**: Due to air ambulance utilization patterns, a significant number of contracts with payers are single case agreements (SCAs). The IFR excludes these agreements from the definition of "contracted rate," as well as historic payments.

AAMS

4

# Addressing Flaws with the QPA

## The QPA Will Have Unintended Consequences

- **Use of Census Divisions Will Produce Absurd Results**: If a geographic area is determined based on all metropolitan statistical areas (MSAs) in a Census division and all other areas in the Census division, a rate in Hawaii or Alaska could dictate the QPA for a pick-up in California.

*** 

**Consequence**: The methodology will produce QPAs that are below fair market rates. If providers are forced to exit the market, patients will lose access to critical services.



5

# Addressing Flaws with the QPA

## Opportunities to Fix the QPA

The QPA could more closely approximate fair market rates if it:
- Differentiates between air ambulance provider types;
- Includes SCAs and historic payments; and
- Removes Census divisions from the geographic region definition.

Irrespective of whether the Departments elect to address the flaws with the QPA methodology, they should at least mitigate the unintended consequences of the methodology in the Part II rule:
- Require payers to disclose information about the limitations of the QPA; and
- Instruct IDR entities to give the QPA no presumptive weight.

AAMS

6

# Aligning the Approach to Coverage Denials with the Act

## The IFR's Approach to Coverage Denials Will Perpetuate Surprise Billing

- The IFR states that "notice of denial of payment" does not include a notice of benefit denial due to an adverse benefit determination (ABD).

- This interpretation allows payers to exempt claims from IDR and skirt the ban on surprise billing.

- In these instances, the payer will neither send an initial payment or notice of denial of payment, and the provider will never reach the IDR process. The provider instead sends a surprise bill to the patient, who may appeal to the payer's ABD through the internal and external appeals processes.

# Aligning the Approach to Coverage Denials with the Act

## The IFR's Approach to Coverage Denials Will Perpetuate Surprise Billing

- Payers deny more than approximately 50 percent of claims for nonparticipating air ambulance services on coverage grounds.

- Yet, AAMS members report that approximately 90 percent of those denials are later overturned on appeal.

- This means that patients must appeal more than 45 - 55 percent of all claims for nonparticipating air ambulance services to obtain the payments to which they were always entitled.

**This approach is self-defeating and does not reflect Congressional intent. Air ambulance services should qualify as essential health benefits in emergency situations.**

8

# Ensuring Equal Weighting of Factors in IDR

**Congress Established a List of Factors that IDR Entities Must Consider and it Did Not Assign Any One Factor Greater Weight**

- In selecting the final payment amount, Congress requires IDR entities to consider a range of factors, including: the QPA, acuity of the patient, ambulance vehicle type, and demonstrations of good faith to enter network contracts, among other elements.

- There is no evidence that Congress intended to give the QPA greater weight. If Congress had wanted the QPA to be the primary consideration in IDR, it could have specified that preference.

- U.S. Senators and Representatives have clearly expressed their intent for factors to be weighed equally, stating that **no single piece of information should be considered the default**.

AAMS

9

# Encouraging Transparency in IDR

## Parties Should Have Additional Time to Respond to New Information Presented in IDR

- Information disclosed in open negotiations should be admissible in IDR, and the parties should share their submissions with the IDR entity.

- The Act imposes a 10-day deadline for parties to submit claims and supporting information to the IDR entity.

- This timeline may be adjusted for "**extenuating circumstances**." This should include the presentation of new information that was not disclosed in negotiations.

- The receiving party should have at least 5 days to respond to the information.



10

# Encouraging Fairness in IDR

**Parties Should Have the Right to Batch Claims to the Fullest Extent Possible, and Access IDR Without Delay**

- The Departments should liberally construe terms such as "the same provider or facility" to maximize batching, and allow batching for periods of up to 180 days.

- The Departments should not delay the availability of IDR past the effective date of the statutory ban on balance billing.

- A delay would contravene the text and structure of the Act and would not be a valid exercise of enforcement discretion.

AAMS

11