# Exhibit 4

**Board of Directors**

**Deborah Boudreaux, MSN, RN, CCRN, C-NPT, LP, CMTE**
**Chair and Region IV Director**
Teddy Bear Transport

**Susan Rivers, RN, BSN, MBA, CMTE**
**Secretary and Region VI Director**
Carilion Clinic Life-Guard

**Rene Borghese, MSN, RN, CMTE**
**Director-At-Large**
Duke Life Flight

**Frankie Toon, RN, CFRN, CMTE, MBA, MSN**
**Treasurer and Director-At-Large**
AirMed

**Douglas Garretson**
**Immediate Past Chair**
STAT MedEvac

**Dustin Windle, RN, CMTE**
**Region II Director**
Guardian Air Transport

**Kolby L. Kolbet RN, MSN, CFRN**
**Region III Director**
Life Link III

**Anthony Pellicone**
**Region V Director**
Northwell Health/ Southside Hospital

**Russell MacDonald, MD, MPH, FRCPC**
**Region VII Director**
Ornge

**Graeme Field**
**Region VIII Director**
NSW Air Ambulance Service

**James Houser MSN, APRN, FNP-C, NRP, CFRN**
**Director-At-Large**
STAT MedEvac

**Guy Barber**
**Director-At-Large**
Air Methods Corporation

**Edward Eroe, LFACHE, CAE, CMTE**
**Public Member**

**Denise Treadwell, CRNP, MSN, CFRN, CEN, CMTE**
**CAMTS Representative**
AirMed International, LLC

**Cameron Curtis, CMM, CAE**
**President and CEO**
Association of Air Medical Services

ASSOCIATION OF AIR MEDICAL SERVICES 

September 7, 2021

The Honorable Xavier Becerra
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

The Honorable Martin Walsh
Secretary
U.S. Department of Labor
200 Constitution Ave N.W.
Washington, DC 20210

The Honorable Janet Yellen
Secretary
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, DC 20220

Dear Secretaries Becerra, Walsh and Yellen:

I write to offer the views of the Association of Air Medical Services (AAMS) on the tri-departmental Interim Final Rule ("IFR"), *Requirements Related to Surprise Billing; Part I*, as prescribed by the No Surprises Act, Pub. L. No. 116-260 (2020) (the "Act"). AAMS is the international trade association that represents over 93 percent of air ambulance providers in the U.S. Together, our 300 members operate more than 1,000 helicopter air ambulances and 200 fixed wing air ambulance services across the United States. AAMS represents every emergency air ambulance care model, including aircraft based at hospitals, independent aircraft at bases in rural areas far from hospitals, and many hybrid variations.

AAMS strongly supports the goal of the Act, which is removing patients from payment negotiations between healthcare providers and payers, through an independent dispute resolution process ("IDR"), while maintaining patient cost sharing at reasonable levels. We believe the implementation of the Act will succeed if air ambulance providers, payers, and IDR entities receive the information they need to resolve payment questions efficiently and fairly. It is critical that this IFR and the upcoming tri-departmental rulemakings promote transparent disclosures of air ambulance cost information, in-

network rate information, and out-of-network payment information.

Fair payments that cover the costs of delivering air ambulance services will help ensure that air ambulances can continue to sustain operations in rural and underserved areas and preserve the emergency medical system that saves American lives every day. The preservation of the emergency medical system is especially important to Americans in underserved and rural communities who lack access to definitive care, e.g., trauma centers and other tertiary care providers.

We look forward to working with the Departments to help the Administration advance the purposes of the Act and promote health equity. We appreciate the opportunity to provide comments on the IFR and offer views on this first rulemaking, as well as considerations we believe the Departments should take into account as you develop the forthcoming rulemaking focused on the IDR process.  In this comment letter, we first address language in IFR Part I that misapprehends current market conditions and the ambulance industry's relationship to the insurance industry.  Then we share our perspectives on three core issues: fixing the Qualifying Payment Amount ("QPA") methodology, aligning the Departments' approach to coverage denials in the IFR with the Act, and encouraging transparency in IDR.

**I. The Departments Should Align Their Prior Statements with Historical Market Conditions**

We understand the Departments are interested in removing patients from payer-provider payment discussions, and we believe that is best accomplished when plans and issuers make fair and efficient payments to air ambulance providers.  We were disheartened to see language in the IFR that misapprehends the historical market conditions and relationship that air ambulance providers share with plans and issuers. AAMS rejects the suggestions in the preamble and economic analysis that air ambulance providers stay out-of-network as a business strategy for maximizing revenues or profits and engage in aggressive collection practices. The experience of AAMS members is the exact opposite. Our members regularly seek in-network agreements with plans and issuers, and succeed in securing such agreements in some cases. But they also struggle mightily to reach network agreements with certain plans and issuers due to the market dominance and business strategies of those payers.  AAMS members cannot establish network agreements with payers who express no interest in reaching such agreements nor can our members enter agreements that are financially unsustainable.

We attribute the experience of AAMS members to a variety of factors unique to the market for air ambulance services.  To deliver the services, air ambulance providers must incur substantial fixed costs for specialized aircraft, airbases, equipment and highly skilled aviation and medical professionals.  All helicopter and many fixed-wing air ambulance transports are emergent and almost always unscheduled, and all emergency air ambulance flights must be requested by a physician or trained first-responder.  In rural areas, the services are critical to saving lives but the number of flights may be lower and even less predictable than in more populated areas.  None of these factors align with the volume discounting model employed by plans and issuers, and so it should come as little surprise that dominant payers have foregone network contracting.

The Departments should align their statements in IFR Part II with historical market conditions, or

at least acknowledge the good-faith, fact-based disagreement that AAMS members have with the insurance industry about those conditions. Our members work tirelessly to reach in-network agreements that adequately cover the cost of services and it is incorrect to state that air ambulance providers are staying out-of-network as a business tactic. AAMS believes that a misunderstanding of historical market conditions and the business practices of providers and payers has skewed policy toward the QPA methodology and other aspects of IFR Part I.  That misunderstanding should be corrected.

**II. The Departments Should Fix the QPA Methodology, which is Fundamentally Flawed**

The QPA methodology in IFR Part I will have unintended consequences for access to emergency air ambulance services, especially in rural America.  We view the QPA as a tool for holding patient cost sharing to reasonable levels, particularly in emergency situations, and not as a final rate-setting mechanism. The QPA, however, factors into the selection of the final payment amount in IDR, and other commenters have asked the Departments to put a thumb on the scale by ordering IDR entities to give primary weight to the QPA.  The conversion of IDR into a rubber stamp for the QPA would be awful policy because the QPA methodology in IFR Part I will already produce QPAs that are below fair and reasonable payment amounts for air ambulance services, and therefore threaten the economic viability of air ambulance providers.  If air ambulance providers have no meaningful recourse in the IDR process, and must accept QPAs as final, then they will be forced to exit the market and patients will lose access to their critical services.  We discuss the fundamental flaws in the current QPA methodology below.

***The QPA Methodology Lumps Dissimilar Air Ambulance Providers Together***: Under IFR Part I, the median contract rate for the QPA turns on the rates for the "same or similar item or service" rendered by a provider in the same or similar specialty in the geographic region.  In their definition of "same or similar item or service," the Departments failed to draw critical distinctions between those that bill for services through a hospital system and those that do not, emergency rotor-wing and emergency and non-emergency fixed wing providers, and active and shuttered providers.  Each of these distinctions can drive the costs of delivering the service, as well as the rate negotiated between the provider and the plan or issuer.  Yet the Departments lumped all of the arrangements together to derive one median amount, which is an inherently unreliable methodology.

For example, a hospital system that contracts with an air ambulance provider may enter into an agreement with a plan or issuer based on the full range of hospital services, including rates for air ambulance services that the hospital system no longer offers or hopes to offer in the future. These rates may be far below market rates and may be included in the final contract without any negotiation because the hospital system will never seek payment for the air ambulance services and, therefore, has no incentive to negotiate an adequate amount.

In contrast, providers of air ambulance services who only bill for those services must ensure that rates with plans and issuers are sufficient to maintain services in a community. Otherwise, they cannot cover their costs.  It is not credible for the Departments to treat independent rates negotiated at arm's length the same as below-market, phantom rates that are accepted by hospital systems because they will never be charged to plans or issuers.

3

The Departments acknowledge legitimate differences between contracting arrangements elsewhere in IFR Part I. Notably, the Departments recognize that standalone emergency departments may have a different relationship to plans and issuers when compared to emergency departments that bill through a hospital system.[1] The Departments should similarly recognize the distinctions between air ambulance contracting arrangements.

**The QPA Methodology Arbitrarily Excludes Relevant Data**: The QPA methodology excludes a wide range of contracts that make up the market today and, instead, focuses on only a small portion of payment arrangements. The QPA methodology excludes, for example, historic out-of-network payments, letters of agreement, arrangements used to supplement a payer's network, incentive-based and retrospective arrangements, and single case agreements ("SCAs").  Given these broad exclusions, the methodology will not produce QPAs that reflect how payers and providers have historically resolved payment disputes at arm's length, nor will the methodology measure of the cost of services.  Rather, the QPA will capture the small number of in-network arrangements that payers and providers negotiated at arm's length, together with arrangements that were accepted without vigorous negotiation (including, for example, the hospital system contracts described above).  Instead of using complete and robust data to build a bridge to fair and sustainable payments, the QPA will have the unintended consequence of exacerbating the historical market conditions that prompted Congress to pass the Act in the first place.

The inclusion of all relevant contractual arrangements is important because no reliable database exists to determine a median contracted rate for air ambulance services in the case of "insufficient information."  There is no existing database that contains a representative number of the air ambulance transports in a given state.  Nor is there an existing database that distinguishes between emergency and non-emergency transports.  At this juncture, the only viable pathway for generating a fair and reliable QPA is to include all relevant contractual arrangements in the QPA methodology.  Going forward, AAMS is interested in creating a database and welcomes the opportunity to partner with the Departments in establishing one.

**Census Divisions Will Produce Absurd Results**:  If there is an insufficient number of contracted rates at the state level to determine a median contracted rate, then IFR Part I requires the determination of the QPA using all metropolitan statistical areas ("MSAs") in a Census division or all other areas in the Census division. Given the unique nature of air ambulance services, this means that a rate from Hawaii or Alaska may dictate the QPA for a pick-up in California. We do not believe this is what Congress envisioned when it tied payment rates to geography. The features of one geographically and economically unique market should not dictate payments in another completely different market. There are better approaches—such as including SCAs and historic payment rates in the QPA methodology—that do not mix payment rates established in markets that are thousands of miles, and in some instances oceans apart.

---

[1] 86 *Fed. Reg.* 36,872, 36,892 (July 13, 2021) ("[W]here a plan or issuer has established contracts with both hospital emergency departments and independent freestanding emergency departments, and its contracts vary the payment rate based on the facility type, the median contracted rate is to be calculated separately for each facility type. The Departments are of the view that this approach will maintain the ability of plans and issuers to develop QPAs that are appropriate to the different types of emergency facilities specified by statute.")

4

In sum, the final QPA methodology should: (1) differentiate between air ambulance provider types, (2) include SCAs in the definition of "contracted rate" and consider historical payment information, and (3) remove Census divisions from the geographic region definition. Together, these changes might produce QPAs that more closely approximate fair market rates and might better sustain access to air ambulance services.

***The Departments Should Mitigate the Unintended Consequences of the QPA***: Regardless of whether the Departments elect to address flaws in the QPA methodology, the Departments should, at a very minimum, include provisions in the Part II rule to mitigate the unintended consequences of the QPA methodology. As a first step, they should require payers to disclose information about the limitations of the QPA to providers. The information should include: the number of contracts used to calculate the QPA; the rates, types of air ambulance providers, and volumes of claims in the QPA; out-of-network volume and payment amounts; volume and payment amounts for all other arrangements (e.g., SCAs); and a description of each contract omitted from the QPA methodology and the reasons for the omission. Disclosure of this information will allow providers to assess whether payers' calculations were performed correctly and will better equip both parties to evaluate the reasonableness of their positions. If providers have confidence that the calculations were correct and that the median is based on a sufficient number of contracts and is reasonable, then the likelihood of settlement will increase, and the resort to IDR will decrease. Such disclosures will align with the Departments' goal of promoting greater cost transparency and could go a long way in reducing the number of disputes that enter IDR, which is good for patients, providers, and payers alike.

In addition, the Departments should instruct IDR entities to give the QPA no presumptive or special weight in the IDR process. IDR entities should evaluate payments to air ambulance providers with an open mind and the benefit of payer disclosures on the limitations of the QPA. If the QPA methodology is finalized in its current form, it will not be reliable for any purpose besides calculating patient cost sharing. The IDR entity should have an understanding of these limitations and should be able to consider the QPA in context.

**III. The Departments Should Align Their Approach to Coverage Denials with the Act**

The Act establishes that payers must issue an initial payment or notice of denial of payment within 30 days of receiving the information necessary to make a claim determination. However, the Departments state in the IFR that the term "notice of denial of payment" does not include a notice of benefit denial due to an adverse benefit determination ("ABD"). The Departments note that there is supposedly a "significant distinction" between an ABD (which may be disputed through the appeals processes), and a denial of payment or initial payment that is less than the billed amount (which may be disputed through IDR).

We believe the Departments have misinterpreted the Act and that IFR Part I effectively enables payers to exempt claims from the IDR process and the ban on surprise billing by denying the claims on coverage grounds (e.g., medical necessity). In these instances, the payer will neither send an initial payment or notice of denial of payment to the provider, and the provider will never reach the IDR process. The provider instead sends a surprise bill to the patient, who may appeal the payer's ABD through the payer's internal and external appeals processes.

The process under IFR Part I is inconsistent with the text and structure of the Act. Section 105(a)(1) of the Act says that if a participant, beneficiary, or enrollee receives air ambulance services from a nonparticipating provider, and the individual's plan or coverage covers "such services" when rendered by a participating provider, then the group health plan or health insurance issuer must send an initial payment or notice of denial of payment to the provider not later than 30 calendar days after the nonparticipating provider transmits the bill for "such services." The plan's or issuer's obligation attaches if the plan or coverage covers at least some services in the general class of air ambulance services, in at least some circumstances. If the plan or coverage excludes all participating air ambulance services, only then is the plan or issuer relieved from the obligation to send an initial payment or notice of denial of payment. Absent an unusual situation, where the plan or coverage excludes all participating air ambulance services, the Act gives payers a binary choice: issue a payment or issue a notice of denial of payment. The Act does not provide for a third option nor does it draw a distinction between the types of notices of denial that are subject to the Act.

The IFR Part I approach is self-defeating on its face because it necessarily perpetuates the practice of surprise billing. Under IFR Part I, providers render emergency care only for a payer to later determine that the care was unnecessary and deny coverage. Providers left with unreimbursed services may then bill a patient, or otherwise risk financial harm, and the patient receives no protection under the Act. Congress passed a law to end surprise billing, and plainly did not intend for surprise billing to continue in the matter allowed by IFR Part I.

Based on our experience, the unintended consequences of the IFR will be stark. Payers deny more than 50 percent of claims for nonparticipating air ambulance services on coverage grounds. Yet, our members typically tell us that approximately 90 percent of those denials are later overturned on appeal, which means that patients must appeal 45 – 55% percent of all claims for nonparticipating air ambulance services to obtain the payments to which they were always entitled. The practice of denying nonparticipating air ambulance claims initially and then providing coverage following appeal is rampant. This practice has the effect of stalling payments for services, and the finalization of IFR Part I would only perpetuate this practice. IFR Part I would maintain the status quo by keeping patients in the middle of more than 50 percent of air ambulance payment disputes. We do not believe that Congress or the Departments intend for this result.

The Departments should align the final Part I rule with the text and structure of the Act, and include coverage denials (including medical necessity denials) in the regulatory definition of "notice of denial of payment." Alternatively, the Departments should use the Part II rulemaking to require payers to cover all emergency air ambulance services as essential health benefits whenever they qualify as emergency services rendered in connection with an emergency medical condition under the "prudent layperson" standard. The application of the "prudent layperson" standard during the initial claims adjudication would greatly reduce the number of coverage denials.

6

### IV. The Departments Should Encourage Transparency by Authorizing Responses in IDR, and Reject Restrictions That Would Render IDR a Rubber Stamp for the QPA

The Departments should make the information that the parties disclose to one another in open negotiations admissible in IDR, require the parties to share their submissions to the IDR entity with one another, and make clear that the only mandatory exemptions of those materials from public disclosure are the ones established by the Freedom of Information Act (FOIA). Anything less than maximum transparency in the IDR process will enable parties to game the IDR system by withholding information from both the IDR entity and the public that is material to the decision-making process and integral to a fair resolution on the merits.

Fairness also requires an opportunity to respond to new information that a party withheld during open negotiations, and disclosed for the first time in its submission to the IDR entity. The Act imposes a 10-day statutory deadline for both sides to submit claims and supporting information to the IDR entity. But the Act authorizes the Secretary to modify that deadline for "extenuating circumstances." The Departments should include a provision in the Part II rule that defines "extenuating circumstances" to include a submitting party's presentation of information that was not disclosed during open negotiations, and that requires the IDR entity to grant the receiving party at least 5 days to respond to such information. A procedural right to respond to new information will encourage transparency during open negotiations and prevent unfair surprise.

The Departments should approach the batching of claims and management of the IDR entities in a manner that is consistent with policies underlying the Federal Rules of Civil Procedure. The Federal Rules facilitate the joinder of parties and claims to promote judicial economy and efficiency, avoid duplicative actions, and reduce costs. The Departments should liberally construe terms such as "the same provider or facility," the "same party," and items and services "related to the treatment of a similar condition" with the aim of enabling the batching of claims to the fullest extent (and thereby reducing the number of IDR proceedings). The Departments should authorize the batching of claims for periods of up to 180 days, and the Departments should not apply any caps on the total fees payable to the IDR entity for a single proceeding, as such caps would frustrate the ability of the IDR entity to adjudicate large batches of claims at reasonable hourly rates. Such an approach would create a strong incentive for settlement of large numbers of claims during open negotiations.

Finally, and perhaps most importantly, the Departments should not delay the availability of the IDR process past the effective date of the statutory ban on balance billing. Such a delay would contravene the text or structure of the Act, and would not be a valid exercise of any type of enforcement discretion. Moreover, the lack of a functional IDR process for any period of time after the effective date of the statutory ban on balance billing would prejudice air ambulance providers because it would disrupt their cash flow and put them at an unfair and material disadvantage in any informal payment negotiations with payers. The Departments should not begin the implementation of the Act with a delay that skews the playing field in favor of payers at the expense of air ambulance providers.

Unless IDR is available concurrent with the ban on balance billing, provides for the robust and

public exchange of information between the parties and the IDR entity, and allows for liberal batching of claims, without any requirement to afford the QPA special weight, IDR will be little more than a rubber stamp for the QPA and its many flaws. All parties deserve a fairer and more transparent process that allows for consideration of all relevant information.

***

Thank you for the opportunity to provide comments on the IFR. We believe it is critical to protect patients' use of air ambulance services, both in emergency and nonemergency situations. Air ambulance services are essential to our healthcare system and there must be a reliable mechanism in place to financially support these operations. We look forward to working with the Departments as the Act is implemented and hope to serve as a resource for addressing the provisions related to air ambulance services. If you have any questions, please contact AAMS Vice President of Public Affairs Christopher Eastlee at ceastlee@aams.org.

Sincerely,

Cameron Curtis, CMM, CAE
President & CEO
Association of Air Medical Services

Deborah Boudreaux, MSN, RN, CCRN, C-NPT, LP, CMTE
Chairman and Region IV Director, AAMS
Teddy Bear Transport, Cooks Children Medical Center