# Exhibit 5

**Board of Directors**

**Deborah Boudreaux, MSN, RN, CCRN, C-NPT, LP, CMTE**
**Chair and Region IV Director**
Teddy Bear Transport

**Rene Borghese, MSN, RN, CMTE**
**Vice-Chair**
**Director-At-Large**
Duke Life Flight

**Susan Rivers, RN, BSN, MBA, CMTE**
**Secretary and Region VI Director**
Carilion Clinic Life-Guard

**Frankie Toon, RN, CFRN, CMTE, MBA, MSN**
**Treasurer and Director-At-Large**
AirMed

**Douglas Garretson**
**Immediate Past Chair**
STAT MedEvac

**Dustin Windle, RN, CMTE**
**Region II Director**
Guardian Air Transport

**Kolby L. Kolbet RN, MSN, CFRN**
**Region III Director**
Life Link III

**Anthony Pellicone**
**Region V Director**
Northwell Health/ Southside Hospital

**Russell MacDonald, MD, MPH, FRCPC**
**Region VII Director**
Ornge

**Graeme Field**
**Region VIII Director**
NSW Air Ambulance Service

**James Houser MSN, APRN, FNP-C, NRP, CFRN**
**Director-At-Large**
STAT MedEvac

**Guy Barber**
**Director-At-Large**
Air Methods Corporation

**Edward Eroe, LFACHE, CAE, CMTE**
**Public Member**

**Denise Treadwell, CRNP, MSN, CFRN, CEN, CMTE**
**CAMTS Representative**
AirMed International, LLC

**Cameron Curtis, CMM, CAE**
**President and CEO**
Association of Air Medical Services

ASSOCIATION OF AIR MEDICAL SERVICES



December 6th, 2021

The Honorable Xavier Becerra
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201

The Honorable Martin Walsh
Secretary
U.S. Department of Labor
200 Constitution Ave N.W.
Washington, DC 20210

The Honorable Janet Yellen
Secretary
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, DC 20220

Dear Secretaries Becerra, Walsh and Yellen:

I write to offer the views of the Association of Air Medical Services (AAMS) on the tri-departmental Interim Final Rule ("IFR"), *Requirements Related to Surprise Billing; Part II*, as prescribed by the No Surprises Act, Pub. L. No. 116-260 (2020) (the "Act"). AAMS is the international trade association that represents over 93 percent of air ambulance providers in the U.S. Together, our over 300 members operate nearly 1,000 helicopter air ambulances and 200 fixed wing air ambulance services across the U.S. AAMS represents every emergency air ambulance care model, including aircraft based at hospitals, independent aircraft at bases in rural areas far from hospitals, and many hybrid variations.

AAMS strongly supports the purpose of the Act, which is removing patients from payment disputes between healthcare providers and payers, through an independent dispute resolution ("IDR") process, while maintaining patient cost sharing at participating levels. However, we are gravely concerned about the negative consequences that will result from the implementation timeline, cost sharing and payment methodologies, and IDR process, as currently drafted.

We believe the IFR threatens the sustainability of air ambulance services and places traditionally underserved communities at risk of reduced access to care. The qualifying payment amount ("QPA") methodology and the Departments' presumption that the QPA is the appropriate out-of-network rate to be selected in IDR will create a race to the bottom in which existing contracts are destabilized and reimbursement drops to an unsustainable level. Instead of simply removing patients from payer-provider payment disputes, the Departments have put patients at risk by making it harder for air ambulance providers to sustain operations and deliver life-saving care. Air ambulance providers can only operate if they receive fair, adequate payments that cover the costs of delivering services. Fair payments are essential to preserving the emergency medical system that saves American lives every day.

Without adequate reimbursement, air ambulance providers may be forced to exit the market or reduce services, leaving patients in emergent situations with few options. This is not the outcome Congress intended when it passed the Act. We urge the Departments to consider the negative impacts the regulations will have on underserved communities and, instead, take a more equitable approach to ensure that access to care is possible, regardless of location.

In this comment letter, we offer several considerations that the Departments should take into account as you revise the regulation, including recommendations in the following key areas:
  I. Navigating Implementation
  II. Qualifying Payment Amount
  III. Weighting of Factors in IDR
  IV. Transparency in IDR
  V. IDR Entity Certification
  VI. Batching of Claims

\*  \*  \*

**I. Navigating Implementation**

We appreciate the ambitious timeline that Congress prescribed in the Act and the Departments' efforts to achieve those milestones to protect consumers from surprise bills. However, the IFRs involve significant, industry-wide changes to day-to-day practices that require time, resources, and careful attention to implement correctly. These changes were initiated and adopted without notice and comment. And, where we engaged with Congressional Members during the design and passage of the Act, we have not seen the intent and vision of those Members, nor our discussions, carried through in the Departments' regulations.

We believe the Departments can achieve the goal of the Act if they provide stakeholders more time to understand, test, and provide thoughtful recommendations on the policies. We have just begun to identify the barriers to implementation and are anticipating many more hurdles ahead. To that end, the Departments should engage more deeply with the air ambulance provider community, so that concerns and solutions can be openly shared and addressed.

The Departments should also exercise enforcement discretion as stakeholders work to become compliant with the new requirements, which are far-ranging and complex (e.g., data reporting,

and more). The Departments have demonstrated a willingness to exercise enforcement discretion for group health plans and issuers. They should extend comparable regulatory relief to air ambulance providers that are making good faith, reasonable efforts to implement the Act. We urge the Departments to use their enforcement discretion as the IFRs are implemented; to work with the air ambulance provider community as obstacles are identified; and to provide reasonable and timely clarification, when needed.

## II. Qualifying Payment Amount

The QPA methodology described in IFR Part I and reinforced in IFR Part II will have unintended consequences for access to emergency air ambulance services, especially in rural America. The Departments posit that the QPA is a median contracted rate that "generally reflect[s] market rates."[1] The QPA methodology, however, arbitrarily excludes from the median calculation certain types of contracts, like single case agreements and alternative payment arrangements (collectively, "SCAs"), that are commonplace in the air ambulance industry. The magnitude of the exclusion is material; AAMS members representing 236 air bases (approx. 25% of the national air bases) report that, in 2019, 38%-56% of out-of-network claims were resolved through SCAs. The result is that under the QPA methodology, the QPA does not reflect market rates.

The QPA methodology also treats all types of air ambulance providers the same – lumping together in the same category those providers that negotiate with insurers as part of a larger hospital system and those providers that negotiate independently Plus, if there is an insufficient number of contracted rates at the state level to determine a median, then IFR Part I requires the QPA to be determined using all metropolitan statistical areas ("MSAs") in a Census division or all other areas in the Census division. This means that an air ambulance provider's reimbursement may derive from amounts paid several states, or even an ocean, away.

This methodology will depress reimbursement. Congress tasked the Departments with implementing a framework that would remove patients from payment disputes and allow for the swift resolution of disagreements. Instead, the Departments have distorted the statutory framework to reduce payment on a national scale – something Congress considered and rejected. This is not a theoretical problem. We were alarmed to see a now widely-circulated letter by BlueCross BlueShield of North Carolina, which uses the QPA as a lever to immediately terminate and renegotiate provider contracts.[2] We are concerned that this is only the start of contract terminations and that, in straying from Congress's intent, the Departments have put patient access to care at risk. As payers terminate contracts and drive reimbursement to levels at or below the administratively depressed QPA, air ambulance providers will be forced to make difficult, but necessary, business decisions. Our members simply cannot operate where expenses exceed reimbursement. This means that transports may be reduced, including in rural, underserved areas. This is not what Congress intended in implementing the Act.

---

[1] 86 *Fed. Reg.* 55,980, 56,060.
[2] *See e.g.,* J. Lagasse, *American Society of Anesthesiologists Accuses BCBSNC of Abusing No Surprises Act*, Healthcare Finance (Nov. 23, 2021). Accessible at: https://www.healthcarefinancenews.com/news/american-society-anesthesiologists-accuses-bcbs-north-carolina-abusing-no-surprises-act.

3

For these reasons and more, we ask that the Departments fix the QPA methodology and we discuss each of the fundamental flaws below.

***The QPA Methodology Arbitrarily Excludes Relevant Data***: The QPA methodology excludes contracted rates from a wide range of contracts, including SCAs, letters of agreement, arrangements used to supplement a payer's network, incentive-based and retrospective arrangements. Given these broad exclusions, the methodology will not produce QPAs that reflect all contracted rates, nor will it account for the cost of services. Rather, the QPA will reflect the comparatively smaller number of rates from in-network contracts, including contracts that were accepted without vigorous negotiation (as described below). This will exacerbate the historic market conditions that prompted the need for the Act in the first place.

Instead, all contracted rates should be included in the QPA calculation, especially since no reliable database presently exists to determine a median contracted rate for air ambulance services in the case of "insufficient information." There is no existing database that contains a representative number of the air ambulance transports in a given state. AAMS is interested in working with the Departments to create such a database. However, in the interim, the only avenue for generating a fair, reliable QPA is to include all contracted rates in the methodology.

***The QPA Methodology Should Differentiate Between Air Ambulance Provider Types***: The QPA is the median contracted rate for the "same or similar item or service" rendered by a provider in "the same or similar specialty" in the geographic region. The Departments lump all air ambulance providers into "the same or similar specialty," and fail to draw critical distinctions between those that bill for services through a hospital system and those that do not, emergency rotor-wing and emergency and non-emergency fixed wing providers, and active and shuttered providers. Each of these distinctions can drive the costs of delivering the service, as well as any contracted rate negotiated between the provider and the payer.

This is an unreliable approach because it does not account for critical differences in an entity's structure and contracting practices. For example, a hospital may enter into an agreement with a payer based on a broad range of services, including rates for air ambulance services. In some instances, a hospital may agree to rates for air ambulance services without actually offering the services. Such rates may be far below market, and may be included in the contract without any negotiation because the hospital will never seek payment.

In contrast, providers of air ambulance services who only bill for air ambulance services must ensure that rates are sufficient to maintain services. Otherwise, they cannot cover their costs. It is not rational for the Departments to treat independent rates negotiated at arm's length the same as below-market, ghost rates that are passively accepted by hospitals because they will never be charged to payers.

The Departments acknowledge legitimate differences between independent and hospital providers elsewhere in IFR Part I. Notably, the Departments recognize that standalone emergency departments may have a different relationship to payers when compared to

4

emergency departments that bill through a hospital system.[3] The Departments should similarly recognize the distinctions between air ambulance providers.

***The Use of Census Divisions Will Produce Absurd Results*:** While we appreciate the Departments' efforts to base the QPA on sufficient information, the use of Census divisions in the context of air ambulance services means that a rate from Hawaii or Alaska may dictate the QPA for a pick-up in California. We believe this approach, again, reflects a misunderstanding of the unique nature of air ambulance services. Congress tied payment rates to geography because it understood that healthcare is local or regional and that the unique features of a market varies by geography and economy. The circumstances of a rural county in Alaska should not dictate payments for services in Los Angeles, California. There are better approaches to reaching a sufficient number of rates – such as including SCAs and historic payment rates established in the same market – that do not involve comparing markets that are thousands of miles apart.

***The Departments Should Mitigate the QPA's Unintended Consequences*:** Regardless of whether the Departments address flaws in the QPA methodology, the Departments should, at a minimum, work to mitigate the unintended consequences of the methodology. As a first step, payers should be required to disclose additional information about the limitations of the QPA to providers. As drafted, payers are required to communicate very little information about the QPA to providers and there is no opportunity for providers, or the Departments, to confirm that payers have taken the necessary and correct steps to reach the final amount. The Departments have placed a significant amount of trust in payers to understand and calculate this complex sum, with hardly any oversight or checks and balances.

To promote transparency and confidence in the QPA, payers should disclose: the number of contracts used to calculate the QPA; the rates, types of air ambulance providers, and volumes of claims in the QPA; out-of-network volume and payment amounts; volume and payment amounts for all other arrangements (e.g., SCAs); and a description of each contract omitted from the QPA methodology and the reasons for the omission. Disclosure of this information will allow providers to assess whether payers' calculations were performed correctly and will better equip both parties to evaluate the reasonableness of their positions. If providers have assurance that the amount is accurate and based on a sufficient number and range of contracts, the number of claims brought to IDR will likely be reduced.

In addition, the Departments should instruct IDR entities on the limitations of the QPA. IDR entities should evaluate payments to air ambulance providers with an open mind and with a clear-eyed understanding of what the QPA does and does not represent. The IDR entity should be able to consider the QPA in context and, based on all of the circumstances Congress articulated in the statute, make a sound selection of the appropriate out-of-network rate.

---

[3] 86 *Fed. Reg.* 36,872, 36,892 (July 13, 2021) ("[W]here a plan or issuer has established contracts with both hospital emergency departments and independent freestanding emergency departments, and its contracts vary the payment rate based on the facility type, the median contracted rate is to be calculated separately for each facility type. The Departments are of the view that this approach will maintain the ability of plans and issuers to develop QPAs that are appropriate to the different types of emergency facilities specified by statute.")

5

### III. Weighting of Factors in IDR

***IDR Entities Should be Free to Weigh the Circumstances that Congress Mandated for Payment Determinations***: The Act establishes certain criteria that an IDR entity must weigh when determining which payment offer to select, including the QPA, the provider or facility's level of training, experience, and quality and outcomes measurements, and more. The IFR, however, ignores these factors and instead requires arbiters to "select the offer closest to the QPA, unless credible information presented by the parties rebuts that presumption and clearly demonstrates the QPA is materially different from the appropriate out-of-network rate [.]"[4] This approach directly conflicts with the process Congress designed.

The Act states that the IDR entity "shall consider" the list of circumstances enumerated, and the QPA is but one of those factors.[5] Congress likely designed the IDR process to consider multiple circumstances because no two patients are alike. The cost of services may vary from case to case based on the severity of the condition, the expertise of the provider/s involved, the patient's underlying conditions, and more. The presumption that the QPA is the appropriate out-of-network rate ignores these realities to the detriment of providers and their patients.

The Departments also add qualifying terms (i.e., "credible information" and "materially different") that are not included in the Act, further diminishing the relevance of the additional circumstances that Congress directed the IDR entities to consider. These qualifiers create a much higher bar for providers to meet and impose an additional step in the resolution process.

The result is that the Departments have transformed the IDR process enacted by Congress into a perfunctory rubber stamp for an administratively depressed QPA. Instead of considering all circumstances mandated by Congress, evaluating the parties' arguments, and reaching an independent conclusion, IDR entities must award the QPA in all but the most exceptional cases. This approach is inconsistent with the statute. If Congress had meant for the QPA to be the appropriate out-of-network rate, then it would have said so. Instead, Congress created an IDR in which the QPA is one of many factors that IDR entities must consider when determining the appropriate out-of-network rate.

Congress's design was to encourage payers and air ambulance providers to resolve their monetary disputes through negotiations between each other to avoid having to risk it all in an IDR determination with little guidance as to what a particular IDR entity would view as the reasonable payment amount. And, even if the parties could not reach an agreement through negotiations, final-offer dispute resolution creates strong incentives for both sides to put forth their most reasonable offer and then for the certified IDR entity to choose the one that it deems most reasonable. The need to make a reasonable offer is reinforced by the statute's obligation on the losing party to bear the costs of the IDR process.

Congress' design is effective because it offers a dispute resolution process that is *un*predictable. Despite this design, the Departments concluded that "emphasizing the QPA will allow for

---

[4] 86 *Fed. Reg.* 55,980, 55,984.
[5] Public Health Service Act (PHSA) § 2799A-2(b)(5)(C).

predictability."[6] The IFR states "[t]his certainty will encourage plans, issuers, providers, and facilities to make offers that are closer to the QPA, and to the extent another factor could support deviation from the QPA, to focus on evidence concerning that factor" and "may also encourage parties to avoid the Federal IDR process altogether and reach an agreement during the open negotiation period."[7] Therefore the express purpose of IFR Part II is to destabilize the foundation on which the dispute resolution is built and to render the process effectively meaningless. Congress created an independent dispute resolution process because it wanted an *independent* dispute resolution process, not one in which outcomes were predetermined.

The Departments should revise their regulations to align with the process Congress intended. IDR entities should have the discretion to weigh all of the circumstances mandated by Congress, consider the parties' arguments, and make independent decisions.

### IV. Transparency in IDR

***The Departments Should Encourage Transparency in IDR:*** The Departments should make the information that the parties disclose to one another in open negotiations admissible in IDR, require the parties to share their submissions to the IDR entity with one another, and make clear that the only mandatory exemptions of those materials from public disclosure are the ones established by the Freedom of Information Act ("FOIA"). Anything less than maximum transparency in the IDR process will permit parties to game the IDR system by withholding information from both the IDR entity and the public that is material to the decision-making process and integral to a fair resolution on the merits.

Fairness also requires an opportunity to respond to new information that a party withheld during open negotiations, and disclosed for the first time in its submission to the IDR entity. The Act imposes a 10-day statutory deadline for both sides to submit claims and supporting information to the IDR entity. But the Act authorizes the Secretary to modify that deadline for "extenuating circumstances." The Departments should define "extenuating circumstances" to include a submitting party's presentation of information that was not disclosed during open negotiations, and that requires the IDR entity to grant the receiving party at least 5 days to respond to such information. A procedural right to respond to new information will encourage transparency during open negotiations and prevent unfair surprise.

### V. IDR Entity Certification

***The Departments Should Require that IDR Entities Request Average Non-Contracted Paid Claims Amounts From the Parties:*** The IFR outlines a process for certifying IDR entities to ensure they carry out their responsibilities. The Act authorizes the Departments to revoke an IDR entity's certification if it demonstrates a pattern or practice of noncompliance. Separately, the Act requires the parties to submit to the IDR entity (i) an offer for a payment amount, and (ii) "such information as requested by the certified IDR entity." Together, these provisions authorize the Departments to require IDR entities to request specific information from parties in IDR as a

---

[6] 86 *Fed. Reg.* 55,980, 56,061.
[7] *Id.*

7

condition of IDR certification.

We recommend that the Departments require IDR entities to request that, with respect to a dispute regarding calendar year 2022, the provider submit the average non-contracted paid claims amount during calendar year 2019 (to be updated by an inflation factor with respect to a dispute regarding a future calendar year). This information is important because it reflects the amounts that payers were willing to offer before the Act was implemented. The information will provide the parties and the IDR entity with a more complete and transparent factual basis for assessing the dispute. The failure to request this information should result in decertification of the IDR entity.

**VI. Batching of Claims**

***The Departments Should Clarify the Definitions Associated with the Batching of Claims; Allow Air Ambulance Providers to Batch Base and Mileage Rates:*** The Act allows multiple qualified IDR dispute items and services to be considered jointly in one determination if they are: (i) furnished by the same provider or facility; (ii) payment is made by the same health plan or issuer; (iii) items or services rendered are related to the treatment of a similar condition; and (iv) items or services were furnished during the same 30-day period or an alternative period as determined by the Secretary. The IFR refines the definition of "same provider or facility" to include entities that bill with the same National Provider Identifier ("NPI") or Taxpayer Identification Number ("TIN").

However, the Act and IFR do not define "same health plan or issuer." We believe that the Departments intend to refer to a specific health plan in the market and not to a payer's parent organization, which may operate on a regional or national basis. If the Departments were to interpret the definition as applying at the parent organization level, it would create a significant backlog as every claim associated with a national payer is forced to wait out the cooling off period. This would be contrary to Congress's vision of establishing an "efficient" resolution process. We request confirmation of this understanding.

Next, the IFR adds a conflicting definition of "items or services." While the Act defines items or services as related to the treatment of a similar condition, the IFR defines items or services as "billed under the same service code, or a comparable code under a different procedural code systems [.]"[8] Service codes are defined according to CPT, HCPCS, or DRG codes. We believe that the Departments should apply the Act's broader definition, with the aim of enabling the batching of claims to the fullest extent (and thereby reducing the number of IDR proceedings).

Similarly, we request that the Departments clarify the ability to bundle air ambulance base rates and milage rates in one payment determination. Every air ambulance flight is billed with a base rate and loaded miles. Under the current structure, it is not clear whether these amounts may be batched in one resolution. It appears that payers may issue separate QPAs for the base rate and mileage and that these amounts will then the deemed separate items or services. This means that for each air transport, an air ambulance provider might need to initiate two IDR processes for: (i) base rates involving the same NPI, same payer, and in the same 30-day window; and (ii)

---

[8] 86 *Fed. Reg.* 55,980, 55,994.

milage rates involving the same NPI, same payer, and in the same 30-day window.

This approach would create tremendous inefficiencies and essentially double the IDR disputes involving air ambulance providers. Rather, the Departments should clarify that, given the nature of air ambulance services, base and mileage rates go hand-in-hand and should be considered in the same determination.

*** 

Thank you for the opportunity to provide comments on the IFR. We believe it is critical to protect patients' use of air ambulance services, both in emergency and nonemergency situations. Air ambulance services are essential to our healthcare system and there must be a reliable mechanism in place to financially support these operations. We are concerned that the IFR will have serious, unintended consequences, particularly for underserved and rural communities, and we urge the Departments to consider our recommendations. If you have any questions, please contact AAMS Vice President of Public Affairs Christopher Eastlee at ceastlee@aams.org.

Sincerely,

Cameron Curtis, CMM, CAE
President & CEO
Association of Air Medical Services

Deborah Boudreaux, MSN, RN, CCRN, C-NPT, LP, CMTE
Chairman and Region IV Director, AAMS
Teddy Bear Transport, Cooks Children Medical Center