**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASSOCIATION OF AIR MEDICAL SERVICES, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, OFFICE OF PERSONNEL MANAGEMENT, KIRAN AHUJA, LAURIE BODENHEIMER, DEPARTMENT OF LABOR, MARTIN J. WALSH, EMPLOYEE BENEFITS SECURITY ADMINISTRATION, ALI KHAWAR, DEPARTMENT OF THE TREASURY, JANET YELLEN, LILY L. BATCHELDER, INTERNAL REVENUE SERVICE, CHARLES RETTIG, AND DOUGLASS O'DONNELL, )<br><br>*Defendants*. ) | Case No.: 1:21-CV-03031-RJL |

**BRIEF OF *AMICI CURIAE* HEALTH POLICY EXPERTS
IN SUPPORT OF DEFENDANTS**

Charles Gerstein
*Counsel of Record*
Gerstein Harrow, LLP
810 7th St. NE St. 301
Washington, DC 20002
*charlie@gerstein-harrow.com*

Jamie Crooks
Fairmark Partners, LLP
1499 Massachusetts Ave., NW
Ste. 113A
Washington, DC 20005
*jamie@fairmarklaw.com*

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE ....................................................................... 1

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................ 4

ARGUMENT ...................................................................................................... 13

I.    THE IFR PART II's GUIDANCE TO IDR ENTITIES ENSURES THAT
      THE NSA FUNCTIONS IN THE MANNER CONGRESS INTENDED ...................... 13

      A.    Anchoring IDR Outcomes to the QPA Will Reduce Insurance
            Premiums While Adequately Compensating Providers, as
            Lawmakers Expected ......................................................................... 13

      B.    The Rule's Guidance to IDR Entities Ensures Decisions Are
            Predictable and Consistent, Encouraging Parties to Settle Without
            Resorting to IDR ............................................................................... 15

II.   TASKED WITH DETERMINING HOW TO CALCULATE THE QPA,
      THE DEPARTMENTS REASONABLY INTERPRETED THE
      STATUTE............................................................................................... 18

      A.    Single-Case Agreements are Not a Contract for Network
            Participation and Would Undermine the Entire Notion of a Median
            of Contracted Rates........................................................................... 19

      B.    Hospital-Based and Independent Air Ambulance Carriers Are Not
            Distinct Specialties, Nor Do Public Payers Differentiate Between
            Them ................................................................................................. 20

      C.    Relying on Geographic Regions Encompassing Areas in Multiple
            States Is Reasonable Given Practical and Market Realities................ 21

      D.    Plaintiff's Arguments Misunderstand The Inherent Nature of an
            Averaging Calculation ....................................................................... 23

III.  SEVERAL OF THE PLAINTIFF'S CLAIMS ABOUT THE IFR'S
      EFFECTS ARE INACCURATE, SUBSTANTIALLY UNDERMINING
      THEIR LEGAL CLAIMS............................................................................ 24

      A.    Contrary to Plaintiff's Claim, the QPA Is Likely Higher Than the
            Price That Would Emerge in a Well-Functioning Market................... 24

      B.    Contrary to Plaintiff's Claim, There is Little Reason to Expect the
            IFR Will Make it More Difficult for Patients to Access Air
            Ambulance Services........................................................................... 24

CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 767 (4th Cir. 2018) .......................................... 11

*Air Evac EMS, Inc. v. Sullivan*, 331 F. Supp. 3d 650, 667 ......................................................... 12

*Bailey v. Rocky Mountain Holdings*, LLC, 889 F.3d 1259, 1272 (11th Cir. 2018) ..................... 11

*EagleMed LLC v. Cox*, 868 F.3d 893, 905 (10th Cir. 2017) ......................................................... 12

*Guardian Flight LLC v. Godfread*, 991 F.3d 916, 919 (8th Cir. 2021) ........................................ 11

*Hiawatha Aviation of Rochester, Inc. v. Minn. Dep't of Health,* 389 N.W.2d 507, 509 (Minn. 1986) ................................................................................................................. 12

*Med-Trans Corp. v. Benton*, 581 F. Supp. 2d 721, 740 (E.D.N.C. 2008) ................................... 12

*PHI Air Med., LLC v. Texas Mut. Ins. Co.*, 549 S.W.3d 804, 812-16 (Tex. App. 2018) ........................................................................................................................................ 12

*Valley Med Flight v. Dwelle*, 171 F. Supp. 3d 930, 943 (D.N.D. 2016) ...................................... 12

## STATUTES

26 U.S.C. § 105, 106, 3121, 3306 ................................................................................................... 8

42 U.S.C. § 300gg-111(a)(2)(B) .................................................................................................... 21

42 U.S.C. § 300gg-111(a)(3)(E) .................................................................................................... 22

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) ............................................................................................ 18

42 U.S.C. § 300gg-112(b)(1)(A) .................................................................................................... 16

42 U.S.C. § 300gg-112(b)(5)(C)(i) .......................................................................................... 14, 15

42 U.S.C. § 300gg-112(b)(5)(C)(ii)(VI) ....................................................................................... 20

42 U.S.C. §1395m(l) ...................................................................................................................... 21

Airline Deregulation Act of 1978, Pub. L. No. 95-504 § 4(a), 92 Stat. 1707 ............................ 11

Ban Surprise Billing Act, H.R. 5800, 116th Congress (2020), *available at*
    https://perma.cc/3C4T-MJ45 ............................................................................ 13

Consumer Protections Against Surprise Medical Bills Act of 2020, H.R. 5826,
    116th Congress (2020), *available at* https://perma.cc/R4VW-LZ7D ..................................... 13

H.R. Rep. No. 116-615 (2020) .............................................................................. 16

Lower Health Care Costs Act, S. 1895, 116th Congress (2019), *available at*
    https://perma.cc/89SM-6XE8 ............................................................................ 13

No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-890
    (2020) ................................................................................................................ 1

REACH Act, H.R. 2328, 116th Congress (2019), *available at*
    https://www.congress.gov/bill/116th-congress/house-bill/2328 ............................................. 13

**RULES**

86 Fed. Reg. 36888 (Jul. 13, 2021) ....................................................................... 22

86 Fed. Reg. 36889 (July 13, 2021) ...................................................................... 20

86 Fed. Reg. 36891 (July 13, 2021) ...................................................................... 21

Requirements Related to Surprise Billing; Part I", 86 Fed. Reg. 36,872 (July 13,
    2021) ("IFR Part I) ............................................................................................ 2

Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55,980 (Oct. 7,
    2021) ("IFR Part II" ......................................................................................... 2

**REGULATIONS**

Medicare Program. Fee schedule for payment of ambulance services, 67 Fed.
    Reg. 9100 (February 27, 2002) ......................................................................... 21

**OTHER AUTHORITIES**

Andrew-Paul Deeb et al., *Geospatial assessment of helicopter emergency medical
    service overtriage*, 91 J. Trauma Acute Care Surgery 178 (2021), *available at*
    https://perma.cc/Y9HF-9UJ9 ....................................................................... 10, 11

Brian H. Cheung, M Kit Delgado, Kristan L. Staudenmayer, *Patient and trauma center characteristics associated with helicopter emergency medical services transport for patients with minor injuries in the United States,* 21 Academic Emergency Med. 1232 (2014), *available at* https://perma.cc/F8ED-3QXB............................ 10

Bryan E. Bledsoe et al., *Helicopter Scene Transport of Trauma Patients with Nonlife-Threatening Injuries: A Meta-Analysis,* 60 J. Trauma 1257 (2006), *available at* https://perma.cc/M4QT-LLRU .......................................................... 10

Camille L. Stewart et al., *Helicopter versus ground emergency medical services for the transportation of traumatically injured children*, 50 J. Pediatric Surgery 347 (2015), *available at* https://perma.cc/H284-FKYR............................................. 10

Carl M. Stevens, *Is Compulsory Arbitration Compatible With Bargaining?*, Indus. Relations (Feb. 1966), *available at* https://perma.cc/8FHK-JMGW ...................... 16

Christopher Garmon & Benjamin Chartock, *One in Five Inpatient Emergency Department Cases May Lead to Surprise Bills*, Health Affairs (Jan. 2017), *available at* https://perma.cc/4C8T-WHLC ................................................................. 4

Christopher Gilliam et al., *Characteristics of scene trauma patients discharged within 24-hours of air medical transport*, 10 Int'l J. Critical Illness & Injury Sci. 25 (2020), *available at* https://perma.cc/LVY8-BSZB.................................... 10

Clayton H. Shatney et al., *The Utility of Helicopter Transport of Trauma Patients from the Injury Scene in an Urban Trauma System,* 53 J. Trauma 817 (2002), *available at* https://perma.cc/7JC8-9LXF ...................................................... 10

Comm. Energy & Com., Markup of H.R. 3375 et. al. H.R. Comm. Rep. (July 17, 2019), *available at* https://perma.cc/5ANC-VJLL.................................................. 16

Daniel Arnold & Christopher Whaley, *Who Pays for Health Care Costs? The Effects of Health Care Prices on Wages*, RAND Corporation (2020), *available at* https://perma.cc/AVV8-HD33 ...................................................................... 8

Dylan Scott, *Congress wants to stop surprise medical bills. But they have one big problem left to solve.*, Vox.com (May 23, 2019), *available at* https://perma.cc/BBA4-YLVL ...................................................................... 13

Eileen M. Bulger et al., *Impact of prehospital mode of transport after severe injury: a multicenter evaluation from the Resuscitation Outcomes Consortium*, 72 J. Trauma Acute Care Surgery 567 (2012), *available at* https://perma.cc/39HR-D86Y ........................................................... 10, 11

iv

Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Aff. Blog (Mar. 26, 2021), *available at https://perma.cc/59RS-BJPA* ...................6, 22

Erin C. Fuse Brown et al., *What States Can Do to Address Out-of-Network Air Ambulance Bills*, 48 J. L. Med. Ethics 462 (2020), *available at* https://perma.cc/36KP-EMSC ...................................................................................... 11

Erin C. Fuse Brown, et al., *Out-of-Network Air Ambulance Bills: Prevalence and Magnitude, and Policy Solutions*, 98 Milbank Q. 747, 748 (2020), *available at* https://perma.cc/L3G7-LSSZ ...................................................................................... passim

Erin L. Duffy et al., *Policies to Address Surprise Billing Can Affect Health Insurance Premiums*, 26 Am. J. Managed Care 9 (Sept. 11, 2020), *available at* https://perma.cc/9UD7-FA4R ..................................................................................... 8

Estimate for Divisions O through FF, H.R. 133, Consolidated Appropriations Act, 2021, Cong. Budg. Off. (Jan. 14, 2021), *available at* https://perma.cc/W4VG-PLJ3.................................................................................................................................. 15

FAIR Health, *Air Ambulance Services in the United States: A Study of Private and Medicare Claims* (Sept. 28, 2021), *available at* https://perma.cc/HA34-XAYD ..................................................................................................................... 7, 11

Gary A. Vercruysse et al., *Overuse of Helicopter Transport in the Minimally Injured*, 78 J. Trauma Acute Care Surgery 510 (2015), *available at* https://perma.cc/UT2A-KML6................................................................................... 10

Ge Bai et al., *Air Ambulances With Sky-High Charges*, 38 Health Aff. 1195, 1195 (2018), *available at* https://perma.cc/R7M6-DF55................................................... 6

H.R. 2328, Reauthorizing and Extending America's Community Health Act, Cong. Budget Off. (Sept. 18, 2019), *available at* https://perma.cc/8VXK-EM8L ................. 14

H.R. 5800, the Ban Surprise Billing Act, as ordered reported by the House Committee on Education and Labor on February 11, 2020, Cong. Budg. Off. (Feb. 13, 2020), *available at* https://perma.cc/XA2A-6HT7 .................................................. 14

H.R. 5826, the Consumer Protections Against Surprise Medical Bills Act of 2020, as introduced on February 11, 2020, Cong. Budget Off. (Feb. 11, 2020), *available at* https://perma.cc/US9F-A5W8 ........................................................................... 14

Henry S. Farber & Harry C. Katz, *Interest Arbitration, Outcomes, and the Incentive to Bargain*, 33 ILR Rev. (Oct. 1979), *available at* https://perma.cc/9NQU-APV8 ..................................................................................... 16

John Hargraves and Aaron Bloschichak, *Air Ambulances- 10 Year Trends in Costs and Use*, Health Care Cost Inst., (Nov. 7, 2019), *available at* https://perma.cc/AQ4U-JRVS ............................................................................... 6, 7

Jonathan T. Kolstad & Amanda E. Kowalski, *Mandate-based health reform and the labor market: Evidence from the Massachusetts reform*, 47 J. Health Econ. 81 (May 2016), *available at* https://perma.cc/6ADQ-PNFG .......................................... 8

Joshua J. Shaw et al., *It's All About Location, Location, Location: A New Perspective on Trauma Transport*, 263 Annals Surgery 413 (2016), *available at* https://perma.cc/7SN8-FU78 ................................................................................. 10, 11

Karan R. Chhabra et al., *Are Air Ambulances Truly Flying Out of Reach? Surprise Billing Policy and The Airline Deregulation Act*, Health Affairs Forefront (Oct. 17, 2019), *available at* https://perma.cc/A8H3-ZQ6A ........................................... 11

Karan R. Chhabra et al., *Most Patients Undergoing Ground and Air Ambulance Transportation Receive Sizable Out-of-Network Bills*, 39 Health Aff. 777, 781 (2020), available at https://perma.cc/4K4G-UDKH. .................................... 2, 5, 6, 9

Katherine Baicker & Amitabh Chandra, *The Labor Market Effects of Rising Health Insurance Premiums*, 24 J. Labor Econ. 3 (2006), *available at* https://perma.cc/FCX5-W9DH ........................................................................... 8

Kevin Schulman et al., *Stop Outrageous Air Ambulance Bills by Disclosing the Transport Price*, BAHM Alliance (Jan. 10, 2019), *available at* https://perma.cc/QH9S-5SSP ........................................................................... 9

Loren Adler et al., *High Air Ambulance Charges Concentrated in Private Equity-Owned Carriers*, USC-Brookings Schaeffer on Health Policy (Oct. 13, 2020), *available at* https://perma.cc/YLP6-SZ92........................................................... 6, 8

Loren Adler et al., *Private equity-owned air ambulances receive higher payments, generate larger and more frequent surprise bills*, Brookings (Nov. 16, 2021), *available at* https://perma.cc/PPW6-Q9M5 .................................................... 8, 25

Maria Michailidou et al., *Helicopter Overtriage in Pediatric Trauma*, 49 J. Pediatric Surgery 1673 (2014), *available at* https://perma.cc/5Q2D-66DM .......................... 10

MedPAC, \Report to the Congress: Medicare Payment Policy" (Mar. 2021), *available at* https://perma.cc/S9AD-7E4 ........................................................ 7, 21

Melanie K. Rose et al., *Is helicopter evacuation effective in rural trauma transport?,* 78 Am. Surgeon 794 (2012), *available at* https://perma.cc/KZ8K-Z3NB ................................................................................................................ 10

Michael T. Meyer et al., *Helicopter Interfacility Transport of Pediatric Trauma Patients: Are We Overutilizing a Costly Resource?,* 80 J. Trauma Acute Care Surgery 313, 313 (2016), *available at* https://perma.cc/Y8BF-B3BY ................... 11

Peep Talving et al., *Helicopter evacuation of trauma victims in Los Angeles: does it improve survival?,* 33 World J. Surgery 2469 (2009), *available at* https://perma.cc/TH39-EHU8 ........................................................................... 10

Press Release, House Committee on Energy & Commerce, Congressional Committee Leaders Announce Surprise Billing Agreement (Dec. 11, 2020), available at https://perma.cc/362S-96SU ..................................................... 15

Press Release, Ways and Means Comm., Neal and Brady Release Legislative Text of Surprise Medical Billing Proposal (Feb. 7, 2020), *available at* https://perma.cc/6FWA-42SR ............................................................................. 16

Rep. Frank Pallone Jr., Opening Statement, Hearing on "No More Surprises: Protecting Patients from Surprise Medical Bills," Comm. Energy and Commerce (June 12, 2019), *available at* https://perma.cc/564H-AR44; Report to Accompany H.R. 5800 (Dec. 2, 2020) (submitted by Rep. Scott, D-VA), *available at* https://perma.cc/8JB4-H7EM ............................................................. 13

S. 1895, Lower Health Care Costs Act, Cong. Budget Off. (July 16, 2019), *available at* https://perma.cc/LBR2-FUCM ...................................................... 14

Sarah Kliff, *A $52,112 Air Ambulance Ride: Coronavirus Patients Battle Surprise Bills*, N.Y. Times (Oct. 13, 2020), *available at* https://perma.cc/RT5H-STF3 ...................... 12

SriGita Krishna Madiraju et al., *In by helicopter out by cab: the financial cost of aeromedical overtriage of trauma patients*, 218 J. Surgical Res. 261 (2017), *available at* https://perma.cc/X2BY-6ZJH ............................................................ 10

Symeon Missios & Kimon Bekelis, *Transport mode to level I and II trauma centers and survival of pediatric patients with traumatic brain injury*, 31 J. Neurotrauma 1321 (2014), *available at* https://perma.cc/77CY-8ZC8 .................... 10

U.S. Gov't Accountability Office, *Air Ambulance: Data Collection and Transparency Needed to Enhance DOT Oversight*, GAO-17-637 (July 2017), *available at* https://perma.cc/GP7E-NMZ2 ........................................................................... 6, 9

U.S. Gov't Accountability Office, *GAO-19-292: Air ambulance: available data show privately-insured patients are at financial risk* 13-14 (Mar. 20, 2019), *available at* https://perma.cc/82BU-UG6C ............................................................... 5

Zack Cooper & Fiona Scott Morton, *Out-of-Network Emergency-Physician Bills — An Unwelcome Surprise*, 375 N. England J. Med. 1915 (2016), *available at* https://perma.cc/2ATG-FSPP ........................................................................... 4

Zack Cooper et al., *Hospital Prices Grew Substantially Faster Than Physician Prices For Hospital-Based Care In 2007–14*, 38 Health Aff. 2 (Feb. 2019), *available at* https://perma.cc/ELL4-WESJ ............................................................... 7

Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. of Political Econ. 9 (Sept. 2020), *available at* https://perma.cc/5AHP-L6EK ...................................................................... 7

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* are nineteen scholars who conduct research in health care economics and health care policy, with particular focuses on surprise billing and air ambulances. The Appendix lists the titles and affiliations of each individual. This brief applies current research and economic principles, as well as *amici*'s knowledge of the Congressional debate that led to the No Surprises Act, to address the issues before the Court in this case. Based on their expertise and other publicly available information discussed herein, *amici* believe that the implementing regulations will generate outcomes consistent with Congressional intent and with the law's text, structure, and purpose. They also believe that the Plaintiff's brief makes factual claims that are at odds with the best available evidence. *Amici* submit this brief to aid the Court's consideration of this important issue.[2]

## INTRODUCTION

Before the No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-890 (2020) ("NSA"), went into effect January 1, 2022, surprise bills—instances where patients are billed by out-of-network health care providers who they had no meaningful role in choosing—were a pervasive problem. It was commonplace for patients to receive bills for medical and air ambulance services rendered by providers outside of their payer's network, often when the patients

---

[1] *Amici* have not been retained by any party to this action. This brief was not authored in whole or in part by counsel for any party. No person other than *amici* and its counsel made a monetary contribution that was intended for the preparation or submission of this brief.

[2] Appendix A provides full list of *amici curiae* and their institutional affiliations. *Amici* make the arguments and observations herein solely in their capacity as individual experts and not on behalf of any institutions with which they are affiliated.

were not aware they had received out-of-network services in the first place.[3] These bills averaged tens of thousands of dollars, of which only a fraction were covered by patients' health insurance.[4]

Recognizing the burden this placed on patients, both directly when they received surprise bills and indirectly when providers exploited the leverage offered by the ability to surprise bill to demand higher prices that were subsequently reflected in premiums, Congress passed the NSA. The NSA limits the amount of cost-sharing that payers can impose on patients for certain out-of-network services—air ambulance services, emergency care, certain post-stabilization care, and non-emergency services provided by out-of-network providers at in-network facilities—to no more than the cost-sharing that would be imposed for in-network services. It additionally limits providers from billing patients for more than this in-network cost-sharing.

In this litigation, the Plaintiff challenges the implementing regulations that the three departments charged with implementing the NSA—Health and Human Services, Labor, and Treasury (the "Departments")—promulgated last year. The challenged interim final rules were promulgated in two parts: "Requirements Related to Surprise Billing; Part I," 86 Fed. Reg. 36,872 (July 13, 2021) ("IFR Part I") and "Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55,980 (Oct. 7, 2021) ("IFR Part II"). In the IFR Part II, the Departments provided guidance regarding how disputes over payment for out-of-network services subject to the NSA should be resolved. The NSA establishes an independent dispute resolution ("IDR") process to resolve these disputes: Each party proposes a payment to the IDR entity, which is directed to consider a historical

---

[3] For the purposes of this brief, "payers" is defined to include both insurers and employers who bear some share of the cost of their employees' health care, such as through a self-funded plan.
[4] Erin C. Fuse Brown, et al., *Out-of-Network Air Ambulance Bills: Prevalence and Magnitude, and Policy Solutions*, 98 Milbank Q. 747, 748 (2020), *available at* https://perma.cc/L3G7-LSSZ; Karan R. Chhabra et al., *Most Patients Undergoing Ground and Air Ambulance Transportation Receive Sizable Out-of-Network Bills*, 39 Health Aff. 777, 781 (2020), *available at* https://perma.cc/4K4G-UDKH.

median in-network rate for similar services—known as the qualifying payment amount ("QPA")—along with other information, and then select one of the proposals. As relevant here, the IFR Part II directs IDR entities to begin with a rebuttable presumption that the proposal closest to the QPA should be chosen, unless the parties' evidence demonstrates that a different amount is appropriate; it also provides guidance on how to interpret and apply non-QPA information. The IFR Part I provided guidance on how the QPA should be calculated for air ambulance services, including: (a) that single-case agreements with otherwise non-participating providers are not considered for purposes of calculating the median in-network contracted rate; (b) that hospital-based and independent air ambulance providers are considered part of the "same or similar specialty"; (c) that the QPA should generally be calculated based on geographic regions consisting of all metropolitan statistical areas ("MSAs") within a state or all non-MSA areas within a state; and (d) that if there is insufficient information to meaningfully calculate the QPA for air ambulance services in the base geographic region, then the geographic region will be defined to encompass either all MSAs within the applicable Census division or all other portions of the Census division.

In this brief, *amici curiae* survey the relevant economic evidence demonstrating that in creating a rebuttable presumption, the IFR Part II ensures the NSA has the effects Congress intended and implements the NSA consistent with the statute's text, structure, and purpose. Tying the IDR process to the QPA will help ensure that the premiums patients pay will remain steady or decline, one of Congress's express intentions when drafting the NSA. Moreover, the IFR Part II provides greater predictability as to the result of the IDR process, which in turn will encourage parties to settle without resorting to the IDR process in every instance, thereby lessening the administrative costs borne by the system. Second, the IFR Part I guidance for calculating the QPA in question is logical given details of the air ambulance market and consistent with the statute.

Lastly, contrary to Plaintiff's assertions, the IFRs will not result in providers receiving below-market payment for their services, nor will they result in inadequate patient access to air ambulance services. Instead, the IFRs ensure that the NSA corrects the longstanding market distortions that Congress sought to eliminate.

For these reasons, discussed in more detail below, *amici curiae* respectfully urge the Court to deny Plaintiff's motion for summary judgment.

## FACTUAL BACKGROUND

The market for air ambulance services is beset by market failures resulting in higher prices and more out-of-network services than would exist in a well-functioning market. For most medical services, patients generally seek medical care from providers that are part of their payers' contracted provider network because doing so is less costly. However, a patient can be unexpectedly treated by an out-of-network provider. This is especially the case when patients require emergency transport from providers, whom they are almost never able to choose because of the emergency.

A patient who receives out-of-network care in this manner may receive a "surprise" out-of-network bill. Normally, the payer pays some amount to the out-of-network provider, but the provider may bill the patient for the difference between the provider's charge (akin to a list price) and what the payer paid—a practice known as balance billing. Prior to the NSA, surprise billing was rampant. Studies estimate that about one in five emergency room visits resulted in a potential surprise out-of-network bill.[5]

---

[5] *See, e.g.*, Zack Cooper & Fiona Scott Morton, *Out-of-Network Emergency-Physician Bills — An Unwelcome Surprise*, 375 N. England J. Med. 1915 (2016), *available at* https://perma.cc/2ATG-FSPP; Christopher Garmon & Benjamin Chartock, *One in Five Inpatient Emergency Department Cases May Lead to Surprise Bills*, Health Affairs (Jan. 2017), *available at* https://perma.cc/4C8T-WHLC.

The problem of surprise billing was far worse in the air ambulance context. Studies estimate that between 69 and 77 percent of air ambulance transports were out-of-network, with similar proportions of out-of-network services across rotary- and fixed-wing transports.[6] After accounting for instances when the payer pays the out-of-network provider's full billed charges, patients were at risk of a potential surprise bill after 40 percent of rotary-wing air ambulance transports.[7] These bills are typically very large, with balance bills for air ambulance services averaging $19,851 in 2016-2017 and exceeding $20,000 when including patient cost-sharing.[8]

The prevalence of surprise out-of-network bills in the air ambulance context is the result of market failure. For other health services, negotiations between payers and providers are typically driven by a price/volume trade-off. By and large, to attract sufficient volume, health care providers must join insurance networks because few patients are willing to voluntarily pay for out-of-network treatment. In exchange for the higher volume that comes from being in-network, providers agree to lower rates. But the standard provider-payer negotiation model does not function properly for air ambulance services because: (1) patients have no ability to choose their provider or decline an air ambulance transport in an emergency; (2) insurers have no ability to steer patients to preferred providers; and (3) air ambulance carriers cannot choose which patients they transport when dispatched in an emergency. Moreover, air ambulance transports are relatively rare, so even with high per-transport costs, the parties may lack the incentive to invest substantial

---

[6] *See, e.g.*, Fuse Brown et al., *supra* note 4; Chhabra et al., *supra* note 4; U.S. Gov't Accountability Office. *GAO-19-292: Air ambulance: available data show privately-insured patients are at financial risk* 13-14 (Mar. 20, 2019), *available at* https://perma.cc/82BU-UG6C.
[7] *See* Fuse Brown et al., *supra* note 4.
[8] *Id.*

resources to negotiate in-network agreements and discounted rates.[9] These conditions created a lucrative out-of-network billing opportunity and revenue strategy for air ambulances.

Many air ambulance providers leveraged the out-of-network billing opportunity by unilaterally setting charges far above their actual costs and above what a third-party payer would reasonably agree to pay *ex ante*.[10] Rotary-wing air ambulances charged an average of $36,700 for a transport in 2017.[11] For an average-distance transport, one study estimates that charges averaged 6.3 times what Medicare would have paid.[12] Air ambulance bills have also risen dramatically over time. Average charges for rotary-wing transports nearly tripled from 2008 to 2017, growing on average by about 12 percent annually.[13] A similar trend is apparent for fixed-wing transports.[14]

These high and rapidly growing charges left patients responsible for exorbitant surprise out-of-network bills, the magnitude of which have grown over time.[15] Moreover, with roughly three-quarters of air ambulance transports occurring out-of-network, many plans paid carriers' inflated full charges, presumably to prevent their enrollees or employees from receiving surprise air ambulance bills the patient may blame on the plan. Research shows that for about half of out-of-network transports, the health plan paid the full amount, even when not obligated to do so.[16]

---

[9] *See* Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Aff. Blog (Mar. 26, 2021), *available at https://perma.cc/59RS-BJPA*.

[10] *See*, e.g., Ge Bai et al., *Air Ambulances With Sky-High Charges*, 38 Health Aff. 1195, 1195 (2018), *available at* https://perma.cc/R7M6-DF55; U.S. Gov't Accountability Office, *Air Ambulance: Data Collection and Transparency Needed to Enhance DOT Oversight*, GAO-17-637 (July 2017), *available at* https://perma.cc/GP7E-NMZ2.

[11] *See* John Hargraves & Aaron Bloschichak, *Air Ambulances- 10 Year Trends in Costs and Use*, Health Care Cost Inst., (Nov. 7, 2019), *available at* https://perma.cc/AQ4U-JRVS.

[12] Loren Adler et al., *High Air Ambulance Charges Concentrated in Private Equity-Owned Carriers*, USC-Brookings Schaeffer on Health Policy (Oct. 13, 2020), *available at* https://perma.cc/YLP6-SZ92.

[13] *See* Hargraves & Bloschichak, *supra* note 11.

[14] *See id*.

[15] *See* Fuse Brown et al., *supra* note 4; Chhabra et al., *supra* note 4.

[16] *See* Fuse Brown et al., *supra* note 4, at 756.

Yet even if the plan picks up the bill, the costs of the very high payments to out-of-network air ambulances are typically passed through to consumers in the form of higher premiums. Further, air ambulance providers' ability to collect substantial payment for out-of-network services (whether from the patient through surprise billing or directly from the payer) without threatening patient volume creates an incentive to remain out-of-network unless offered very high payment.

This leverage—which would not exist in a well-functioning market—also helps explain why air ambulance providers are able to extract such high *in-network* rates from payers when they do contract.[17] In 2016-2017, in-network rates for interfacility air ambulance transports averaged almost four times (369 percent) what Medicare would pay for the same services, a much higher markup than the 136 percent of Medicare rates that clinician in-network rates averaged.[18] Taken together, the average price paid for in- and out-of-network air ambulance transports by payers grew by 10.4 percent annually, on average, rising from $11,400 in 2008 to $27,900 in 2017.[19] FAIR Health estimates that average prices grew by another 61 percent between 2017 and 2020.[20] Price growth this rapid is extraordinary even in the context of American health care. Hospital prices, by comparison, grew less than half as quickly (5.1 percent annually) over a similar period.[21]

Investors took note. By 2017, two private equity firms controlled 63 percent of the air ambulance market, likely indicating that these investors perceived the chance to earn outsized

---

[17] Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. of Political Econ. 9 (Sept. 2020), *available at* https://perma.cc/5AHP-L6EK.

[18] Fuse Brown et al., *supra* note 4, at 762; MedPAC, *Report to the Congress: Medicare Payment Policy* (Mar. 2021), *available at* https://perma.cc/S9AD-7E4.

[19] Hargraves & Bloschichak, supra note 11.

[20] FAIR Health, *Air Ambulance Services in the United States: A Study of Private and Medicare Claims* (Sept. 28, 2021), *available at* https://perma.cc/HA34-XAYD.

[21] Zack Cooper et al., *Hospital Prices Grew Substantially Faster Than Physician Prices For Hospital-Based Care In 2007–14*, 38 Health Aff. 2 (Feb. 2019), *available at* https://perma.cc/ELL4-WESJ.

profits. Indeed, research suggests that both private equity-owned and publicly traded air ambulance operators were especially aggressive in capitalizing on the pronounced market failures. These air ambulance providers charged significantly higher amounts, averaging $48,250 in 2017 for an average-distance rotary-wing transport, compared to $28,800 for providers that were not publicly traded or owned by private equity.[22] Air ambulance providers owned by private equity or that are publicly traded were out-of-network much more frequently, completing 88 percent of transports out-of-network in 2017 compared to 59 percent by other operators, and generating substantially higher potential surprise bills ($26,507 vs. $15,671).[23] Private equity and publicly traded air ambulance operators also extracted payments, both in- and out-of-network, from payers nearly 60 percent higher than other operators for similar services ($32,051 vs. $20,146).[24]

Payers must set premiums to cover their claims spending, so the upward pressure on both in- and out-of-network prices created by the ability to surprise bill has historically translated into higher commercial insurance premiums.[25] Higher premiums are ultimately borne by consumers, whether directly or indirectly via reductions in wages for people enrolled in employer-sponsored plans, and by the federal government, which subsidizes nearly all commercial coverage.[26]

---

[22] Adler et al., *supra* note 12.

[23] Loren Adler et al., *Private equity-owned air ambulances receive higher payments, generate larger and more frequent surprise bills*, Brookings (Nov. 16, 2021), *available at* https://perma.cc/PPW6-Q9M5.

[24] *Id.*

[25] Erin L. Duffy et al., *Policies to Address Surprise Billing Can Affect Health Insurance Premiums*, 26 Am. J. Managed Care 9 (Sept. 11, 2020), *available at* https://perma.cc/9UD7-FA4R.

[26] *See, e.g.*, Katherine Baicker & Amitabh Chandra, *The Labor Market Effects of Rising Health Insurance Premiums*, 24 J. Labor Econ. 3 (2006), *available at* https://perma.cc/FCX5-W9DH; Daniel Arnold & Christopher Whaley, *Who Pays for Health Care Costs? The Effects of Health Care Prices on Wages*, RAND Corporation (2020), *available at* https://perma.cc/AVV8-HD33; Jonathan T. Kolstad & Amanda E. Kowalski, *Mandate-based health reform and the labor market: Evidence from the Massachusetts reform*, 47 J. Health Econ. 81 (May 2016), *available at* https://perma.cc/6ADQ-PNFG; 26 U.S.C. § 105, 106, 3121, 3306.

Air ambulance providers cite their high fixed costs as the main reason for the high prices they charge.[27] In fact, the opposite is likely true: the ability to extract ever-increasing prices has prompted these providers to increase their *costs*. Due to market dysfunctions, air ambulance companies profit from increasing the supply of vehicles and bases and simultaneously raising their charges.[28] The Government Accountability Office found that despite relatively flat demand for their services, from 2012 through 2017, the number of rotary-wing air ambulance bases increased 15 percent, from 752 to 868, and the number of fixed-wing bases increased 25 percent, from 146 to 182.[29] Nearly half of the new rotary-wing bases were in areas with existing air ambulance coverage, suggesting unnecessary duplication.[30] With demand remaining relatively flat, increasing supply in areas with existing coverage increases the cost-per-transport, which air ambulances recoup by extracting higher commercial prices from payers and patients.[31]

An increasing supply of air ambulance providers is not an unalloyed good. Although there can be a critical need for rapid transport, there is no evidence that, prior to the infusion of private equity investment, air ambulance services were seriously underprovided. Instead, as investment ramped up, numerous studies indicated that these services were being overutilized at various locations across the country. There are two types of such studies: those that evaluate how urgent a transported patient's need is, and those that compare the medical outcomes for similar sets of patients transported by air versus by ground. In the first type of study, independent researchers across a wide range of studies consistently report that over half of emergency air ambulance

---

[27] *See* Pl.'s MSJ Br. at 12.
[28] Kevin Schulman et al., *Stop Outrageous Air Ambulance Bills by Disclosing the Transport Price*, BAHM Alliance (Jan. 10, 2019), *available at* https://perma.cc/QH9S-5SSP.
[29] *See* U.S. Gov't Accountability Off., *supra* note 6; Fuse Brown et al., *supra* note 4 at 749.
[30] U.S. Gov't Accountability Off., *id*. at 15.
[31] Chhabra et al., *supra* note 4.

transports unnecessary "overtriage,"[32] or transport patients with either low-severity conditions or who were treated and released within 24 hours. In particular, a Stanford research team noted that "areas where helicopters are prevalent will more likely use them with minor injury patients."[33]

The second set of studies compares patient outcomes when transported by air versus ground. Some of this research shows a modest survival benefit for air transport, but other studies, which are methodologically rigorous, show no life-saving benefit over ground transport.[34] Of

---

[32] *See, e.g.*, Bryan E. Bledsoe et al., *Helicopter Scene Transport of Trauma Patients with Nonlife-Threatening Injuries: A Meta-Analysis,* 60 J. Trauma 1257 (2006), *available at* https://perma.cc/M4QT-LLRU; Brian H. Cheung, M Kit Delgado, Kristan L. Staudenmayer, *Patient and trauma center characteristics associated with helicopter emergency medical services transport for patients with minor injuries in the United States,* 21 Academic Emergency Med. 1232 (2014), *available at* https://perma.cc/F8ED-3QXB; Christopher Gilliam et al., *Characteristics of scene trauma patients discharged within 24-hours of air medical transport*, 10 Int'l J. Critical Illness & Injury Sci. 25 (2020), *available at* https://perma.cc/LVY8-BSZB; SriGita Krishna Madiraju et al., *In by helicopter out by cab: the financial cost of aeromedical overtriage of trauma patients*, 218 J. Surgical Res. 261 (2017), *available at* https://perma.cc/X2BY-6ZJH; Maria Michailidou et al., *Helicopter Overtriage in Pediatric Trauma*, 49 J. Pediatric Surgery 1673 (2014), *available at* https://perma.cc/5Q2D-66DM; Clayton H. Shatney et al., *The Utility of Helicopter Transport of Trauma Patients from the Injury Scene in an Urban Trauma System,* 53 J. Trauma 817 (2002), *available at* https://perma.cc/7JC8-9LXF; Gary A. Vercruysse et al., *Overuse of Helicopter Transport in the Minimally Injured*, 78 J. Trauma Acute Care Surgery 510 (2015), *available at* https://perma.cc/UT2A-KML6.

[33] *See* Cheung et al., *supra* note 32, at 1238.

[34] *See, e.g.*, Bledsoe, *supra* note 32; Eileen M. Bulger et al., *Impact of prehospital mode of transport after severe injury: a multicenter evaluation from the Resuscitation Outcomes Consortium*, 72 J. Trauma Acute Care Surgery 567 (2012), *available at* https://perma.cc/39HR-D86Y; Andrew-Paul Deeb et al., *Geospatial assessment of helicopter emergency medical service overtriage*, 91 J. Trauma Acute Care Surgery 178 (2021), *available at* https://perma.cc/Y9HF-9UJ9; Symeon Missios & Kimon Bekelis, *Transport mode to level I and II trauma centers and survival of pediatric patients with traumatic brain injury*, 31 J. Neurotrauma 1321 (2014), *available at* https://perma.cc/77CY-8ZC8; Melanie K. Rose et al., *Is helicopter evacuation effective in rural trauma transport?,* 78 Am. Surgeon 794 (2012), *available at* https://perma.cc/KZ8K-Z3NB; Joshua J. Shaw et al., *It's All About Location, Location, Location: A New Perspective on Trauma Transport*, 263 Annals Surgery 413 (2016), *available at* https://perma.cc/7SN8-FU78; Camille L. Stewart et al., *Helicopter versus ground emergency medical services for the transportation of traumatically injured children*, 50 J. Pediatric Surgery 347 (2015), *available at* https://perma.cc/H284-FKYR; Peep Talving et al., *Helicopter evacuation of trauma victims in Los Angeles: does it improve survival?*, 33 World J. Surgery 2469 (2009), *available at* https://perma.cc/TH39-EHU8.

concern, experts note that because helicopter air transport is a high-risk endeavor with a "crash rate [that] is 6,000 times that of commercial airliners,"[35] ill-advised use of this service can expose patients to unnecessary danger.[36] Thus, in the words of one respected academic research team, for many types of emergency situation there "is ongoing controversy about the relative effectiveness of air medical versus ground transportation for severely injured patients."[37]

In light of these problems, many states have made attempts to regulate the air ambulance industry, whether through rate oversight or consumer protections, but have been stymied by legal challenges from air ambulance operators citing federal preemption.[38] Courts have read the Airline Deregulation Act of 1978 (ADA) as barring any state effort to rein in air ambulance overcharging.[39] Air ambulance industry challenges have invalidated state laws to protect consumers from balance billing and the sale of dubious air ambulance membership programs,[40]

---

[35] Michael T. Meyer et al., *Helicopter Interfacility Transport of Pediatric Trauma Patients: Are We Overutilizing a Costly Resource?*, 80 J. Trauma Acute Care Surgery 313, 313 (2016), *available at* https://perma.cc/Y8BF-B3BY.

[36] *See* Deeb et al., *supra* note 34.

[37] *See* Bulger et al., *supra* note 34, at 567; *see also* Shaw et al., *supra* note 34, (noting that the "utility of helicopter transport for trauma patients has been debated widely in the literature").

[38] Karan R. Chhabra et al., *Are Air Ambulances Truly Flying Out of Reach? Surprise Billing Policy and The Airline Deregulation Act*, Health Affairs Forefront (Oct. 17, 2019), *available at* https://perma.cc/A8H3-ZQ6A; Erin C. Fuse Brown et al., *What States Can Do to Address Out-of-Network Air Ambulance Bills*, 48 J. L. Med. Ethics 462 (2020), *available at* https://perma.cc/36KP-EMSC.

[39] Airline Deregulation Act of 1978, Pub. L. No. 95-504 § 4(a), 92 Stat. 1707 (codified at 49 U.S.C. § 41713(b)(1)). The preemption provision states, "Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."

[40] *See, e.g.*, *Guardian Flight LLC v. Godfread*, 991 F.3d 916, 919 (8th Cir. 2021) (holding that North Dakota's law prohibiting air ambulance balance billing and regulating membership programs were both preempted by the ADA); *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 767 (4th Cir. 2018) (holding that state law barring balance billing by air ambulances was preempted by the ADA); *Bailey v. Rocky Mountain Holdings*, LLC, 889 F.3d 1259, 1272 (11th Cir. 2018) (same).

laws to create preferred call lists for emergency management dispatchers to direct calls to in-network air ambulance providers,[41] laws to apply state licensing or certificate of need laws to air ambulances,[42] and laws to apply state workers compensation fee schedules to air ambulance providers.[43] Thus, unlike ordinary medical services, air ambulances operate virtually free of any state regulation. Congress finally stepped into the regulatory vacuum by devoting a section of the No Surprises Act specifically to stopping surprise billing by air ambulance operators.

Air ambulances have historically been considered the most egregious example of surprise billing abuse against individual patients,[44] a problem exacerbated by private equity investors and publicly traded companies that took advantage of the market failures described here as well as the legal vacuum that left states unable to regulate the providers. Air ambulance operators have historically relied on out-of-network billing as a revenue strategy to a greater extent than other health care providers have. As a result, there are few in-network rates to draw from and those that exist are inflated well above what would occur in a well-functioning market. Congress thus

---

[41] *See Valley Med Flight v. Dwelle*, 171 F. Supp. 3d 930, 943 (D.N.D. 2016) (finding North Dakota's preferred call lists for in-network air ambulance providers were preempted by the Airline Deregulation Act).

[42] *See Med-Trans Corp. v. Benton*, 581 F. Supp. 2d 721, 740 (E.D.N.C. 2008) (invalidating North Carolina certificate of need laws for air ambulances to enter the market); *Hiawatha Aviation of Rochester, Inc. v. Minn. Dep't of Health,* 389 N.W.2d 507, 509 (Minn. 1986) (invalidating state licensure requirement for air ambulances as preempted by the ADA).

[43] *See, e.g.*, *Dwelle*, *supra* note 41 at 944-47 (finding North Dakota's air ambulance laws applying state workers compensation schedules were preempted by the Airline Deregulation Act); *EagleMed LLC v. Cox*, 868 F.3d 893, 905 (10th Cir. 2017) (same for Wyoming worker compensation statute); *Air Evac EMS, Inc. v. Sullivan*, 331 F. Supp. 3d 650, 667 (W.D. Tex. 2018) (same for Texas worker compensation statute); *PHI Air Med., LLC v. Texas Mut. Ins. Co.*, 549 S.W.3d 804, 812-16 (Tex. App. 2018) (reversed the district court's finding that the McCarran-Ferguson applied to the Texas worker compensation statute).

[44] *See, e.g.*, Sarah Kliff, *A $52,112 Air Ambulance Ride: Coronavirus Patients Battle Surprise Bills*, N.Y. Times (Oct. 13, 2020), *available at* https://perma.cc/RT5H-STF3.

understood air ambulance services were a critical sector for the NSA to stamp out harmful billing practices and correct myriad market distortions.

## ARGUMENT

### I.    THE IFR PART II's GUIDANCE TO IDR ENTITIES ENSURES THAT THE NSA FUNCTIONS IN THE MANNER CONGRESS INTENDED

#### A.    Anchoring IDR Outcomes to the QPA Will Reduce Insurance Premiums While Adequately Compensating Providers, as Lawmakers Expected

During the legislative debate, many Members of Congress stated that legislation to curtail surprise billing should reduce or at least not increase insurance premiums.[45] Every proposal advanced by House and Senate committees effected this objective by linking out-of-network payment to median contracted rates for relevant services. The proposal reported out by the Senate Committee on Health, Education, Labor, and Pensions linked out-of-network payment directly to median contracted rates.[46] Proposals reported out by the House Committee on Ways and Means, the House Committee on Energy and Commerce, and the House Committee on Education and Labor established arbitration processes to determine out-of-network payments similar to the NSA's in which a historical median contracted rate played a central role.[47]

The Congressional Budget Office (CBO) published estimates indicating that all of the committee-reported proposals would reduce premiums. According to CBO, the reduction in

---

[45] Rep. Frank Pallone Jr., Opening Statement, Hearing on "No More Surprises: Protecting Patients from Surprise Medical Bills," Comm. Energy and Commerce (June 12, 2019), *available at* https://perma.cc/564H-AR44; Report to Accompany H.R. 5800 (Dec. 2, 2020) (submitted by Rep. Scott, D-VA), *available at* https://perma.cc/8JB4-H7EM; Dylan Scott, *Congress wants to stop surprise medical bills. But they have one big problem left to solve.*, Vox.com (May 23, 2019), *available at* https://perma.cc/BBA4-YLVL.

[46] Lower Health Care Costs Act, S. 1895, 116th Congress (2019), *available at* https://perma.cc/89SM-6XE8.

[47] Consumer Protections Against Surprise Medical Bills Act of 2020, H.R. 5826, 116th Congress (2020), *available at* https://perma.cc/R4VW-LZ7D; Ban Surprise Billing Act, H.R. 5800, 116th Congress (2020), *available at* https://perma.cc/3C4T-MJ45; REACH Act, H.R. 2328, 116th Congress (2019), *available at* https://www.congress.gov/bill/116th-congress/house-bill/2328.

premiums would in turn reduce the cost to the federal government of subsidizing insurance coverage, generating estimated federal savings over a ten-year period of between $18 billion and $25 billion, depending on the specific proposal.[48]

For the committee proposals relying on arbitration, the basis of CBO's conclusion was its belief that arbitration decisions would average close to the historical median contracted rate. This in turn would drive out-of-network payments more broadly toward this median rate because payers would refuse to pay much more than the price expected to emerge from arbitration, and providers would refuse to accept much less. For similar reasons, CBO also expected that in-network rates for many providers would converge toward the historical median. CBO believed that this would reduce premiums because the historical *median* (mid-point) was not influenced by the very high prices negotiated by a minority of providers and, thus, was lower than the historical *mean*.

The NSA followed the template of the earlier proposals CBO analyzed; it created an IDR process in which historical median contracted rates, referred to in the NSA as the QPA, receive considerable emphasis. When enumerating the factors IDR entities must consider, the NSA lists the QPA first and in its own subclause, while listing all other factors together in a single subclause.[49] As noted above, the NSA also provides detailed instructions on how to calculate the QPA, and it establishes a detailed audit process.[50] By contrast, the NSA says nothing about how

---

[48] S. 1895, Lower Health Care Costs Act, Cong. Budget Off. (July 16, 2019), *available at* https://perma.cc/LBR2-FUCM; H.R. 2328, Reauthorizing and Extending America's Community Health Act, Cong. Budget Off. (Sept. 18, 2019), *available at* https://perma.cc/8VXK-EM8L; H.R. 5826, the Consumer Protections Against Surprise Medical Bills Act of 2020, as introduced on February 11, 2020, Cong. Budget Off. (Feb. 11, 2020), *available at* https://perma.cc/US9F-A5W8; H.R. 5800, the Ban Surprise Billing Act, as ordered reported by the House Committee on Education and Labor on February 11, 2020, Cong. Budg. Off. (Feb. 13, 2020), *available at* https://perma.cc/XA2A-6HT7.
[49] 42 U.S.C. § 300gg-112(b)(5)(C)(i).
[50] *Id.* § 300gg-112(b)(5).

14

to measure or apply the other factors IDR entities are directed to consider. The NSA further emphasizes the central role of the QPA in the IDR process by directing that IDR results be expressed as a percentage of the QPA when those results are reported publicly.[51]

CBO's conclusions about how the NSA would affect payments to providers, insurance premiums, and the federal budget mirrored its assessments of earlier, similar committee proposals. In its final analysis of the NSA as enacted, CBO estimated that the statute would reduce the federal deficit by $17 billion over a ten-year period.[52] As in its prior analyses, CBO expected that the NSA would reduce aggregate payments to health care providers, thereby reducing insurance premiums. The committee chairs who announced the agreement on the NSA highlighted that the federal savings could be used to finance other health care provisions.[53]

The guidance the Departments offered in the IFR Part II, therefore, ensures that the NSA functions as Congress expected at enactment. By emphasizing that the QPA should play a central role in the IDR entities' decisions, the IFR Part II will ensure that typical IDR outcomes will be close to the QPA—exactly as CBO's analyses assumed. The resulting effects on what payers pay air ambulances providers both in- and out-of-network will ensure that the NSA reduces premiums, while most providers with existing contracts (half of whom were, by definition, historically at or below the median) experience little or no reduction in payments, and many see increases.

## B. The Rule's Guidance to IDR Entities Ensures Decisions Are Predictable and Consistent, Encouraging Parties to Settle Without Resorting to IDR

As Plaintiff recognizes in both its complaint and briefing, Compl. ¶ 100; Memorandum in Support of Plaintiff's Motion for Summary Judgment, ECF 5-1, at 20 ("MSJ"), Congress intended

---

[51] *Id*. § 300gg-112(b)(7)(B)(iii).

[52] Estimate for Divisions O through FF, H.R. 133, Consolidated Appropriations Act, 2021, Cong. Budg. Off. (Jan. 14, 2021), *available at* https://perma.cc/W4VG-PLJ3.

[53] Press Release, House Committee on Energy & Commerce, Congressional Committee Leaders Announce Surprise Billing Agreement (Dec. 11, 2020), *available at* https://perma.cc/362S-96SU.

that a majority of disputes between payers and providers over balance bills would be resolved via negotiated settlements without resort to the IDR process.[54] Concerns about overuse of the IDR process often centered on the fact that the IDR process generates administrative costs, which will be borne by the parties to the IDR and ultimately passed on to consumers.[55]

Lawmakers' desire to encourage negotiated settlements rather than resort to the IDR process is clearly reflected in the NSA's text and structure. The statute requires a payer and provider to complete a 30-day "open negotiation" period before they are permitted to access the IDR process.[56] It further emphasizes that the parties may continue to negotiate even after initiating the IDR process.[57] If a dispute does proceed to IDR, the NSA requires the parties to pay a fee that covers the costs the federal government incurs to carry out the IDR process,[58] and the losing party is required to pay the fees imposed by the IDR entity. These provisions indicate Congress's preference for resolution of balance bill disputes through negotiated settlement.

Economic research demonstrates that providers and payers are most likely to forgo arbitration processes akin to IDR when they share common expectations about the outcome.[59] Just as with litigation, proceeding to IDR imposes significant administrative costs on the parties, including the fees directly imposed by the NSA and the administrative costs associated with

---

[54] Press Release, Ways & Means Comm., Neal and Brady Release Legislative Text of Surprise Medical Billing Proposal (Feb. 7, 2020), *available at* https://perma.cc/6FWA-42SR; Comm. Energy & Com., Markup of H.R. 3375 et. al. H.R. Comm. Rep. (July 17, 2019), *available at* https://perma.cc/5ANC-VJLL.

[55] H.R. Rep. No. 116-615 (2020); Comm. Energy & Com., *supra* note 54.

[56] 42 U.S.C. § 300gg-112(b)(1)(A).

[57] *Id.* § 300gg-112(b)(2)(B).

[58] *Id.* § 300gg-112(b)(8)(b).

[59] Carl M. Stevens, *Is Compulsory Arbitration Compatible With Bargaining?*, Indus. Relations (Feb. 1966), *available at* https://perma.cc/8FHK-JMGW; Henry S. Farber & Harry C. Katz, *Interest Arbitration, Outcomes, and the Incentive to Bargain*, 33 ILR Rev. (Oct. 1979), *available at* https://perma.cc/9NQU-APV8.

furnishing information to the IDR entity. If the parties have shared expectations about the outcome of the IDR process, they will expect to benefit both from reaching a settlement at a price close to what is expected to emerge from the IDR process and from avoiding the costs of the process itself. By contrast, if the parties have divergent expectations about the likely outcomes of the IDR process, then reaching settlements will often be difficult or impossible.

Absent the IFR Part II's guidance, providers and payers would be much more likely to have divergent expectations about likely IDR outcomes. Although, as noted above, the text of the NSA offers considerable evidence that the QPA should play a central role in IDR entities' decisions, the NSA does not fully explain how IDR entities should integrate the QPA with the other pieces of information the statute requires them to consider in making final payment determinations. Additionally, in contrast to the detailed rules the NSA lays out governing calculation of the QPA, it does not explain how its enumerated "additional circumstances" should be defined or measured, much less when and how they should affect IDR entities' decisions. These omissions create ambiguity about what, precisely, the NSA directs IDR entities to do.

This ambiguity would have made it difficult for providers and payers to form sensible *a priori* expectations of how IDR entities are likely to behave. Providers and payers would have had to form expectations based on their own experience with the IDR process. However, absent clarifying guidance from the Departments, the statutory ambiguities would likely cause different IDR entities to interpret the statute's instructions in different ways and, thus, reach markedly different decisions even when presented with identical facts. Different providers and payers would then have formed meaningfully different beliefs about typical IDR outcomes based on the idiosyncratic set of cases they themselves had knowledge of, frustrating the NSA's clear preference for parties to resolve disputes without resorting to the IDR process.

The IFR Part II's guidance substantially reduces this ambiguity by clarifying how the QPA and non-QPA factors should be integrated in IDR entities' decision-making and clarifying the meaning of the non-QPA factors. The guidance thus makes it far easier for parties to form meaningful expectations regarding IDR outcomes before observing actual cases, thus facilitating settlement and helping to achieve the outcome Congress intended.

## II.   TASKED WITH DETERMINING HOW TO CALCULATE THE QPA, THE DEPARTMENTS REASONABLY INTERPRETED THE STATUTE

The No Surprises Act defines the QPA as "the median of the contracted rates recognized by the plan . . . for the same or similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished, consistent with the methodology established by the Secretary under paragraph (2)(B)."[60] The Departments are further explicitly tasked with establishing through rulemaking the methodology payers must use to determine the QPA and the geographic regions used for the QPA calculation.[61]

Plaintiff complains about several aspects of how the IFR Part I calculates the QPA, specifically that: (1) single-case agreements with non-network providers are not considered for purposes of calculating the median contracted rate; (2) hospital-based and independent air ambulance providers are considered part of the "same or similar specialty"; and (3) if there is insufficient information to meaningfully calculate the QPA for air ambulance services in the base geographic region, then the geographic regions will be defined to encompass either all MSAs within the applicable Census division or all other portions of the Census division.

---

[60] 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).
[61] *Id.*

However, the Departments' substantive choices reflect reasonable readings of the statute and, in at least some cases, the only reasonable reading. Further, contrary to Plaintiff's claim, these choices are consistent with "market realities."

### A.      Single-Case Agreements are Not a Contract for Network Participation and Would Undermine the Entire Notion of a Median of Contracted Rates

Contrary to Plaintiff's argument, *see* MSJ, ECF 5-1, at 22-27, single-case agreements should not be included in the calculation of the QPA because they are different in kind from the agreements that air ambulance providers make to join payers' contracted networks. Network contracts establish rates prospectively for a large number of transports, whereas single-case agreements often are nothing more than retrospective settlements of individual disputed payment claims when the patient and payer face the prospect of paying the full, unilaterally-set list price.

There is clear evidence in both the legislative record and the text of the NSA that Congress understood the term "contracted rate" to encompass only rates pursuant to a network agreement. Notably, when the biparitsan leadership of the House and Senate committees of jurisdiction announced the final agreement on the NSA, both their press release and the associated section-by-section summary of the legislation referred to the QPA as the "median in-network rate."[62] The text of the NSA reflects the same understanding of the term "contracted rate." Notably, one of the "additional circumstances" that the NSA directs IDR entities to consider is "demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider and the plan or issuer, as applicable, during the previous 4

---

[62] Press Release, House Comm. Energy & Commerce, Press Release, Congressional Committee Leaders Announce Surprise Billing Agreement (Dec. 11, 2020), *available at* https://perma.cc/362S-96SU.

plan years."[63] This language demonstrates that Congress understood a "contracted rate" to be a rate that results from "efforts…to enter into network agreements" – that is, an in-network rate.

Considering the different factors that influence these two entirely different types of agreements and this evidence on Congress' understanding of the term "contracted rate," the Departments had good reason to disregard single-case agreements and fully explained their rationale in the preamble.[64] Moreover, had the agencies included single-case agreements in the calculation of the QPA, they would have massively distorted the QPA in a manner divorced from market realities. Including these rates would have given a single-case rate that settles an isolated payment dispute the full weight of a large managed-care network agreement that commits the air ambulance operator for several years to a rate covering hundreds or thousands of transports.

**B.      Hospital-Based and Independent Air Ambulance Carriers Are Not Distinct Specialties, Nor Do Public Payers Differentiate Between Them**

Plaintiff next argues that the IFR Part I impermissibly treats hospital-based air ambulance providers as the same specialty as independent air ambulance providers.  MSJ, ECF 5-1, at 27-29. But Plaintiff's proposed distinction does not reflect the market's economic realities. Whether or not an air ambulance carrier is owned by a hospital does not, in itself, affect the nature of the work they perform, the methods they use to perform that work, nor the types of labor or equipment they need to do that work. Consistent with this, public and private payers do not regard transports by hospital-based and free-standing operators as distinct services. Instead, Medicare pays the same rates to both, and private insurers use the same billing codes and categories for both. Considering hospital-based and independent air ambulance operators as part of the "same or similar specialty," as the IFR Part I does, is therefore a reasonable choice. Moreover, if QPAs differed based on the

---

[63] 42 U.S.C. § 300gg-112(b)(5)(C)(ii)(VI).
[64] 86 Fed. Reg. 36889 (July 13, 2021).

air ambulance carrier's ownership status, then patient cost-sharing would also depend on ownership status (since the QPA is used to compute patient cost-sharing). However, as noted in IFR Part I, this would contravene the NSA's overarching objective to ensure that patients' cost-sharing obligations do not depend on the identity of the provider that treats them in settings where patients are unable to exercise choice, like the air ambulance setting.[65]

Further, Plaintiff offers no evidence to support its contention that hospitals price their ambulance services below their costs. Indeed, research using a large insurance claims dataset found that hospital-based air ambulance carriers were paid 433% of what Medicare would pay for the same service.[66] Medicare's rates were established through a negotiated rulemaking process with the air ambulance industry that took into account the payment needed to cover air ambulance carriers' costs.[67] By way of comparison, clinicians were paid an average 1.36 times Medicare prices by commercial payers.[68] Thus, contrary to Plaintiff's contention, it appears that hospital-based air ambulance carriers are, in fact, paid prices that substantially exceed their costs.

### C.    Relying on Geographic Regions Encompassing Areas in Multiple States Is Reasonable Given Practical and Market Realities

The NSA explicitly instructs the Departments to use rulemaking to define the geographic regions in which the QPA should be calculated.[69] Contrary to Plaintiff's argument, *see* MSJ, ECF 5-1, at 29-31, in cases where a payer has insufficient information to calculate a meaningful QPA in the base geographic region, there are good reasons to use a broader region encompassing either all MSAs within the applicable Census division or all other portions of the Census division.

---

[65] 86 Fed. Reg. 36891 (July 13, 2021).
[66] *See* Fuse Brown et al., *supra* note 4, at Fig. 3.
[67] 42 U.S.C. §1395m(l); Medicare Program. Fee schedule for payment of ambulance services, 67 Fed. Reg. 9100 (February 27, 2002) (codified at 42 C.F.R. pts. 410, 414).
[68] *See* MedPAC, *supra* note 18.
[69] 42 U.S.C. § 300gg-111(a)(2)(B).

First, the structure of the NSA demonstrates that Congress wanted the QPA to be calculated using a payer's own contracted rates when possible, as the IFR Part 1 noted in explaining the Departments' overall approach to establishing rules governing calculation of the QPA.[70] While the NSA allows for the QPA to be calculated through the use of a third-party database in instances of "insufficient information," those rules apply only if the usual calculation is not feasible.[71] Adopting a broader definition of geographic region in cases where there are few applicable contracts in the base geographic region limits the use of the third-party database method to cases where it is truly necessary, as Congress intended and as the IFR Part I explains.[72] Had the Departments not taken this approach, use of third-party databases could have been quite common because roughly three-quarters of air ambulance services have historically been delivered out-of-network—the direct result of the pronounced market failures in the air ambulance market that the NSA sought to fix.[73]

Second, the paucity of in-network contracts for air ambulance services may have made reliance on third-party databases difficult, further justifying the Departments' decision to define geographic region in a way that limits how often they will need to be invoked. Indeed, Plaintiff's own evidence speaks to the difficulty of relying on an independent database for state-level in-network rate information rather than using a broader geographic region, noting that there "is no existing database that contains a representative number of the air ambulance transports in a given state." Declaration of Christopher, ECF 5-3, Exh. 5, at 4.

Third, Plaintiff's own complaint acknowledges why a broader, multi-state area is often fitting for use in calculation: "[M]ore than 33 percent of helicopter air ambulance flights will cross

---

[70] 86 Fed. Reg. 36888 (Jul. 13, 2021).
[71] 42 U.S.C. § 300gg-111(a)(3)(E).
[72] 86 Fed. Reg. 36893 (Jul. 13, 2021).
[73] Fuse Brown et al., *supra* note 9.

a state border and nearly all cross a county or municipal boundary. Nearly all fixed-wing air ambulances cross state borders."[74]

### D.     Plaintiff's Arguments Misunderstand The Inherent Nature of an Averaging Calculation

Based both on its argument that hospital-based and independent air ambulance providers must be categorized separately and its insistence that the Departments should have defined the relevant geography much more narrowly than they did, it appears that Plaintiff opposes the averaging logic inherent in Congress' decision to define the QPA as a median.

Under Plaintiff's unreasonable view, no two air ambulance bases are ever the same; in essence, then, it is never right to apply an average among different air bases, no matter how finely tailored the average may be. Manifestly, this was *not* Congress's view, as averaging across differences is inherent to the calculation of a median.

For instance, with respect to geographic regions, Plaintiff's logic appears to point to a result that would dispense with the QPA altogether, by inevitably pushing for smaller and smaller geographic units, to the point that data are simply unavailable to calculate an average. Recognizing that illogical endpoint, the Departments sensibly required the QPA to be calculated based on a relevant geographic area for which adequate data are available; it resorted to the broader area only when there is "insufficient information" to calculate a more localized average.

In contrast, the IFR Part I respects Congress' specification of an averaging approach. It then, consistent with the statute, requires IDR entities to consider other factors credibly raised by air ambulance operators as justification for departing from the baseline established by the QPA.

---

[74] Compl. ¶ 45.

III.   **SEVERAL OF THE PLAINTIFF'S CLAIMS ABOUT THE IFR'S EFFECTS ARE INACCURATE, SUBSTANTIALLY UNDERMINING THEIR LEGAL CLAIMS**

A.   **Contrary to Plaintiff's Claim, the QPA Is Likely Higher Than the Price That Would Emerge in a Well-Functioning Market**

Plaintiff claims that "the IFR [Part I] administratively ***deflates the QPA well below what market conditions would actually produce***."[75] As explained above, the IFR Part I details the calculation of QPAs for air ambulance services such that they will reflect median in-network prices as of 2019 in a logical manner consistent with the statute. Moreover, the QPAs that emerge for air ambulance services will almost certainly be above prices that would emerge in an efficient market.

The evidence reviewed earlier indicates that the leverage air ambulance operators derived from the threat of surprise billing inflated the *contracted rates* they were able to negotiate for their services. That is, typical in-network prices paid to air ambulance providers are already higher than would have existed in a well-functioning market. *See supra* pp. 6-10. Because the QPA is based on those prior contracted rates, it largely "locks in" those inflated rates. The fact that the QPA is a median, rather than a mean, may mitigate this to some degree by dampening the impact of rates negotiated by the providers that most aggressively leveraged surprise billing, but the QPA is still most likely above an efficient market rate. *Supra* Section I.A.

B.   **Contrary to Plaintiff's Claim, There is Little Reason to Expect the IFR Will Make it More Difficult for Patients to Access Air Ambulance Services**

Plaintiff further argues that if the QPA is calculated as directed in the IFR Part I and IDR decisions are typically close to the QPA, this "could force [air ambulance operators] out of the market altogether, and, as a result, reduce access to critical emergency services for patients."[76] However, economic evidence demonstrates that this is unlikely. The QPA is a median of existing

---

[75] Compl. ¶¶ 12, 81 (emphasis added).
[76] Compl. ¶ 119.

rates, which are likely higher than those that would emerge in a well-functioning market. Thus, payment rates close to the QPA will generally be adequate to elicit continued supply of air ambulance services. By definition, half of existing contracts for the relevant services already specified equal or lower prices. Similarly, it is notable that air ambulance providers other than those owned by private equity or a publicly traded company were able to deliver the same services for roughly 60 percent of the price paid to private equity or publicly-traded carriers.[77]

Additionally, it is far from clear that patients would be harmed by any adjustment in service capacity that may occur. Instead, as outlined above, *supra* pp. 10-11, there is evidence that many areas may have an oversupply of air ambulance operators, that excess supply may lead to overuse, and that air ambulance transport may be medically unnecessary in many cases.[78] Plaintiff presents no studies showing that moderate reduction in air ambulance services causes patient harm, nor shows evidence that substantial expansion of air ambulance service has improved patient outcomes. If worrisome gaps in service did emerge, carriers able to operate near or below the QPA average are well-positioned to expand as needed. Indeed, many carriers—those previously paid prices below the QPA—should see improved finances because they are now able to secure prices closer to the QPA.

## CONCLUSION

Because the IFR Parts I and II comports with the NSA's text, Congress's intent and expectations, and the economic logic underlying the statute, *amici curiae* urge the Court to reject Plaintiff's challenge to the regulation.

Dated: January 25, 2022                    /s/ Charles Gerstein
                                           Charles Gerstein
                                           Gerstein Harrow, LLP

---

[77] Adler et al., *supra* note 23.
[78] *See supra* text accompanying notes 29-37.

810 7th St. NE Ste. 301
Washington, DC 20002
*Counsel of Record*
charlie@gerstein-harrow.com

/s/ Jamie Crooks
Jamie Crooks
Fairmark Partners, LLP
1499 Massachusetts Ave., NW
Ste. 113A
jamie@fairmarklaw.com

*Counsel for Amici Curiae*

# APPENDIX A

## List of *Amici Curiae* and Relevant Affiliations

**Loren Adler, M.S.**
Associate Director, USC-Brookings Schaeffer Initiative for Health Policy

**Gerard Anderson, Ph.D.**
Professor, Johns Hopkins University

**Erin Fuse Brown, J.D., M.P.H.**
Catherine C. Henson Professor and Director, Center for Law, Health & Society at
Georgia State University College of Law

**Karan R. Chhabra, M.D., M.Sc.**
Clinical Fellow in Surgery, Harvard Medical School
House Officer, Department of Surgery, Brigham and Women's Hospital

**Zack Cooper, Ph.D.**
Associate Professor of Public Health and of Economics, Yale University

**Sabrina Corlette, J.D.**
Research Professor, Georgetown University McCourt School of Public Policy
Center Co-Director, Center on Health Insurance Reforms

**Erin Duffy, Ph.D.**
Research Scientist, USC Schaeffer Center for Health Policy & Economics

**Matthew Fiedler, Ph.D.**
Fellow, USC-Brookings Schaeffer Initiative for Health Policy

**Paul B. Ginsburg, Ph.D.**
Professor of Health Policy and Management, University of Southern California Price
School of Public Policy
Nonresident Senior Fellow, Brookings Institution
Senior Fellow, USC Schaeffer Center for Health Policy & Economics

**Mark A. Hall, J.D.**
Professor of Law and Public Health, Wake Forest University

**Jack Hoadley, Ph.D.**
Research Professor Emeritus, Georgetown McCourt School of Public Policy

**Benedic Ippolito, Ph.D.**
Senior Fellow, American Enterprise Institute

**Maanasa Kona, J.D.**
    Assistant Research Professor, Georgetown McCourt School of Public Policy

**Kevin Lucia, J.D., M.P.H.**
    Research Professor, Georgetown McCourt School of Public Policy
    Co-Director, Center on Health Insurance Reforms

**Kevin Schulman, M.D.**
    Professor of Medicine, Stanford University School of Medicine
    Professor of Business (by courtesy), Stanford University Graduate School of Business

**Barak Richman, J.D., Ph.D.**
    Professor of Law, Duke University

**Avik Roy, M.D.**
    President, Foundation for Research on Equal Opportunity

**Andrew M. Ryan, Ph.D.**
    UnitedHealth Professor of Health Management and Policy, University of Michigan
    School of Public Health

**Erin Trish, Ph.D.**
    Co-Director, USC Schaeffer Center for Health Policy & Economics