## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF AIR MEDICAL SERVICES,<br><br>                    Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>                    Defendants. | No. 1:21-cv-03031-RJL |

### BRIEF *AMICI CURIAE* OF
### THE AMERICAN BENEFITS COUNCIL, BUSINESS GROUP ON HEALTH, COUNCIL OF INSURANCE AGENTS AND BROKERS, ERISA INDUSTRY COMMITTEE, HR POLICY ASSOCIATION, NATIONAL ALLIANCE OF HEALTH CARE PURCHASER COALITIONS, NATIONAL RETAIL FEDERATION, PURCHASER BUSINESS GROUP ON HEALTH, SELF-INSURANCE INSTITUTE OF AMERICA, AND UNITE HERE IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT <u>AND OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTEREST OF THE AMICI CURIAE ........................................................................... 1

INTRODUCTION .......................................................................................................... 3

ARGUMENT .................................................................................................................. 5

   I.   The Tri-Agencies' Authority for the IDR Process in the IFR Is Clear and Should Receive Deference. ................................................................................................ 5

   II.  The Tri-Agencies' Reasonable Interpretation of the Statute Is Consistent with the Text and Structure of the NSA. ...................................................................... 7

   III. The IFR Is Consistent with the Policy Goals of Congress in Adopting the NSA. ............ 11

CONCLUSION ............................................................................................................. 15

CERTIFICATE OF SERVICE .................................................................................... 16

Appendix ........................................................................................................................ I

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                **Page(s)**

*Chevron USA, Inc. v. Nat. Res. Def. Council*,
  467 U.S. 837 (1984) ............................................................................................ 6
*K Mart Corp. v. Cartier, Inc.*,
  486 U.S. 281 (1988) ............................................................................................ 8
*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ............................................................................................ 6
*Richards v. United States*,
  369 U.S. 1 (1962) ................................................................................................ 8

**Statutes**

5 U.S.C. § 554 ........................................................................................................... 7
42 U.S.C. § 300gg-22 ............................................................................................... 7
42 U.S.C. § 300gg-92 ............................................................................................... 7
42 U.S.C. § 300gg-111(a)(2) ................................................................................... 9
42 U.S.C. § 300gg-111(a)(2)(B)(iv) ..................................................................... 10
42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) ..................................................................... 9
42 U.S.C. § 300gg-111(a)(3)(E)(iii) ........................................................................ 9
42 U.S.C. § 300gg-111(c)(1)(A) .............................................................................. 7
42 U.S.C. § 300gg-111(c)(2)(A) .............................................................................. 6
42 U.S.C. § 300gg-111(c)(5)(C)(ii)(V) ................................................................. 14

**Rules**

Fed. R. App. 29(a)(2) ............................................................................................... 1
Fed. R. App. 29(a)(4)(E) ........................................................................................... 1

**Regulations**

45 C.F.R. § 150.443 .................................................................................................. 7
45 C.F.R. § 149.140(b) ............................................................................................. 9
45 C.F.R. § 149.140(b)(2)(ii) ................................................................................. 10
45 C.F.R. § 149.140(c)(2) ......................................................................................... 9
86 Fed. Reg. 36872 ................................................................................................. 10
86 Fed. Reg. 55980 ................................................................................................... 3

## **Other Authorities**

AJMC, *Can We Stop Surprise Medical Bills AND Strengthen Provider Networks? California Did*
(Aug. 22, 2019) ................................................................................................ 13, 14
ASPE, *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act*
  (Nov. 22, 2021) .................................................................................................... 13
Congressional Budget Office Estimate for Divisions O through FF of H.R. 133,
  Consolidated Appropriations Act 2021 (Jan. 14, 2021) ...................................... 5, 12

H.R. 133, Consolidated Appropriations Act 2021, Division BB .................................................... 1

H.R. REP. No. 116-615 ................................................................................................................. 15

Letter from Sen. Murray and Rep. Pallone to Xavier Becerra, Sec. of U.S. Department of
      Health and Human Services (Jan. 7, 2022) ....................................................................... 4, 8, 12

Loren Adler, *Experience with New York's arbitration process for surprise out-of-network bills*
      (Oct. 24, 2019) ................................................................................................................... 13

Testimony of Ilyse Shuman before the House of Representatives Comm. on Educ. and
      Labor, Subcommittee on Health, Emp., Labor, and Pensions (Apr. 2, 2019) ............................ 2

Witness Statement of James Gelfand for Testimony before House Ways and Means
      Health Subcommittee (May 21, 2019) ..................................................................................... 2

## INTEREST OF THE AMICI CURIAE[1]

*Amici* are a group of entities comprised of trade organizations, employer and industry groups and coalitions, and labor organizations that collectively represent thousands of employers and labor organizations and that together provide health insurance coverage for many millions of employees and their families. In fact, *Amici* are involved in some way in the provision of health insurance coverage for nearly all Americans covered by employer-sponsored group health plans.[2]

As payers of health care services, *Amici* and their members have an immense interest in the implementation of the No Surprises Act ("NSA") (H.R. 133, Consolidated Appropriations Act, Division BB). Surprise medical bills can be financially and emotionally devastating to participants already dealing with the challenges of a medical emergency or serious health condition. They are often complex and very hard to understand and decipher particularly since individuals often have no meaningful way to avoid surprise bills, especially with respect to emergency care. The financial burden imposed by surprise bills can be extraordinary and is often borne, in part, by plan sponsors (such as *Amici* and their members) who step in to provide financial protection for the individual. Moreover, the occurrence of surprise billing practices by providers undermines plans' efforts to develop high-quality, cost-effective network designs because some provider groups and types have been incented to remain out-of-network with plans and issuers. This, in turn, results in unnecessary and increased costs for the health care system generally, but most specifically, for plan sponsors (such as *Amici* and their members) and the individuals enrolled in the related plans, through higher premium contributions, reduced benefits,

---

[1] No party's counsel authored this brief either in whole or in part, and no party or party's counsel, or person or entity other than *Amici*, their members, and their counsel, contributed money intended to fund preparing or submitting this brief. Counsel for both parties have consented to the filing of this brief. *See* Fed. R. App. 29(a)(2), (a)(4)(E).

[2] See the attached appendix for a more detailed description of each amicus.

or both. Moreover, *Amici* have substantial interests in the independent dispute resolution ("IDR")
process set out under the NSA, not only because plan sponsors will be a party to the IDR and
impacted by the associated administrative costs and burdens, but also because the IDR process
will impact the willingness of providers to go or stay in-network and the in-network rates
providers will accept. All of these elements play a large role in determining access to and the
cost of employer-sponsored coverage.

Collectively, *Amici* have expended considerable efforts to support a federal solution to
the scourge of surprise medical bills—with the twin goals of eliminating surprise medical bills to
participants and reducing overall health care costs to the system caused by surprise billing
practices. Many of the *Amici* have engaged with Congress, including its individual members and
various committees, for over three years regarding a potential federal legislative solution and
were extensively involved in the legislative process that resulted in the NSA. *Amici* not only
worked with members of Congress to develop and refine federal legislation, specifically
including the NSA, they also testified before congressional committees regarding the harmful
effects of surprise medical billing on group health plans and their participants, the need for a
comprehensive and effective solution to surprise bills, and how a well-designed and
implemented solution could help bring down health plan costs caused by surprise billing
practices.[3] *Amici* also advocated on behalf of their members and employees during the
rulemaking process that followed the enactment of the NSA. For all these reasons, *Amici* are

---

[3] *See Testimony of Ilyse Shuman before the House of Representatives Comm. on Educ. and
Labor, Subcommittee on Health, Emp., Labor, and Pensions* (Apr. 2, 2019), https://edlabor.
house.gov/imo/media/doc/2019-04-02%20HELP%20Hearing%20Schuman%20Testimony.pdf;
*Witness Statement of James Gelfand for Testimony before House Ways and Means Health
Subcommittee* (May 21, 2019), https://docs.house.gov/meetings/WM/WM02/20190521/
109508/HHRG-116-WM02-Wstate-GelfandJ-20190521.pdf.

uniquely positioned to assist the Court by providing insight into the requirements under the statute and its impact on the American people.

### INTRODUCTION[4]

In promulgating the Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55980 (the "IFR"), the United States Department of Labor, Department of the Treasury, and Department of Health and Human Services (the "Tri-Agencies") charted a staid and reasonable course in establishing the details of the IDR process required by the NSA. As is specifically relevant here, the Tri-Agencies established that the IDR entity should begin its assessment of the parties' competing offers by first looking to the Qualifying Payment Amount ("QPA"), which is generally the plan's or issuer's median contracted rate for the medical item or service. Then, the IDR entity is to consider certain other information if it is credible and shows that the appropriate out-of-network rate materially deviates from the QPA.

The IFR closely adheres to the NSA's statutory language and structure. Not only is the QPA identified as the first factor to consider in the statute, it is also a carefully calculated amount that reflects the objective arms-length negotiations between plans and providers. Congress recognized the value of the QPA in designing a federal solution to surprise medical bills and by design the QPA plays a central and recurring role with respect to the NSA and its surprise billing protections. In addition to its role in the IDR process, the QPA is the basis upon which the participant's cost-sharing (*i.e.*, coinsurance) is to be determined by the group health plan or

---

[4] *Amici* address only Count 1 of the Plaintiff's complaint and acknowledge that this case concerns the IDR Process as it specifically applies to air ambulance providers and as such rules that are distinct from the rules for other emergency service providers. However, both sets of rules are materially the same for the purpose of this amicus brief, and so materially identical versions of this brief are being filed in related litigations challenging the IFR. Therefore, we have retained the citations to the sections pertaining to emergency service providers other than air ambulances. *Amici* do not address Count 2 of the Plaintiff's complaint.

issuer. And in recognition of the importance of the QPA to all parties involved—including participants, payers and providers—the statute sets forth a separate audit process by the relevant federal agencies to ensure the reliability of the QPA determinations that plans and insurers make. The QPA is also a key element of the public reporting that the Tri-Agencies will provide on an ongoing basis regarding the IDR process. The relative importance of the QPA to the IDR entity's review process is informed by reading the statute in its entirety, in which case the central role of the QPA to the NSA becomes clear.

In addition, the legislative history of the NSA shows that Congress intended for the IDR entity's review process to begin with the QPA and for the QPA to play a central role in that review process. Senator Patty Murray, Chair of the Senate Committee on Health, Education, Labor, and Pensions ("HELP"), and Congressman Frank Pallone, Jr., Chairman of the House Committee on Energy and Commerce, two key architects of the NSA, recently reiterated that the IDR process adopted by the Tri-Agencies comports with the intent of Congress to provide a fair reimbursement, including ensuring that plans and issuers pay material variations from the QPA when demonstrated by credible evidence to be more appropriate, while eliminating surprise balance bills and reducing overall health care costs. Decl. of R. Temme, Ex. A, Jan. 7, 2022 Letter from Sen. Murray and Rep. Pallone. to Xavier Becerra, Sec. of U.S. Department of Health and Human Services ("Murray-Pallone Letter") at 5.

Also, the Tri-Agencies' implementing regulations effectuate the important public policy goal of the NSA to not just protect patients from surprise bills but also lower health care costs, which is vital for employers, other plan sponsors and employees alike. Importantly, the NSA eliminates the market distortion caused by providers' ability to surprise balance bill, which served as an incentive for providers to avoid network participation or to seek inflated in-network

rates from health care payers, leading to higher premiums for employees and their families. The IDR process in the IFR supports this key element of the NSA by ensuring that the IDR process cannot be abused in such a way that providers can continue to inflate in-network rates, which should lead to lower costs for plan sponsors and lower premiums for plan participants. *See Congressional Budget Office ("CBO") Estimate for Divisions O through FF of H.R. 133, Consolidated Appropriations Act 2021* (Jan. 14, 2021), https://www.cbo.gov/system/files/2021-01/PL_116-260_div%20O-FF.pdf (identifying reductions in premiums in most markets of between 0.5 and 1 percent as a result of the NSA's surprise balance billing provisions). The predictability that will result from the IFR also drives down the costs associated with arbitration by encouraging negotiated resolutions (or avoidance of IDR altogether) which reduces the IDR-related administrative costs and the likelihood that more costly arbitration is required as part of the payment process, which is key for employers and other plan sponsors. Furthermore, the IDR process promotes fairness in the IDR determinations by preventing claims for the same or similar service from being reimbursed at materially different rates for the same plan in a given geography, absent credible evidence to the contrary. For these reasons, the Court should not modify the Tri-Agencies' implementing regulations, which mirror the statutory text - the Court's best evidence of Congressional intent - and are essential to meeting Congress's goal of lower health care costs for employees and their families.

## **ARGUMENT**

I.    **The Tri-Agencies' Authority for the IDR Process in the IFR Is Clear and Should Receive Deference.**

In enacting the NSA, Congress included an express direction to the Tri-Agencies to engage in rulemaking with regard to the specifics of the NSA's IDR process. Furthermore, in requiring the Tri-Agencies to promulgate rules, Congress anticipated that those rules would

benefit from the deference given to the Tri-Agencies by well-established case law. Any effort to undermine the regulations issued pursuant to that explicit rulemaking authority would undermine the unassailable intent of Congress, and should be avoided.

It is well understood that agencies have authority to interpret ambiguities or gaps in statutes. "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of any rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron USA, Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843 (1984), *reh'g denied*, 468 U.S. 1227 (1984); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (holding the agency's subsequent interpretation of an ambiguous statute is binding on courts, notwithstanding a court's earlier, contrary interpretation.). Where a statute is silent or ambiguous with respect to a specific issue, the only question is whether "the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. If so, then the agency's construction is controlling, even if the agency's construction is not the only plausible reading of the statute—or even the reading that a court would adopt. *Id.* at n.11.

Here, Section 103 of the NSA explicitly directs the Tri-Agencies to issue regulations developing an IDR process to decide the out-of-network payment amount for certain services that cannot be settled via negotiation between out-of-network providers and group health plans and issuers. *See* 42 U.S.C. § 300gg-111(c)(2)(A). More specifically, it states that "[n]ot later than 1 year after December 27, 2020, the [Tri-Agencies] shall establish by regulation one independent dispute resolution process…."

While the NSA includes numerous details about the IDR process including, for example, specifying the period of negotiations required prior to the initiation of the IDR process,[5] the batching of medical claims in the IDR process,[6] the selection and certification of IDR entities,[7] the submission of offers by the parties,[8] and the factors to be considered (and not considered) by the IDR entity,[9] some details remain undefined, including the specific process to be applied by the IDR entity in making its determination or guidelines to structure the IDR entity's decision making.  The Tri-Agencies addressed these undefined details in the IFR. Given the directive to the Tri-Agencies under Section 103 of the statute, Congress clearly understood there would be a necessary role for the Tri-Agencies in promulgating rules to develop a fulsome and comprehensive IDR review process in accord with the statutory text, policy goals of the statute and Congressional Budget Office score, including by addressing those aspects of the statutory scheme that warrant additional detail.[10] Thus, the plain language of the statute itself supports the Tri-Agencies' proper use of regulatory authority in implementing the challenged portions of the IFR.

## II.     The Tri-Agencies' Reasonable Interpretation of the Statute Is Consistent with the Text and Structure of the NSA.

---

[5] 42 U.S.C. § 300gg-111(c)(1)(A).

[6] *Id.* at § 300gg-111(c)(3).

[7] *Id.* at § 300gg-111(c)(4).

[8] *Id.* at § 300gg-111(c)(5)(B).

[9] *Id.* at § 300gg-111(c)(5)(C)–(D).

[10] Indeed, analogous regulations have been promulgated in circumstances similar to those present with respect to the NSA. For example, the statutory language comprising the Health Insurance Portability and Accountability Act ("HIPAA") also includes an administrative review procedure as part of its enforcement regime. *See* 42 U.S.C. § 300gg-22. While those procedures cross-reference 5 U.S.C. § 554, no standard of review is specified in the statute. *Id.* When the Tri-Agencies promulgated implementing regulations for HIPAA, *see* 42 U.S.C. § 300gg-92, the regulations included a burden of proof provision as well as a standard of review provision. *See* 45 C.F.R. § 150.443. The IDR process established by the Tri-Agencies addresses similar omissions.

Under the IFR, when choosing between the two competing proposed amounts, an IDR entity is to first look to the QPA, and then to consider additional factors, information the IDR entity requested, and other information provided by either party, as long as the information is credible and clearly demonstrates that the QPA is materially different from the appropriate out-of-network rate. These guidelines are fully consistent with the text and structure of the NSA.[11]

Interpretation of the statutory language involves not only assessing the plain language of the statute itself, but also interpreting the meaning of that language in light of the act as a whole. *See e.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (holding "in ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole"); *Richards v. United States*, 369 U.S. 1, 11 (1962) (holding "[w]e believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, 'we must not be guided by a single sentence or member of a sentence, but (should) look to the provisions of the whole law, and to its object and policy'") (footnote omitted).

Here, the QPA, which is the first item the IDR entity is to consider and which is central to the IDR process, was very carefully designed by Congress to be an objective, commercially reasonable rate. As such, the QPA provides a reasonable starting point from which the IDR entity should begin its evaluation as part of the IDR process. Per the statute, the QPA generally is the median of the contracted rates recognized by the plan or issuer on January 31, 2019 for the same or similar item or service that is provided by a provider in the same or similar specialty and

---

[11] It is also fully supported by the legislative history, but because that is already amply addressed by other briefs, we have omitted that discussion here. *See* Murray-Pallone Letter.

provided in a geographic region in which the item or service is furnished, increased for inflation. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I); 45 CFR § 149.140(b).[12] Because the QPA is set by the median of contracted rates for the same or similar services, and accounts for factors such as provider specialties and geography, it provides an objective assessment of what providers of similar services in similar geographic areas accept for the particular service at issue.

Also, the QPA amount is subject to audit by the Department of Health and Human Services, which further ensures its accuracy, 42 U.S.C. § 300gg-111(a)(2), and is the amount on which participant cost-sharing is to be based under the NSA. *Id.* at § 300gg-111(a)(1)(C). This further demonstrates why the QPA was so carefully designed by Congress and will be carefully audited by the Tri-Agencies. In addition, the central role of the QPA in the IDR process is made clear in the elements that the Tri-Agencies are to report about the IDR process publicly each quarter, including the number of times the payment amount determined by the IDR entity exceeds the QPA, the amount of each offer in each IDR expressed as a percentage of the QPA, and the offer that was chosen by the IDR entity expressed as a percentage of the QPA. *Id*. at § 300gg-111(c)(7)(B)(iv).

Moreover, the NSA provides specific factors that the IDR entity must consider during the IDR process and places them into a specific order in the statute. The statute first lists the QPA as an item that the IDR entity must consider. In a separate, subsequent paragraph, the text goes on to require that the IDR entity consider any of the "additional circumstances" listed in the NSA that might be applicable, information that the IDR entity requests, and any information relating to the offer submitted by either party. This ordering in the statutory text supports the process

---

[12] There are provisions that address the situation where a plan either has insufficient information or is newly covering an item or service that utilizes, among other things, publicly available databases of charge amounts. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(iii); 45 CFR § 149.140(c)(2).

adopted by the Tri-Agencies for how the IDR entity is to evaluate the parties' offers. In addition, as evidenced by the use of the term "additional" in the header to the statute, the additional circumstances, while an important part of the review process, presupposes that prior information is being added to and is necessarily secondary to the QPA in the process. Accordingly, it is clear from the statute itself that Congress intended for the IDR entity to first consider the QPA as part of its review process and for the QPA to play a central role in that process.

Lastly, we note for the Court's attention that the additional circumstances that the IDR entity may consider are in many cases subsumed within the QPA calculation itself. The NSA specifies that the QPA calculation promulgated by the Tri-Agencies "may account for relevant payment adjustments that take into account quality or facility type (including higher acuity settings and the case-mix of various facility types) that are otherwise taken into account for purposes of determining payment amounts with respect to participating facilities." 42 U.S.C. § 300gg-111(a)(2)(B)(iv). And the Tri-Agencies did account for those elements by including the use of service codes and modifiers when calculating the QPA. 45 CFR § 149.140(b)(2)(ii). The Tri-Agencies explained that

> A service code is a unique identifier, typically consisting of a string of numeric digits or alphanumeric characters, that corresponds to a standardized description, which is used to identify with specificity the item or service that was furnished to a patient. *Different codes may be assigned to the same general service on the basis of certain variations in the provider's method or approach, the complexity of the procedure or medical decision-making, and patient acuity level.* Payers, providers, and facilities understand these service codes and commonly use them for billing and paying claims (including for both individual items and services, and for items and services provided under a bundled payment arrangement).

86 Fed. Reg. 36872, 36890-91 (emphasis added). In light of the foregoing, in many instances the QPA determination itself will already account for the additional factors. Thus, it makes plain sense to provide in regulation, as Congress did by statute, for the QPA to be the first step in the

IDR process, and for deviation from the QPA to occur only when credible evidence exists that a material difference in the circumstances supports a payment rate that is higher or lower than the QPA.

Ultimately, the IDR entity is tasked in the statute with identifying the most reasonable of the two offers presented. However, this does not mean that the IDR entity must consider all of the factors equally or that immaterial variances from the QPA be recognized as part of the process. For all of the foregoing reasons, Congress clearly intended for the QPA to be the starting point of the IDR entity's evaluation of the offers and for the QPA to continue to play a central role in that process. Given the central and recurring role that Congress assigned to the QPA throughout the statute, and given the potential costs to the system associated with excessive and unnecessary use of the IDR process, the statute fully supports the IFR's requirement that a deviation from the QPA be material and shown to be credible. Such an interpretation is also supported by sound public policy, as discussed below, and well-established principles of judicial economy.

### III.   The IFR Is Consistent with the Policy Goals of Congress in Adopting the NSA.

The IDR process included in the IFR promotes the key public policies behind Congress's adoption of the NSA. First, and vitally, the IDR process as set out in the IFR is essential to effectuating Congress' intent that the NSA lower health care costs.

While protecting patients from surprise balance bills was a primary consideration of the NSA, based in part on testimony of *Amici* and others, Congress also sought to address the cost of coverage more generally through the NSA. In scoring the budgetary impact of the NSA (and its predecessor legislation), the CBO determined that the IDR provision would generate significant savings as the result of lower premium rates (which thus reduces federal tax expenditures

through lower tax subsidies). *See CBO Estimate for Divisions O through FF of H.R. 133, Consolidated Appropriations Act, 2021* (Jan. 14, 2021), https://www.cbo.gov/system/files/2021-01/PL_116-260_div%20O-FF.pdf. The legislative history of the NSA makes clear that Congress sought to address not only patients' exposure to exorbitant balance billing, but also address the systemic costs associated with providers' demand for inflated in-network rates, which in turn impact participants, employers, and the federal government in the form of increased premiums. *See* Murray-Pallone Letter at 4.

The IDR process set out in the IFR is necessary to ensure that the NSA protects against premium increases and results in lower health care costs as Congress intended. This is because the IDR process under the IFR, which like the statute gives the QPA a central role, will help protect against incentives for providers to leave or remain out of networks.  As intended by the NSA, this will in turn eliminate unnecessary costs and premium increases for the consumer by correcting the market-failure that allowed providers to charge inflated rates.  Plans and issuers have worked hard to develop strong provider networks. These networks are essential to the provision of affordable and patient-protective health coverage. Provider networks improve access to coverage for patients; help bring down the cost of care, which in turn reduces premium amounts; and allow for higher-quality, coordinated care across network providers. If the IDR process instead presented an opportunity for windfall payments from plans and issuers, routinely resulting in payments above the median contracted rate, the incentive for providers to go out of network (or stay out of network) would increase, and the cost of maintaining networks would increase, thus weakening networks, increasing costs and premiums, and preventing employers and patients from benefiting from the health care efficiencies gained through plan networks.

This is borne out by the experience of insurers arbitrating claims under existing state-based surprise billing dispute resolution schemes. One study of the impacts of the State of New York's arbitration effort to address surprise balance bills, under which IDR entities are instructed to consider billed charges rather than in-network rates, noted that "the very high out-of-network reimbursement now attainable through arbitration will increase emergency and ancillary physician leverage in negotiations with commercial insurers, leading either to providers dropping out of networks to obtain this higher payment, extracting higher in-network payment rates, or some combination thereof, which in turn would increase premiums." *See* Loren Adler, *Experience with New York's arbitration process for surprise out-of-network bills* (Oct. 24, 2019), https://www.brookings.edu/blog/usc-brookings-schaeffer-on-health-policy/2019/10/24/ experience-with-new-yorks-arbitration-process-for-surprise-out-of-network-bills/. *See also* ASPE*, Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act* (Nov. 22, 2021), https://aspe.hhs.gov/reports/evidence-surprise-billing.

This evidence demonstrates that the NSA's focus on the QPA as a key factor in the IDR process is critical to controlling health care costs. The IDR process as set forth in the IFR will reduce incentives for providers to leave health plan networks because business models that rely on being out-of-network and collecting balance bills will no longer be viable and the IDR process will be sufficiently consistent and predictable so that providers will understand a windfall is unlikely. This will not just help reduce premium costs but could also expand availability of and access to providers in health plan networks.[13]

---

[13] For example, in California, which implemented an IDR model that utilizes the median in-network rate, the total number of in-network physicians increased 16%, with larger gains in many specialties that have historically been responsible for most surprise bills. AJMC, *Can We Stop Surprise Medical Bills AND Strengthen Provider Networks? California Did* (Aug. 22,

13

Moreover, Congress made clear its desire for strong networks in one of the additional circumstances set out in the NSA which is "good faith efforts (or lack of good faith efforts) … to enter into network agreements" as well as contracted rates for the previous four years. 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(V). Thus, if credible and material, the IDR entity must consider a provider's decision to go out of network and its prior contracted rates, if any. Conversely, failing to implement the IDR process consistent with the statute will increase incentives for in-network providers to negotiate higher in-network rates to stay in-network, or create incentives for providers to avoid or leave networks, thus driving up the patient cost sharing and balance bills outside of surprise billing situations, increasing overall premium costs for employers and enrollees, and reducing revenues for the federal government—all results Congress clearly sought to avoid.

In addition, the steps established by the IFR foster predictability in the outcome of the IDR process. This is also crucial in controlling health care costs and is essential to employer-sponsored plans because where both parties can accurately evaluate the probable outcome, they are incentivized to reach an economically efficient settlement. With more predictability, the plan and provider will be more likely to avoid IDR altogether, settle during open negotiation, or reach an agreement regarding in-network participation. In these ways, the predictability fostered by the IDR process works to prevent expenditures in arbitrating claims; arbitrating claims would increase plan expenditures on items other than medical care and should be expected to be reflected in higher premium costs for employees and employers alike. The alternative, *i.e.*, an evaluative methodology untethered from any objective payment amount, would incentivize the

---

2019), https://www.ajmc.com/view/can-we-stop-surprise-medical-bills-and-strengthen-provider-networks-california-did.

14

frivolous use of the IDR process by providers by allowing for more subjective and unpredictable outcomes, to the detriment of plan participants and the plans in which they participate.

Lastly, the IDR process set forth in the IFR plays the important role of providing consistency for plans and providers. The IFR does this by providing that the QPA is the first consideration and deviation occurs only where it is supported by clear and credible evidence that the payment amount should be materially different. Such an interpretation is not only grounded in the statute but also in sound policy as an unguided IDR process could routinely result in wide variation in reimbursement for identical services in the same geography.  This would be unfair and vex plans (and providers) by awarding different amounts from the plan or issuer for the same services provided under nearly identical circumstances. Fostering disparate outcomes for similar claims would produce a result that Congress did not intend when it enacted the NSA, which is designed, in part, to promote consistency for not just patients, but plans and providers. H.R. REP. No. 116-615, Pt. 1, at 57–58 (2020).[14]

## CONCLUSION

The IFR is not only fully consistent with the text and structure of the NSA, it is also essential to effectuate Congress's intent that lower health care costs result from the prohibition on surprise bills. The Court should deny Plaintiff's Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and uphold the IFR.

Dated: January 25, 2022                    Respectfully submitted,

                                                            */s/ Kara P. Wheatley*
                                                            Kara P. Wheatley (DC Bar No. 975541)
                                                            Seth T. Perretta (*pro hac vice* pending)

---

[14] While the QPA may vary from plan to plan, that variation reflects the results of arms-length negotiations between plans and providers. In seeking to undermine the reasonableness of the QPA, the plaintiff's position would result in variation that does not reflect market realities regarding the true costs of medical goods and services.

Ryan C. Temme (*pro hac vice* pending)
Matthew W. Lanahan (*pro hac vice* pending)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Tel: (202) 867-0620
Fax: (202) 659-4503
kwheatley@groom.com
sperretta@groom.com
rtemme@groom.com
mlanahan@groom.com

*Counsel for Amici*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 25, 2022, a true and correct copy of the foregoing

document was served on all counsel of record through this Court's CM/ECF filing system.

*/s/ Kara P. Wheatley*
Kara P. Wheatley

16

**Appendix**

| Organization | Brief Description |
|---|---|
| American Benefits Council | The American Benefits Council is a national non-profit organization dedicated to protecting and fostering privately sponsored employee benefit plans. Its approximately 440 members are primarily large, multistate employers that provide employee benefits to active and retired workers and their families. The Council's membership also includes organizations that provide employee-benefit services to employers of all sizes. Collectively, the Council's members either directly sponsor or provide services to retirement and health plans covering virtually every American who participates in employer-sponsored benefit programs. The American Benefits Council regularly participates as amicus curiae in cases affecting employee benefits. |
| Business Group on Health | Business Group on Health is the leading non-profit organization representing large employers' perspectives on optimizing workforce strategy through innovative health, benefits and well-being solutions and on health policy issues. The Business Group keeps its membership informed of leading-edge thinking and action on health care cost and delivery, financing, affordability and experience with the health care system. The Business Group's over 440 members include 74 Fortune 100 companies as well as large public sector employers, who collectively provide health and well-being programs for more than 60 million individuals in 200 countries. |

I

| Organization | Brief Description |
|---|---|
| Council of Insurance Agents and Brokers | The Council of Insurance Agents & Brokers represents over 200 employee benefits and property/casualty agencies and brokerage firms. Council member firms annually place more than $300 billion in commercial insurance business in the United States and abroad. They place 90 percent of all U.S. insurance products and services as well as administer billions of dollars in employee benefits. Council members conduct business in some 30,000 locations and employ upward of 350,000 people worldwide, specializing in a wide range of insurance products and risk management services for business, industry, government, and the public. |
| ERISA Industry Committee | The ERISA Industry Committee (ERIC) is a national nonprofit organization advocating exclusively for large plan sponsors that provide health, retirement, paid leave, and other benefits to their nationwide workforces. With member companies that are leaders in every sector, ERIC advocates on the federal, state, and local levels for policies that promote flexibility and uniformity in administering their employee benefit plans, while fighting against a patchwork of conflicting and burdensome rules. ERIC also fights in federal court against state and local laws that conflict with ERISA and joins legal cases as amicus curiae to support large plan sponsors in litigation impacting critical employee benefit plan design or administration." |
| HR Policy Association | HR Policy Association is the lead organization representing Chief Human Resource Officers at major employers. The Association consists of over 390 of the largest corporations doing business in the United States and globally, and these employers are represented in the organization by their most senior human resource executive. Collectively, their companies employ more than 10 million employees in the United States, over nine percent of the private sector workforce, and 20 million employees worldwide. These senior corporate officers participate in the Association because of their commitment to improving the direction of human resource policy. hrpolicy.org. |

| Organization | Brief Description |
|---|---|
| National Alliance of Health Care Purchaser Coalitions | The National Alliance of healthcare purchaser coalitions is an alliance of approximately 45 regional coalitions of employers and other plan sponsors. It supports over 12,000 healthcare purchasers ranging from 60% of the Fortune 100 companies, many midsized companies, public sector employers (cities, states, school districts, federal employees) and union groups (e.g. UAW, 32BJ) who collectively provide health coverage to over 45 million Americans. The National Alliance helps to lead improvements in health, equity and value for organizations and communities across the country. |
| National Retail Federation | The National Retail Federation ("NRF") is the world's largest retail trade association, representing all aspects of the retail industry. NRF's membership includes discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and Internet retailers. Retail is the nation's largest private sector employer, supporting one in four U.S. jobs – 52 million working Americans. Contributing $3.9 trillion to annual GDP, retail is a daily barometer for the nation's economy. NRF regularly advocates for the interests of retailers, large and small, in a variety of forums, including before the legislative, executive, and judicial branches of government. |
| Purchaser Business Group on Health | PBGH is a nonprofit coalition representing nearly 40 private employers and public entities across the U.S. that collectively spend $100 billion annually purchasing health care services for more than 15 million Americans and their families. PBGH has a 30-year track record of incubating new, disruptive operational programs in partnership with large employers and other health care purchasers. Our initiatives are designed to test innovative methods and scale successful approaches that lower health care costs and increase quality across the U.S. |
| Self-Insurance Institute of America | The Self Insurance Institute of America, Inc. ("SIIA") is an association of self-insured employers and industry participants, including third-party administrators, captive managers, and excess carriers. See SIIA, About SIIA, https://www.siia.org/i4a/pages/index.cfm?pageid=4451. |

| Organization | Brief Description |
|---|---|
| UNITE HERE | UNITE HERE is a labor union that represents 300,000 working people across Canada and the United States. Our members work in the hotel, gaming, food service, manufacturing, textile, distribution, laundry, transportation, and airport industries. Our membership is diverse. We are predominantly women and people of color, and we hail from all corners of the planet. Together, we are building a movement to enable people of all backgrounds to achieve greater equality and opportunity. |