**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ASSOCIATION OF AIR MEDICAL SERVICES,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>*Defendants*. | Civ. No. 1:21-cv-3031 (RJL) |

**CONSOLIDATED REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT**

Brian R. Stimson (D.C. Bar. No. 1657563)
Sarah P. Hogarth (D.C. Bar. No. 1033884)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
bstimson@mwe.com
shogarth@mwe.com

*Attorneys for Plaintiff
Association of Air Medical Services*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................ ii

Glossary ................................................................................................................................ v

Introduction .......................................................................................................................... 1

Argument .............................................................................................................................. 3

I.  IFR Part II's weighting of the QPA is inconsistent with the statutory text
    (Count I) ......................................................................................................................... 3

    A.  The statutory text belies the Departments' QPA presumption ............................... 3

    B.  The Departments' "interpretation" defies the unambiguous statutory
        text, structure, purpose, and legislative history of the NSA ................................ 4

    C.  There is no explicit statutory gap for the Departments to fill with a
        regulation that dictates IDR outcomes ................................................................ 10

II. IFR Part I's intentional deflation of the QPA is arbitrary, capricious, and
    contrary to law (Count II) ............................................................................................. 11

    A.  The Departments' QPA methodology for nonparticipating air
        ambulance services is contrary to law, arbitrary, and capricious ....................... 12

        1.  The QPA methodology impermissibly excludes myriad contracted
            rates from the calculation of the median ..................................................... 12

        2.  The QPA methodology arbitrarily carves air ambulance services
            out from the general definition of "same or similar specialty" ................... 16

        3.  The QPA methodology uses overbroad geographic regions that
            defeat the structure of the statute and will produce absurd results ............. 19

    B.  The Departments' policy of deflating the QPA for air ambulance
        providers to reduce patient cost-sharing is inconsistent with the
        statutory text and purpose .................................................................................. 21

III. The Court should vacate the unlawful portions of the IFRs ........................................... 22

Conclusion ........................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993)...............................................................................22

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001)............................................................................22

*\*Am. Corn Growers Ass'n v. EPA,*
  291 F.3d 1 (D.C. Cir. 2002).....................................................................................5

*Bates v. United States,*
  522 U.S. 23 (1997).................................................................................................12

*\*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984)..................................................................................10, 14, 21

*Citizens for Responsibility and Ethics in Washington v. FEC,*
  316 F. Supp. 3d 349 (D.D.C. 2018).........................................................................5

*Dick v. New York Life Ins. Co.,*
  359 U.S. 437 (1959)...............................................................................................11

*\*Eagle Pharms., Inc. v. Azar,*
  952 F.3d 323 (D.C. Cir. 2020)......................................................................3, 7, 9, 21

*Engine Mfrs. Ass'n v. EPA,*
  88 F.3d 1075 (D.C. Cir. 1996).................................................................................8

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000).................................................................................................9

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.,*
  554 U.S. 33 (2008)...................................................................................................5

*Int'l Union, UMW v. FMSHA,*
  920 F.2d 960 (D.C. Cir. 1990)...............................................................................22

*Landstar Express Am., Inc. v. Fed. Mar. Comm'n,*
  569 F.3d 493 (D.C. Cir. 2009).................................................................................9

*Mercy Hospital, Inc. v. Azar,*
  891 F.3d 1062 (D.C. Cir. 2018)...............................................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983).................................................................................................16

*Nat'l Ctr. for Mfg. Scis. v. Dep't of Defense,*
  199 F.3d 507 (D.C. Cir. 2000).................................................................................5

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012)...............................................................................................21

*NRDC v. EPA,*
  25 F.3d 1063 (D.C. Cir. 1994)..............................................................................4, 5

**Cases—continued**

*NRDC v. EPA,*
   489 F.3d 1250 (D.C. Cir. 2007)...........................................................................22

*SAS Inst., Inc. v. Iancu,*
   138 S. Ct. 1348 (2018)..........................................................................................4

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
   559 U.S. 393 (2010)............................................................................................11

*United States v. Mead Corp.,*
   533 U.S. 218 (2001)............................................................................................10

**Statutes, rules and regulations**

45 C.F.R.
   § 149.140(a)(1) ...................................................................................................13
   § 149.140(a)(7)(ii)...............................................................................................23
   § 149.140(a)(12) ...........................................................................................16, 18
   § 149.140(c)(3) ...................................................................................................23
   § 149.510(c)(4)(ii)........................................................................................3, 4, 6

29 U.S.C.
   § 1104(a)(1)(A) ...................................................................................................13

42 U.S.C.
   § 300gg-111(a)(1) ...............................................................................................21
   § 300gg-111(a)(2)(B)...........................................................................................18
   § 300gg-111(a)(3)(E)(i)..................................................................................12, 13
   § 300gg-111(a)(3)(E)(i)(I)....................................................................................18
   § 300gg-111(a)(3)(E)(iii)......................................................................................20
   § 300gg-111(a)(3)(H)...........................................................................................21
   § 300gg-111(b)(1).................................................................................................7
   § 300gg-111(b)(5)(C)(i).........................................................................................5
   § 300gg-112(a)(1)........................................................................................6, 7, 21
   § 300gg-112(a)(3)..................................................................................................3
   § 300gg-112(b)(2)(A)......................................................................................10, 11
   § 300gg-112(b)(5)(A).............................................................................................3
   § 300gg-112(b)(5)(C)(i)..........................................................................................6
   § 300gg-112(b)(5)(C)(ii).........................................................................................5

Fed. R. Evid. 302 .........................................................................................................11

**Other Authorities**

Amicus Br. of Members of Congress in Support of Plaintiffs at 4-11, *Am. Med.
   Ass'n v. HHS*, No. 21-cv-3231 (D.D.C. Jan. 12, 2022), ECF No. 44-1 .....................................

Ban Surprise Billing Act, H.R. 5800, 116th Cong. (2020).........................................9, 14

H.R. Rep. No. 116-615 (2020)...............................................................................9, 14, 15

**Other Authorities—continued**

Press Release, *Congressional Committee Leaders Announce Surprise Billing*
    *Agreement* (Dec. 11, 2020) .......................................................................1, 8, 15

*Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872 (July 13, 2021)
    86 Fed. Reg. at 36,882 ...............................................................................13, 15
    86 Fed. Reg. at 36,888 .......................................................................................20
    86 Fed. Reg. at 36,891 ...............................................................................17, 18
    86 Fed. Reg. at 36,892 ...............................................................................18, 19

*Requirements Related to Surprise Billing; Part II,* 86 Fed. Reg. 55,980 (Oct. 7, 2021)
    86 Fed. Reg. at 55,996 .................................................................................4, 10

**GLOSSARY**

| | |
|---|---|
| AAMS | Association of Air Medical Services |
| ERISA | Employee Retirement Income Security Act |
| IDR | Independent Dispute Resolution |
| IFR | Interim Final Rule |
| NSA | No Surprises Act |
| QPA | Qualifying Payment Amount |

**INTRODUCTION**

The No Surprises Act was intended to end surprise billing and to remove patients from the middle of payment disputes between insurers and certain emergency and other specialty providers, including air ambulance providers. The Act as passed was the product of a deliberate legislative compromise marked by a careful balancing of stakeholder interests. Press Release, *Congressional Committee Leaders Announce Surprise Billing Agreement* (Dec. 11, 2020), perma.cc/J2VZ-T6ZL. To "promote fairness in payment disputes" between out-of-network air ambulance providers and group health plans and issuers, the Act established an independent dispute resolution framework in which both sides submit an offer to an independent arbitrator that considers all relevant information and chooses one as the appropriate out-of-network rate. *Id.* Congress considered and rejected numerous other proposals, including bills that would have dictated payment rates outright by reference to an insurers' median in-network rate.[1]

The Departments would have the Court believe otherwise. As they tell it, and in reliance on a House Report for a rejected proposal that would have dictated rates up to certain values, the Act was designed to have the *Departments* dictate the outcomes of the IDR process and to ensure those outcomes were at the lowest possible cost to plans and issuers. That is not the balanced approach that Congress struck, and the Departments' undoing of Congress's design through interim final rules is unlawful.

*First*, in IFR Part II, the Departments added to the statute's text a mandate that the offer closest to the qualifying payment amount must be selected as the payment amount, save in rare instances. The Departments downplay what they have done, pretending that they have merely told arbitrators to "begin with" the QPA and then "move on to" the other factors. It speaks volumes that to defend what the Departments have done, it must be made unrecognizable. The rule does

---

[1]   We incorporate by reference the background section in our opening brief (Dkt. #5-1 at 3-14).

not merely tell the arbitrator the order in which to absorb information. It *mandates* that the arbitrator select the offer closest to the QPA, full stop, unless a party provides enough evidence on all the other mandatory statutory factors to show that the QPA "is materially different from the appropriate out-of-network rate." That does not allow meaningful consideration of all the factors Congress required the IDR entity to consider nor is it a meaningful escape hatch. The Departments specifically intended IDR entities to routinely select the QPA as the payment amount, directly contrary to the Act's text, structure, and purpose, and its promise that IDR entities would *independently* decide what a fair payment amount is in each case.

*Second*, along with mandating the QPA as the payment amount, the Departments further took it upon themselves to intentionally deflate the QPA for air ambulance providers through IFR Part I. Their brief attempts to justify doing so as ostensibly in pursuit of a policy to control healthcare costs by reducing healthcare providers' payments to unsustainably low levels. But, again, the Departments rely on the House Report for a rejected proposal that was intended to curb the growth of healthcare costs relative to the status quo by dictating median in-network rates. Congress chose not to adopt that proposal nor to go further and dictate even lower payment rates. Instead, Congress wanted *fair* payment rates. The Departments ignored statutory text, undisputable facts, and basic fairness when excluding myriad contract rates, ballooning geographic regions, and carving air ambulance providers alone out from the general regulatory definition of "same or similar specialty" to intentionally deflate the QPA.

Congress did not intend for healthcare providers to bear the full burden of a market recalibration meant to protect patients with health coverage from getting surprise medical bills. Unfortunately, the Departments it entrusted to implement the new system decided otherwise, jeopardizing the very viability of providers who furnish critical emergency services to those most in need. The challenged provisions in the IFRs are in excess of statutory limits, arbitrary and capricious, and contrary to law. They should be vacated.

**ARGUMENT**

I.    **IFR PART II'S WEIGHTING OF THE QPA IS INCONSISTENT WITH THE STATUTORY TEXT (COUNT I)**

We demonstrated in the opening brief (at 15-21) that Congress specifically addressed whether the QPA should bear controlling weight in the IDR process and decided it should *not*. The Departments attempt to both minimize IFR Part II's inconsistency with the statutory text and to justify it. But the statute's plain language forecloses the Departments' QPA presumption.

A.    **The statutory text belies the Departments' QPA presumption**

The statutory text is plain. It says first that "the certified IDR entity *shall (i) taking into account the considerations specified in subparagraph (C), select one of the offers* submitted under subparagraph (B) to be the amount of payment for such services determined under this subsection for purposes of subsection (a)(3)." 42 U.S.C. § 300gg-112(b)(5)(A). The directive to consider all information and to then "select one of the offers" is clear.

The Departments parroted this, providing that "the certified IDR entity must: select as the out-of-network rate … one of the offers submitted under paragraph (c)(4)(i) of this section, taking into account the considerations specified in paragraph (c)(4)(iii) of this section … ." 45 C.F.R. § 149.510(c)(4)(ii). So far, so good. But then they went an extra step and added language to the statute's text: "The certified IDR entity *must select the offer closest to the qualifying payment amount* unless the certified IDR entity determines that credible information submitted by either party under (c)(4)(i) clearly demonstrates that the qualifying payment amount is materially different from the appropriate out-of-network rate." *Id.* (emphasis added). "Where a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 337 (D.C. Cir. 2020) (quoting *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018)). The

3

Departments have supplanted the statutory text here. That should resolve matters, and the challenged portions of IFR Part II must be set aside.

The Departments effectively concede that a regulation deeming the QPA dispositive would run afoul of the statute's text. Their suggestion nonetheless (Dkt. #10-1 at 22-23) that they have been faithful to the text by granting a narrow window of opportunity for the other factors to have any relevance is strange indeed. A mandate that the winning offer *must* be the one closest to the QPA is nowhere in the text, and neither is a narrowly circumscribed license for the IDR entity to consider other statutorily enumerated information only where it is "credible" and "clearly demonstrate[s] that the QPA is materially different from the appropriate out-of-network rate." 45 C.F.R. § 149.510(c)(4)(ii). Had that been what Congress intended, the text would have looked far different. That is evidenced by the Departments' parroting of the statutory text and then adding to it.

### B.   The Departments' "interpretation" defies the unambiguous statutory text, structure, purpose, and legislative history of the NSA

In IFR Part II, the Departments characterized their authority for enacting the QPA presumption as the "best interpretation" of the statute (*Requirements Related to Surprise Billing; Part II,* 86 Fed. Reg. 55,980, 55,996 (Oct. 7, 2021)), ostensibly on a view that they have implicit authority to interpret ambiguities in the statute they administer. Their brief, however, belies the notion that they have in any sense "interpret[ed]" the statute. The Departments are grasping at textual, structural, and purposive straws. Congress foreclosed the QPA presumption the Departments have issued.

1.    The Departments' "text" analysis begins with ordering—the statute lists the QPA first. Dkt. #10-1 at 19. But similar interpretive efforts have been "easily dismissed." *NRDC v. EPA,* 25 F.3d 1063, 1071 (D.C. Cir. 1994). Where a statute lists factors without "assign[ing] any particular weight to them," the *decision-maker* is to weigh them, notwithstanding a claim that those at the beginning of the list are the "most important." *Id.*; *see also Am. Corn Growers Ass'n v. EPA,*

291 F.3d 1, 6 (D.C. Cir. 2002) ("To treat one of the five statutory factors in such dramatically different fashion distorts the judgment Congress directed the states to make.").

The Departments' only other textual hook is the word "additional." "Additional circumstances" appears in a statutory *heading* of the section enumerating the circumstances relevant to air ambulances (42 U.S.C. § 300gg-112(b)(5)(C)(ii)) and "additional" appears in the text of Subparagraph (C)(i)(II), referencing any "additional information" that the party chose to submit. According to the Departments, use of the word "additional" means that these circumstances must be "added to" "some other circumstance," *i.e.*, the QPA, and, ergo, they reasonably decided that Congress intended the QPA to be presumed dispositive. Not so.

As a preliminary matter, "[a] subchapter heading cannot substitute for the operative text of the statute," and "provisions in a statute do not always align with its title." *Citizens for Responsibility and Ethics in Washington v. FEC*, 316 F. Supp. 3d 349, 396 (D.D.C. 2018) (quoting *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008); *Nat'l Ctr. for Mfg. Scis. v. Dep't of Defense*, 199 F.3d 507, 511 (D.C. Cir. 2000)). The statutory text does not refer to the enumerated factors as "additional circumstances" when directing that the IDR entity "shall consider" them. 42 U.S.C. § 300gg-111(b)(5)(C)(i). The Departments' argument that the listed factors are merely "additional" and, thus, unimportant is inconsistent with the statutory text, which does not call them "additional" and requires they be considered.

Even so, calling something "additional" does not connote that the added material is less important or should be ignored except in limited circumstances. To be sure, it implies that some information already exists that is being added to (*see, e.g.*, *Additional*, Merriam-Webster.com), but it does not come with a thumb on the scale in terms of *relative* importance. And that is what this case is about—the Departments deeming the QPA presumptively dispositive. The Departments' cramped reading of "additional" is impossible to square with the operative text, which requires that the QPA be considered in every case "*and*" requires that all information submitted, including

information on the enumerated circumstances, be considered in every case. 42 U.S.C. § 300gg-112(b)(5)(C)(i). The Departments, by contrast, have deemed the QPA effectively dispositive and ordered the IDR entity to *ignore* this other information unless it is "credible" and "clearly demonstrate[s] that the QPA is materially different from the appropriate out-of-network rate." 45 C.F.R. § 149.510(c)(4)(ii). The word "additional" in a heading is far too slender a reed on which to rest the Departments' supposed "interpretation" of the statute.

2.      The Departments press on, invoking the "structure" of the NSA too. Dkt. 10-1 at 20-21. According to the Departments, the "overall statutory scheme" reflects that Congress "expect[ed]" the QPA to serve as a "proxy for the in-network price" and thus a "reasonable amount of payment." Dkt. #10-1 at 20. And so, the Departments say, their "interpretation" of the statute deeming the QPA essentially dispositive in the IDR process follows perforce.

The circuitous route the Departments must take to show this Congressional "expectation" undercuts the notion that this "expectation" exists. That is especially so when, had this expectation indeed existed, Congress could have easily said so by adding the text necessary to weight the QPA in the IDR process or by adopting any of the other proposals that dictated payment amounts. What is more, the Departments divine this "expectation" from the Act's patient cost-sharing limits. It is correct that the NSA limits patient cost-sharing for nonparticipating air ambulance services by requiring the application of "the same requirement that would apply if such services were provided by … a participating provider," with any cost-sharing "based on rates that would apply for such services if they were furnished by such a participating provider." 42 U.S.C. § 300gg-112(a)(1). The Act does *not*, however, tie patient cost-sharing for air ambulance services to the QPA. *See* Dkt. #5-1 at 31-33. The Departments seem to acknowledge this because they cite (unlawful) *IFR Part I* for the proposition that the QPA determines patient cost-sharing obligations. It does not. Patient cost-sharing for services provided by air ambulances is based on "the same requirement that would apply if such services were provided by such a participating provider," and is not tied

to the QPA. *See* 42 U.S.C. § 300gg-112(a)(1). *But compare id.* § 300gg-111(b)(1) (tying cost-sharing for *other* provider types to the "recognized amount," which may be the QPA). The Departments' interpretation of the statute does not reflect Congress's "expectation," particularly because it conflicts with what Congress enacted for patient cost-sharing for air ambulance services.

In addition to this misguided structural argument, the Departments contend that the statutory factors Congress specially listed are already taken into account in "calculation of the [QPA] in the first place." Dkt. #10-1 at 20-21. That is, the Departments presumed that Congress enacted redundancies (contrary to ordinary interpretive principles) and so took it upon themselves to read those redundancies out of the statute. But "redundancies that are subtle or pitted against otherwise plain meanings [are] feeble interpretive clues." *Mercy Hospital, Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018). That the QPA might indirectly account for some information relevant to the other factors is not "so unreasonable or so bizarre that the Congress could not have meant what it said" (*Eagle Pharms.*, 952 F.3d at 340): the IDR entity shall consider the QPA, the enumerated factors, and any other submitted information, save three limited data points.

3.     The Departments turn, then, to purpose. They lament that they find it "difficult to imagine" how an arbitrator could make a decision without starting with the QPA. Dkt. #10-1 at 21. That's an easy one. Each side gives the arbitrator an offer to choose from. Those are two clear starting points. The arbitrator can then consider the QPA for what it is—the median of *contracted* rates—evaluate all the other information submitted, and then decide which offer is the fairest *out-of-network* rate for the particular service.

Nor does this plain reading of the statute somehow undermine Congress's supposed goal of monitoring and controlling healthcare costs. Dkt. #10-1 at 21-22. As an initial matter, "an agency cannot 'avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy.'" *Eagle Pharms.*, 952 F.3d at 337 (quoting

*Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996)). The text here is clear and should not be overridden by the Departments' views about purpose.

Still, the Departments do violence to the policy choices that Congress did make. As we have explained (Dkt. #5-1 at 7-8), the NSA's goal was to extract *patients* from payment disputes and to set up a mechanism for providers and plans or issuers to efficiently reach a fair out-of-network rate through the IDR process. It was not to foist in-network prices onto out-of-network providers (though such proposals were considered and rejected)[2] nor to drive healthcare providers out of business and reduce access to critical services in the sole pursuit of reducing healthcare costs.[3] The NSA was, instead, a legislative compromise designed "to protect patients from surprise medical bills and establish a *fair* framework to resolve payment disputes between health care providers and health insurance companies." Press Release, *Congressional Committee Leaders Announce Surprise Billing Agreement* (Dec. 11, 2020), perma.cc/J2VZ-T6ZL (emphasis added). The mechanism Congress designed—forcing healthcare providers and plans or issuers to come to the table and leaving the patients out of it—will naturally control out-of-network healthcare costs. The NSA regulates payments for out-of-network healthcare services, just not in the way the Departments would have preferred. "[N]either courts nor federal agencies can rewrite a statute's plain

---

[2]     Various amici argue this point, asserting that the QPA presumption enables "predictability." *See* Amicus Br. of America's Health Insurance Plans, Dkt. #17-2; Amici Br. of Health Policy Experts, Dkt. #20-1; Amici Br. of Employer and Labor Organizations, Dkt. #21-2; Amici Br. of Patient Advocacy Organizations, Dkt. #24-1. But Congress did not set out to achieve "predictability" by making the QPA the out-of-network rate. That approach would (and does) defeat the entire purpose of baseball-style arbitration, which serves no meaningful purpose when it is modified to yield the same outcome (the QPA) in substantially all cases.

[3]     Throughout their brief, the Departments blame "private equity groups" for rising healthcare costs. *See, e.g.*, Dkt. #10-1 at 5-7. AAMS represents providers of all types, not only those funded by private investors. Regardless, healthcare providers, including air ambulances, are typically private entities that deliver critical and life-saving healthcare services. They must be able to cover their costs and make some amount of profit to carry on as viable businesses. The NSA is not about socialized medicine or doing away with private investment in healthcare. It is only about bringing plans and issuers and providers to the table to reach an appropriate out-of-network rate.

text to correspond to its supposed purposes." *Eagle Pharms.*, 952 F.3d at 334-335 (quoting *Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009)).

4.      This conclusion is reinforced by the legislative history, which reflects that the Departments' preferred policy is one that Congress considered and rejected. The Departments minimize the relevance of the legislative history (Dkt. #10-1 at 25), but it speaks volumes in a case like this, where an agency, under the guise of "interpretation," makes a policy choice Congress refused. *E.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147-148 (2000); *see also Amicus* Br. of Members of Congress in Support of Plaintiffs at 4-11, *Am. Med. Ass'n v. HHS*, No. 21-cv-3231 (D.D.C. Jan. 12, 2022), ECF No. 44-1 (describing the various proposals before Congress and its ultimate compromise in the NSA).

The Departments cite throughout their brief House Report No. 116-615, which pertains to one of the rejected proposals (the Ban Surprise Billing Act, H.R. 5800, 116th Cong. (2020)), considered by the House Committee on Education and Labor. That Committee proposed a structure in which plans would pay the "recognized amount"—a benchmark median of contracted rates like the QPA—with an "alternative payment" possibly determined through an IDR process if the median contracted rate was at least $25,000 for the air ambulance service. H.R. Rep. No. 116-615 at 8, 29-32, 58-59 (2020). *That* proposal was not adopted in the NSA.[4] Instead, the NSA establishes a balanced approach for all disputed cases that frees *patients* from payment disputes and requires providers and insurers to negotiate a fair payment amount or have one set by an IDR entity after

---

[4]   The Committee stated that its proposal was designed to reduce premiums and the deficit by "curbing cost growth *relative to the status quo*." H.R. Rep. No. 116-615 at 75 (2020) (emphasis added). Unlike the Departments, the Committee never sought to drive future payments to nonparticipating air ambulance providers down below the amounts historically paid to participating providers. Presumably, the Committee appreciated that doing so would jeopardize patient access to critical services.

considering all the statutory factors. IFR Part II's determination otherwise must be set aside at *Chevron* step one or, at minimum and for the same reasons, at *Chevron* step two.

### C.     There is no explicit statutory gap for the Departments to fill with a regulation that dictates IDR outcomes

Though the rulemaking suggested that IFR Part II was an "interpretation" of the statute (86 Fed. Reg. at 55,996), the Departments briefly imply (Dkt. #10-1 at 23-24) that Congress expressly "assign[ed] to the Departments, not individual private arbitrators, the responsibility to resolve any ambiguities with regard to how the statutory factors are to be applied." As an initial matter, even where Congress has left an explicit gap, the agency cannot fill it with a "regulation … manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). And IFR Part II's QPA presumption is indeed manifestly contrary to the statute.

Regardless, there was no such explicit gap for the *Departments* to weigh the statutory factors that Congress directed the *IDR entity* to weigh. At most, Congress gave the Departments authority to "establish by regulation … one independent dispute resolution *process* … under which … a certified IDR entity under paragraph (4) determines, subject to subparagraph (b) and in accordance with the succeeding provisions of this subsection, the amount of payment." 42 U.S.C. § 300gg-112(b)(2)(A) (emphasis added).

The need for "one" "process" was necessary because the NSA applies to plans regulated by three different Departments and the Office of Personnel Management under four different statutes (ERISA, the Internal Revenue Code, the Public Health Service Act, and the Federal Employees Health Benefit Act). Congress thus envisioned a cooperative effort among the Departments to consolidate the *process*. A license to prescribe a unitary process is not a license to revise the *substance* of the payment decision in a way that contradicts Congress's enactment. Dkt. #5-1 at 15 n.6. Instead, Congress directed that the Departments prescribe a unitary process by which the *IDR entities* would "in accordance with the succeeding provisions of *this subsection*" determine the

appropriate out-of-network rate. 42 U.S.C. § 300gg-112(b)(2)(A) (emphasis added). Congress deemed the *statute* to be the guiding light for the IDR entities in determining the out-of-network rate. Indeed, the law often distinguishes between process and substance (*see, e.g.*, *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010)), and "presumptions (and their effects) and burden of proof are 'substantive'" (*Dick v. New York Life Ins. Co.*, 359 U.S. 437, 446 (1959); Fed. R. Evid. 302). Congress's narrower grant to the Departments—only to prescribe a unitary "process"—confirms that it did not leave a gap, let alone an express one, for the Departments to dictate the substantive outcomes of that process.

The Departments suggest that it was "implausible" that Congress intended "private arbitrators [to] enjoy 'complete discretion' to weigh any of the statutory factors in any way they choose." Dkt. #10-1 at 24. But the Departments do not explain what is implausible about that. That is, after all, the point of enacting an IDR process—to choose who will be the decision-maker. Congress directed the IDR entities to review the two offers, the QPA, information on all the other factors, and to select the appropriate out-of-network rate. That is not a "standardless delegation" of authority. *Id.* What *is* implausible—and utterly contrary to the text—is the notion that Congress intended for the *Departments* to make the QPA effectively dispositive of every payment dispute after going to all the trouble of designing an IDR process that did *not* select the Departments as the decision-maker, did *not* select the QPA as presumptively dispositive, and did *not* impose heighted evidentiary requirements on the factors. The challenged provisions of IFR Part II should be set aside.

## II. IFR PART I'S INTENTIONAL DEFLATION OF THE QPA IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW (COUNT II)

We demonstrated in the opening brief (at 22-33) that the Departments have also implemented a definition of the QPA that is inconsistent with the statutory text and arbitrary and capricious and with the express purpose of deflating the payments that air ambulance providers could

receive through the IDR process. The Departments' response cannot salvage the challenged provisions.

**A.      The Departments' QPA methodology for nonparticipating air ambulance services is contrary to law, arbitrary, and capricious**

>   **1.      *The QPA methodology impermissibly excludes myriad contracted rates from the calculation of the median***

IFR Part I first impermissibly deflates the QPA by excluding vast swaths of contracted rates common in the industry, contrary to the statutory text and to APA principles. *See* Dkt. #5-1 at 22-27. The Departments' defense of their exclusion of these contracts fails.

a.      As we explained (at 22-24), the statutory text belies the Departments' excision of single-case and other agreements from the contracted rates used to calculate the QPA. The Departments, however, argue (at 27-28) that the statutory text supports their rule. They contend that the text's use of the parenthetical "under such plans or coverage" means that the statute encompasses only rates contracted "under the *generally applicable* terms of a health plan or health insurance policy." Dkt. #10-1 at 28 (emphasis added). But courts "ordinarily resist reading words … into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997). The text does not refer to "generally applicable" rates. Instead, the text requires considering any "contracted rates recognized by the plan or issuer … as the total maximum payment … under such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i). By definition, a single case agreement contains a rate that is contracted and, thus, is recognized by the plan or issuer as the total maximum payment under the plan or coverage. Indeed, air ambulance providers and plans or issuers can reach contractual agreements with respect to a particular patient or even for multiple transports. Single-case and similar agreements are contracted and often for multiple cases. These contracted rates reflect the appropriate market rate in an industry where in-network contracts can be hard to come by given that plans and issuers have little incentive to reach agreement.

For their "generally applicable" limitation, the Departments place particular emphasis on the phrase "*under* such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i) (emphasis added). In their telling, "under" such plans or coverage must mean the "generally applicable terms" of the plans or coverage. But the text does not say that. If a plan or issuer reaches an agreement to reimburse a provider for services, reimbursement must necessarily be under the plan or coverage; otherwise, the plan or issuer would be dispensing plan assets without any apparent plan purpose. *But cf.* 29 U.S.C. § 1104(a)(1)(A) (obligating an ERISA plan fiduciary to perform his duties "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; (ii) and defraying reasonable expenses of administering the plan").

The Departments, too, recognized that single-case agreements are rates "under the plan" through the way they defined "contracted rate"—acknowledging that a "single case agreement … supplement[s] the network of the plan or coverage for a specific participant." 45 C.F.R. § 149.140(a)(1); *accord Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872, 36,882 (July 13, 2021) (an "individual would expect items and services delivered at a health care facility that has a single case agreement in place with respect to the individual's care to be delivered on an in-network basis"). Their brief has no answer to this. A single-case agreement is a rate contracted under the plan, and the statute does not include the "generally applicable" limitation the Departments urge in their brief. These agreements are squarely within the statute's plain language.

Nor does the statute's use of "insurance market" change things. We agree that the statute directs that the contracted rates must be "determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered *within the same insurance market*." 42 U.S.C. § 300gg-111(a)(3)(E)(i) (emphasis added). But that just means if an issuer offers multiple plans in the same market (e.g., self-insured group health plans), then *all* rates, including the single-case rates under all the plans offered in the same market, are included in calculating the median contracted rate.

As a final argument, the Departments try to analogize single-case agreements to payment amounts adjudicated under the NSA's IDR process, implying that it would not make sense to include IDR payment amounts, so single-case agreements should not be included either. But that is not the result of AAMS's argument. Contracted rates, of course, must be *contracted* for. A payment amount dictated through the IDR process is not a "contracted" rate; it is the rate decided and paid when contract negotiations have irretrievably broken down. The opposite is true for single-case agreements, which *are*, as the Departments' own rule acknowledged, rates contracted under the plan. With the statutory text plain, the Court's inquiry is complete. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-843 (1984). The Departments' excision of single-case and other types of agreements must be set aside.

      b.      The Departments' choice to exclude single-case and other agreements was also arbitrary and capricious with respect to the air ambulance industry.

*First*, we explained that the exclusion of single-case agreements was arbitrary and capricious because the Departments, in trying to capture "market rate[s]," purposefully excluded market rates ubiquitous in the industry. Dkt. #5-1 at 25-26. Apparently recognizing that they have *not* captured market rates by excluding single-case agreements and thus acted capriciously, the Departments change their tune, ascribing a different "purpose" to the NSA. Dkt. #10-1 at 28-29. They now say the NSA was meant to "resolve" the "market failure" of air ambulances "charg[ing] far more" than is "fair." Dkt. #10-1 at 28-29.

But the House Report they cite, again, pertains to a bill that was considered and rejected. *See supra* at 9-10; H.R. Rep. No. 116-615 (2020) (accompanying H.R. 5800). The House Committee on Education and Labor proposed a structure in which plans would pay the "recognized amount"—a benchmark median of contracted rates like the QPA—with an "alternative payment" potentially determined through an IDR process if the median contracted rate was at least $25,000

for the air ambulance service. *Id.* at 8, 29-32, 58-59. That proposal, indeed, would have concluded that the QPA-equivalent *is* the out-of-network rate until it reaches a certain dollar value threshold.

Additionally, the Departments' newfound statutory purpose fundamentally conflicts with Congress's purpose in enacting the NSA. As we have already explained, the NSA was a legislative compromise designed "to protect patients from surprise medical bills and establish a fair framework to resolve payment disputes between health care providers and health insurance companies." Press Release, *Congressional Committee Leaders Announce Surprise Billing Agreement* (Dec. 11, 2020), perma.cc/J2VZ-T6ZL. The NSA enacted a Congressionally designed market recalibration that put payment disputes into the hands of IDR entities *without* any thumb on the scale in favor of the QPA. That is the policy Congress chose after balancing the interests of all the stakeholders. While it is not the one the Departments would have preferred, the NSA's text overwhelmingly reflects that appropriate out-of-network rates have to be reached by having plans or issuers and providers go through the IDR process, *not* by federal fiat dictating that a "fair" rate means the median of an underinclusive set of contracted rates, particularly given the high volume of "contracted rates" in single-case and similar agreements that are fair market rates.

*Second*, the Departments defend their choice to treat single-case agreements as contracts for one purpose (defining who is a "participating" provider) but not other purposes (deciding what contracts must be considered in calculating the QPA). The Departments say only that these contexts are "different." But that makes no sense—the Departments have said that a certain kind of agreement *is* and *is not* a contract at the same time under the same statute, all depending on their (misguided) views about what produces the best policy. But agencies are not entitled to ignore statutory text in favor of their preferred outcomes; their job, instead, is to implement the statute that Congress actually wrote. On that score, the Departments' recognition that a contract is a contract for purposes of balance billing protections (86 Fed. Reg. at 36,882) but not for purposes of calculating the benchmark rate is arbitrary and not consistent with law.

The NSA directed that all contracted rates should be considered in calculating the median, and the Departments' exclusion of the predominant method of contracting to set market rates in the industry plainly conflicts with the statutory text.

### 2. The QPA methodology arbitrarily carves air ambulance services out from the general definition of "same or similar specialty"

We explained (at 27-29) that IFR Part I arbitrarily treats all air ambulance services as the same specialty, though they are not, and it does so even while allowing freestanding and hospital-based emergency facilities to be treated differently. The Departments first assert (at 30-31) that "[a]ll air ambulance providers perform the same service," suggesting they must be the same "specialty" under the statute because specialties mean "cardiology or urology." Dkt. #10-1 at 30-31. That argument diverges from IFR Part I's "specialty" definition. In IFR Part I, the Departments defined "provider in the same or similar specialty" to mean "the practice specialty of a provider, *as identified by the plan or issuer consistent with the plan's or issuer's usual business practice*, except that, with respect to air ambulance services, all providers of air ambulance services are considered to be a single provider specialty." 45 C.F.R. § 149.140(a)(12) (emphasis added). Once again, the Departments promulgated a general definition of a term and then excluded air ambulances from it. Contrary to their argument in litigation, the Departments did not consider the definition of a "specialty" to turn on whether the provider "perform[s] the same service for patients." Dkt. #10-1 at 30. Instead, they decided it should be determined consistent with insurers' "usual business practice," *except* in the case of air ambulance services. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). The Departments did not say in IFR Part I that a "specialty" turns on whether the services provided are sufficiently the same or not from the patient's perspective. Instead, they said it turns on insurers' usual business practices.

16

The exemption requiring the treatment of all air ambulance providers as the same specialty cannot be defended on the reasoning the Departments gave. They said that "types of air ambulance providers" should not be considered different specialties, regardless what insurers' usual business practices are, because patients cannot "choose" the air ambulance provider and should not have to pay "higher cost-sharing" because of that lack of choice. 86 Fed. Reg. at 36,891. But the NSA was not meant to relieve patients of cost-sharing they would otherwise have to pay under their plan nor was it meant to result in intentionally deflated payment rates. It, instead, was designed to set cost-sharing at the level a patient would expect to pay a participating provider under their plan (hence "no surprises") and to ensure that the nonparticipating provider receives a fair payment rate. *See* Dkt. #5-1 at 31-33. The Departments' justification for treating different air ambulance providers as members of the same specialty in all cases, regardless of what the usual business practices of plans and issuers would warrant, is arbitrary and capricious.

The Departments carved air ambulance providers out from their general definition of "provider in the same or similar specialty" because they recognized that the usual business practice of at least some plans or issuers is to treat hospitals as a specialty different from all other air ambulance providers. Otherwise, there would have been no reason for the carve-out. The Departments further recognized that the result of that differentiation is that hospitals "sometimes have lower contracted rates" than independent air ambulance providers (86 Fed. Reg. at 36,891).

None of this is surprising. Hospitals are facilities; they provide a wide range of emergency and scheduled services in addition to air ambulance services. Hospitals can provide additional services to the patients they bring to their facilities by air ambulance. And they can transport patients between their facilities to deliver even more services. Other air ambulance providers furnish

17

one service. Naturally, some plans or issuers recognize these differences, treat hospitals and other air ambulance providers as separate specialties, and contract with them differently.[5]

This conclusion is reinforced by the approach the Departments took with respect to hospital-based and freestanding emergency departments, allowing the payment rate to be calculated separately for these facilities. Dkt. #5-1 at 28-29. But the Departments disagree. First, they say that "facility," not "specialty," was the statutory word under consideration when treating emergency departments differently. But they fail to explain how that distinction is material. The statute itself requires that the QPA be calculated only with respect to providers "in the same or similar specialty" (42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)), but gives the Departments permission to account for differences in "facility type" (*id.* § 300gg-111(a)(2)(B)). That is, the Departments had permission to account for differences in facility type but an *obligation* to account for differences in provider specialty. That they did account for differences with respect to emergency departments but refused with respect to air ambulance providers is potent evidence of arbitrariness. What is more, the Departments came to essentially the same conclusion on how to address both of these criteria—by looking to how the specialty or facility is treated under plans' usual practices. *Compare* 45 C.F.R. § 149.140(a)(12), *with* 86 Fed. Reg. at 36,891-36,892. Yet, when it came time to consider air ambulance provider specialties that are treated differently in contracting with insurers, the Departments refused to apply that same logic. Suddenly, for air ambulance providers, the Departments

---

[5]     The *amicus* brief of the Association of Critical Care Transport (ACCT) (Dkt. #27-4) illustrates why the Departments should apply the same definition of "provider in the same or similar specialty" to all providers, including air ambulance providers. ACCT asserts that the Departments should treat hospitals and other air ambulance providers as the same specialty. But in taking that position, ACCT ignores the Departments' recognition that at least some plans or issuers already treat hospitals and other air ambulance providers as separate specialties and contract with them accordingly. Regardless, the only defensible outcome here, as a matter of statutory text, is to apply the same general definition to air ambulance providers that applies to all other providers. Under that definition, the plan or issuer will use QPAs across geographic regions that account for the considerations that led the plan or issuer to treat hospitals and other air ambulance providers as the same or different specialties in the first place.

decided that the contracting practices of plans and issuers are irrelevant. That is arbitrary reasoning.

The Departments further defend their differential treatment of air ambulance providers versus emergency departments by saying they drew the distinction because "there are material differences in the case-mix and level of patient acuity" between freestanding and hospital-based emergency departments. Dkt. #10-1 at 31. But they reasoned in IFR Part I's preamble only that "there *may* be appreciable differences in the case-mix and level of patient acuity between these types of facilities" (86 Fed. Reg. at 36,892 (emphasis added)) before deferring to insurers' contracts varying the payment rates between these facility types. Affirmatively refusing to give air ambulance provider specialties the same treatment is arbitrary and contrary to the Departments' own acknowledgment that hospitals and other air ambulance providers receive different contracted rates from some plans or issuers.

### 3. *The QPA methodology uses overbroad geographic regions that defeat the structure of the statute and will produce absurd results*

Our opening brief explained (at 29-30) that the Departments further intentionally deflated the QPA by relying on overbroad geographic regions, such that contracted rates in Hawaii could dictate rates in California or rates in Florida could dictate the QPA in Washington, D.C. The Departments do not dispute these absurd results, but they defend the choice anyway (at 31-32).

The Departments first argue that they reasonably chose to define the geographic regions as large as they did to reduce instances in which there are too few contracted rates to calculate the QPA. Dkt. #10-1 at 32-33. But that is a problem of the Departments' own making by excluding myriad contracted rates from the QPA calculation. *See* Dkt. #5-1 at 22-27; *supra* at 12-16. Had they properly included all these contracted rates as the statute requires, the risk of "insufficient information" would plummet.

Additionally, the Departments acknowledge that the *statute* prescribes a mechanism for filling the gap where there are an insufficient number of contracted rates, by using a third-party database. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(iii); Dkt. #10-1 at 32-33. But they contend that Congress intended them to "minimize" its use only to "circumstances where the plan or issuer cannot rely on its contracted rates as a reflection of the market dynamics in the geographic region." Dkt. #10-1 at 32-33 (quoting 86 Fed. Reg. at 36,888). But that is circular reasoning. It assumes that there *are* "market dynamics" in a region spanning many states and even crossing oceans. The Departments do not have factual support for that proposition, and it is dubious, particularly given the prevalence of state-by-state insurance plans. The Departments offered no factual or legal basis for believing these ballooned geographic regions have any semblance of "market dynamics" within them. The Departments identified no support for the notion that air ambulance providers serving the Washington, D.C. metro area are competing with air ambulance providers serving Miami, Florida, for inclusion in networks serving residents of each of these areas. Yet the necessary implication of their reasoning is that a rate in Miami, Florida, should dictate payment for Washington, D.C. The Departments' "market dynamics" rationale is arbitrary and capricious given that they did not undertake to understand the geographic dynamics in the air ambulance industry at all.

The Departments' strained "market-dynamics" reasoning is really a restatement of their primary justification—that they should have overbroad geographic regions to ensure that there would be a sufficient number of contracted rates to calculate the QPA. But Congress enacted a solution that addresses this concern, and it was *not* to iteratively expand the geographic region until enough rates would be captured. It was, instead, to require the Departments to define an appropriate geographic region and, then, to rely on third-party databases when the region lacks sufficient contracted rates to calculate the QPA. The Court should therefore vacate the Departments' overbroad Census-division-level regions.

**B.    The Departments' policy of deflating the QPA for air ambulance providers to reduce patient cost-sharing is inconsistent with the statutory text and purpose**

A final point bears emphasis. At various points throughout their briefing, the Departments ascribe to the NSA the goal of reducing patient cost-sharing by deflating the QPA. We explained (at 31-33) that the NSA unambiguously does *not* tie patient cost-sharing to the QPA for air ambulance providers.

The Departments, however, argue that they "reasonably… filled this gap by looking to the Act's parallel structure for services performed by health facilities and providers." Dkt. #10-1 at 34. This, they say, permits them to tether patient cost-sharing for nonparticipating air ambulance services to the QPA *rather than*, as the statute directs, to "the same requirement that would apply if such services were provided by a participating provider." 42 U.S.C. § 300gg-112(a)(1).

The Departments' admission that they used the "parallel structure" from another part of the Act defeats their argument. "Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012). Congress chose to calculate patient cost-sharing based on the QPA for *other* providers, directing that the "cost-sharing requirement is calculated as if the total amount that would have been charged … were equal to the recognized amount" (42 U.S.C. § 300gg-111(a)(1)), which, in turn, is defined as an amount set by state law *or* the QPA (*id.* § 300gg-111(a)(3)(H)). Congress chose a different approach for air ambulance services and did not incorporate the QPA into the determination of patient cost-sharing. "Although the [Departments] may believe that" their approach "better accomplishes the [NSA's] goals, 'under *Chevron*,' an agency cannot 'avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy.'" *Eagle Pharms.*, 952 F.3d

21

at 337. Congress enacted two different approaches for patient cost-sharing. The Departments cannot override that choice. As such, intentionally deflating the QPA cannot be justified by its supposed effect on reducing patient cost-sharing.

## III.   THE COURT SHOULD VACATE THE UNLAWFUL PORTIONS OF THE IFRS

The Departments agree with us that any relief in this case should be limited only to the portions of the IFRs that AAMS challenged. Dkt. #5-1 at 35-36. They diverge, however, by arguing that the relief should not be vacatur of the challenged provisions but a remand. The Departments are wrong. Vacatur of the challenged provisions is the proper remedy.

"If an appellant has standing … and prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001). Vacatur is particularly appropriate when a court's "decision foreclose[s]" the agency from "promulgating the same standards on remand." *NRDC v. EPA*, 489 F.3d 1250, 1261-1262 (D.C. Cir. 2007). And, even in the case of an "inadequately supported rule," courts still must weigh "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed" to remand rather than vacate. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-151 (D.C. Cir. 1993) (quoting *Int'l Union, UMW v. FMSHA*, 920 F.2d 960, 967 (D.C. Cir. 1990)).

Under these standards, the normal remedy of vacating all the challenged provisions is the right one.

*First*, AAMS's success on its claims should foreclose the Departments from issuing most, if not all, of these same standards on remand. In particular, the Departments' QPA presumption in IFR Part II and its exclusion of vast swaths of contracted rates in IFR Part I are inconsistent with the statutory text and, thus, could not be re-promulgated on remand. Vacatur is thus especially warranted. *See, e.g.*, *NRDC*, 489 F.3d at 1261-1262.

*Second*, insofar as the Court's decision rests on inadequate support that could theoretically be cured, both factors weigh in favor of vacatur. For the many reasons we have explained at length, the deficiencies in the challenged provisions are serious. Each challenged provision was premised on and infected by the Departments' own policy choice—to intentionally deflate insurers' payments to healthcare providers as much as possible regardless of the loss of patient access to services—a policy that Congress considered but did not enact. These are serious deficiencies. The Departments contend that there is "a serious possibility" they could substantiate the challenged provisions in a forthcoming final rulemaking. But, as we have explained, in the main, the challenged provisions are flatly contrary to the statutory text, and they are all based on flawed policy judgments that Congress rejected. Stripped of those improper policy considerations, the likelihood that any of the challenged provisions could be justified is, at best, extremely low and does not support a lesser remedy than AAMS should presumptively have for succeeding on its APA claims.

Even were there any possibility the Departments could reach any of these same judgments, the Departments have not identified any meaningful disruption that would outweigh the need to vacate the challenged provisions, and there is not any. With respect to IFR Part II, the arbitrators simply need to apply the statutory factors as written, without any presumption to choose the offer closest to the QPA nor to impose a heightened credibility standard. There will not be any disruption to IDR entities' ability to select the prevailing offer in the IDR process consistent with the statute. With respect to IFR Part I, the IDR process remains completely operable even with the challenged provisions excised. Insurers can still calculate the QPA; they simply need to include *all* contracted rates, segregate rates by provider specialty consistent with the statute, and determine geographic regions by using the Departments' state-by-state method (*see* 45 C.F.R. § 149.140(a)(7)(ii)) or by defaulting to third party databases (*see id.* § 149.140(c)(3)). The IDR process can proceed apace with these refinements.

The Departments' assertion of disruption is overblown. They say that arbitrators will have "no guidance as to how to proceed." Dkt. #10-1 at 23. That is not correct; the arbitrators simply need to follow the statutory and regulatory process without weighting the QPA or applying a heightened credibility or materiality standard to other factors. The IDR entities will still be able to collect information and then choose one of the offers. The Departments also say that other stakeholders have an interest in a rule "that prohibit[s] balance billing and that will reduce upward pressure on health costs." *Id.* at 35. As to the first reason, AAMS has not challenged the prohibitions on balance billing. Those all remain in effect, including by statute. As to the second reason, that is not a meaningful disruption either. As we have explained, Congress's design *does* control healthcare costs. Vacating the challenged provisions leaves Congress's design and most of the Departments' design in place. The No Surprises Act will continue to control healthcare costs without running healthcare providers out of business, thus fulfilling Congress's objective.

All in all, vacating the challenged provisions leaves in place a complete statutory process that enables IDR to still proceed in accord with Congress's design and without causing serious irreparable harm to healthcare providers in the interim. *See* Foster Decl. (Dkt. #1-5); Preissler Decl. (Dkt. #1-6); Portugal Decl. (Dkt. #1-7); Sannerud Decl. (Dkt. #5-2); Eastlee Decl. (Dkt. #5-3) ¶ 12.

## CONCLUSION

The Court should grant AAMS's motion for summary judgment, deny the Departments' cross-motion for summary judgment, and enter final judgment vacating the challenged portions of the IFRs.

Dated: February 1, 2022                         Respectfully submitted,

                                                /s/ *Sarah P. Hogarth*
                                                Brian R. Stimson (D.C. Bar No. 1657563)
                                                Sarah P. Hogarth (D.C. Bar. No. 1033884)
                                                MCDERMOTT WILL & EMERY LLP
                                                500 North Capitol Street NW
                                                Washington, DC 20001
                                                (202) 756-8000
                                                bstimson@mwe.com
                                                shogarth@mwe.com

                                                *Attorneys for Plaintiff*
                                                *Association of Air Medical Services*