IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| ASSOCIATION OF AIR MEDICAL SERVICES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-03031-RJL |
| | ) | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) | Consolidated with No. 1:21-cv-03231-RJL |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

I.     THE RULE'S ARBITRATION PROCEDURES ARE CONSISTENT WITH THE NO SURPRISES ACT. ................................................................................... 3

     A.    The Departments Reasonably Exercised Their Statutory Authority to Guide the Discretion of Arbitrators. ................................................................... 3

     B.    The Departments Are Entitled to *Chevron* Deference. ................................. 10

     C.    The Arbitration Rule Is Procedurally Proper. .............................................. 14

II.    THE DEPARTMENTS ADOPTED A REASONABLE METHODOLOGY TO CALCULATE THE QUALIFYING PAYMENT AMOUNT. ................................. 19

     A.    The Departments Reasonably Established a Methodology for the Calculation of the Median of Contracted Rates. .............................................................. 19

     B.    The Departments Reasonably Treated All Air Ambulance Providers as in the Same or Similar Specialty. ........................................................................... 22

     C.    The Departments Reasonably Defined Geographic Regions for Use in Calculating the Qualifying Payment Amount. ............................................... 24

     D.    The Departments Reasonably Interpreted the Act to Base Patients' Cost-Sharing for Air Ambulance Services on the Qualifying Payment Amount ...... 25

III.   ANY RELIEF SHOULD BE APPROPRIATELY LIMITED. ................................. 27

CONCLUSION ................................................................................................................. 29

## TABLE OF AUTHORITIES

### Cases

*Adirondack Med. Ctr. v. Sebelius,*
    740 F.3d 692 (D.C. Cir. 2014) ................................................................................................11

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ................................................................................................28

*Am. Corn Growers Ass'n v. EPA,*
    291 F.3d 1 (D.C. Cir. 2002)......................................................................................................8

*Am. Great Lakes Ports Ass'n v. Schultz,*
    962 F.3d 510 (D.C. Cir. 2020) ................................................................................................29

*Am. Hosp. Ass'n v. Azar,*
    964 F.3d 1230 (D.C. Cir. 2020) *cert. denied*, 141 S. Ct. 2853 (2021). ..................................11

* *Am. Hosp. Ass'n v. NLRB,*
    499 U.S. 606 (1991) ................................................................................................................9

*Am. Med. Ass'n v. Reno,*
    57 F.3d 1129..........................................................................................................................28

*Ardestani v. INS,*
    502 U.S. 129 (1991) ..............................................................................................................20

*Asiana Airlines v. FAA,*
    134 F.3d 393 (D.C. Cir. 1998) ................................................................................................16

*AT&T Servs., Inc. v. FCC,*
    21 F.4th 841 (D.C. Cir. 2021) ................................................................................................29

*Baptist Mem'l Hosp.-Golden Triangle v. Sebelius,*
    566 F.3d 226 (D.C. Cir. 2009) ................................................................................................12

*Biden v. Missouri,*
    142 S. Ct. 647 (2022) ........................................................................................................ 17, 18

*Catwaba Cnty. v. EPA,*
    571 F.3d 20 (D.C. Cir. 2009) ................................................................................................27

*Chamber of Commerce of U.S. v. SEC,*
    412 F.3d 133 (D.C. Cir. 2005) .......................................................................................... 13, 24

*Chevron, U.S.A. v. Natural Res. Def. Council,*
    467 U.S. 837 (1984)................................................................................................................2

*City of Arlington v. FCC,*
    569 U.S. 290 (2013) ................................................................................................................11

\* *Coalition for Parity, Inc. v. Sebelius,*
    709 F. Supp. 2d 10 (D.D.C. 2010) .........................................................................................19

*Cogentrix Energy Power Mgmt., LLC v. FERC,*
    --- F.4th ---, 2022 WL 258592 (D.C. Cir. Jan. 28, 2022) ................................................ 11, 27

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ................................................................................................................12

\* *FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) ...........................................................................................................19

*Fisher v. PBGC,*
    994 F.3d 664 (D.C. Cir. 2021) ...............................................................................................27

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.,*
    554 U.S. 33 (2008) ...................................................................................................................5

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ................................................................................................................12

*Friedman v. Sebelius,*
    686 F.3d 813 (D.C. Cir. 2012) .................................................................................................5

*Fund for Animals, Inc. v. Kempthorne,*
    472 F.3d 872 (D.C. Cir. 2006) ...............................................................................................10

*Growth Energy v. EPA,*
    5 F. 4th 1 (D.C. Cir. 2021) ................................................................................................13, 24

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.,*
    685 F.3d 353 (3d Cir. 2012) ...................................................................................................11

\* *In re Border Infrastructure Env't Litig.,*
    915 F.3d 1213 (9th Cir. 2019) ..................................................................................................5

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ...........................................................................................................16

\* *Martin v. Occupational Safety & Health Rev. Comm'n,*
    499 U.S. 144 (1991) .................................................................................................................9

*Methodist Hosp. of Sacramento v. Shalala,*
    38 F.3d 1225 (D.C. Cir. 1994) ...............................................................................................16

*Michigan v. EPA,*
  576 U.S. 743 (2015) ...................................................................................................16

*Peretz v. United States,*
  501 U.S. 923 (1991) .....................................................................................................6

*Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.,*
  471 F.3d 1350 (D.C. Cir. 2006) ................................................................................12

*Ramirez v. ICE,*
  471 F. Supp. 3d 88 (D.D.C. 2020) ..............................................................................8

*Shands Jacksonville Med. Ctr. v. Burwell,*
  139 F. Supp. 3d 240 (D.D.C. 2015) ..........................................................................28

*SoundExchange, Inc. v. Copyright Royalty Bd.,*
  904 F.3d 41 (D.C. Cir. 2018) ....................................................................................12

*Springer v. Fairfax Cnty. Sch. Bd.,*
  134 F.3d 659 (4th Cir. 1998) ......................................................................................5

*Temple Univ. Hosp. v. NLRB,*
  929 F.3d 729 (D.C. Cir. 2019) ..................................................................................28

*United States v. Nordic Village, Inc.,*
  503 U.S. 30 (1992) .......................................................................................................5

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ...................................................................................................11

*Van Hollen v. FEC,*
  811 F.3d 486 (D.C. Cir. 2016) ..................................................................................27

*Weyerhaeuser Co. v. Costle,*
  590 F.2d 1011 (D.C. Cir. 1978) ..................................................................................8

**Statutes**

5 U.S.C. § 706 ..................................................................................................... 12, 13

26 U.S.C. § 9833 ........................................................................................................15

29 U.S.C. § 1191c ......................................................................................................15

* 42 U.S.C. § 300gg-92 ..............................................................................................15

* 42 U.S.C. § 300gg-111 .....................................................................................passim

* 42 U.S.C. § 300gg-112 .....................................................................................passim

42 U.S.C. § 7491 .............................................................................................................8

Pub. L. No. 116-260, Div. BB, § 103(a), 134 Stat. 1182 (2020) ..................................5

**Regulations**

45 C.F.R. § 149.140..................................................................................................19, 24

45 C.F.R. § 149.510...................................................................................................*passim*

45 C.F.R. § 149.520.......................................................................................................4

*Requirements Related to Surprise Billing: Part I,*
    86 Fed. Reg. 36,872 (July 13, 2021) ..............................................................*passim*

*Requirements Related to Surprise Billing: Part II,*
    86 Fed. Reg. 55,980 (Oct. 7, 2021) ..............................................................*passim*

**Other Authorities**

Centers for Medicare & Medicaid Servs., *Report: No Surprises Act Listening Session with Providers*
    (Apr. 14, 2021) ........................................................................................................16

Cong. Budget Office, *H.R. 5826, the Consumer Protections Against Surprise Medical Bills Act of 2020,*
    *as Introduced on February 10, 2020* (Feb. 11, 2020) ....................................13

Eileen Applebaum and Rosemary Batt, *Private Equity Buyouts in Healthcare: Who Wins, Who Loses?,*
    Institute for New Economic Thinking Working Papers (Mar. 15, 2020) .........23

Erin C. Fuse Brown et al., *Out-of-Network Air Ambulance Bills: Prevalence, Magnitude, and Policy*
    *Solutions*, 98 MILBANK QUARTERLY 747 (2020) ....................................20, 25

Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Affairs
    Forefront (Mar. 26, 2021) ..................................................................................21, 25

H.R. 5826, § 7, 116th Cong. (2020)............................................................................13

H.R. REP. NO. 116-615 (2020) .............................................................................8, 9

Loren Adler et al., *High Air Ambulance Charges Concentrated in Private Equity-Owned Carriers*,
    USC-Brookings Schaeffer on Health Policy (Oct. 13, 2020) ..............................23

Loren Adler et al., *Understanding the No Surprises Act*, USC-Brookings Schaeffer Initiative for
    Health Policy (Feb. 4, 2021) ................................................................................8

Medical Billing and Coding Certification,
    https://www.medicalbillingandcoding.org/cpt-modifiers/ ..................................7

Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. POL.
    ECON. 3626 (2020)...............................................................................................20

## INTRODUCTION

Congress enacted the No Surprises Act to address a market failure. In a free market, parties negotiating at arm's length will arrive at a fair price for a given product. The health care market, however, often has not worked in this way. In an emergency, a patient may have no way to choose the air ambulance that transports him, or the facility that treats him. Or a patient might schedule a procedure at an in-network facility, only to later find that part of her care was performed by an out-of-network physician. In cases like these, providers have been able to drive their prices up, knowing that their services could not be rejected no matter what they charged. The result has been a dramatic increase in health care costs reflected in both health insurance premiums and federal deficits.

Congress addressed this crisis through several interlocking reforms. The Act bans providers from balance billing their patients in these circumstances and limits the patient's cost sharing to the amount the patient would have paid to an in-network provider for the same service. Out-of-network providers are referred to arbitration to resolve any remaining payment disputes with the patient's health plan. Congress directed the Departments who are the Defendants here to set the process under which an arbitrator will determine the payment amount. Under this process, the statute tells the arbitrator to begin with the "qualifying payment amount," a term of art in the statute that generally refers to the median of in-network contracted rates for a medical service. The statute treats this amount as a proxy for what the price for an out-of-network service would have been if the provider and the plan had negotiated a price in advance. The statute also instructs the arbitrator to consider whether any additional circumstances or information may be relevant in setting a different payment amount for a particular out-of-network service.

The Plaintiffs fault the Departments for issuing a rule that directs the arbitrator to begin with the qualifying payment amount, but the Departments faithfully followed the statutory structure and text in so doing. The arbitration rule tracks the statute by instructing the arbitrator to begin with this amount, and then to inquire whether any additional evidence counsels in favor of finding that the final payment amount should be higher or lower than that figure. The alternative approach that the Plaintiffs favor would have created a free-for-all, in which the arbitrator would have virtually

1

unconstrained discretion to rely on any information of his or her choosing, and to choose an out-of-network payment amount by whim. This approach would have reinstated the market failure that Congress was trying to solve.

The Plaintiffs question whether the Departments' arbitration rule is entitled to deference under *Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984). The Departments, however, acted under an explicit grant of authority to set the rules for the No Surprises Act's arbitration process, and they exercised that authority to promote the Congressional goals of reining in health care costs and ensuring the regularity and predictability of arbitrations under the Act. The *Chevron* test governs here, and the arbitration rule easily survives under that standard.

The American Medical Association Plaintiffs also challenge the procedural validity of the arbitration rule, contending that the rule should have been issued only after notice and comment. But the Public Health Service Act, ERISA, and the Internal Revenue Code authorize the Departments to issue interim final rules as they find to be appropriate. And, in any event, the Departments had good cause to forgo notice and comment. They did so to honor requests from numerous regulated parties, including the providers who are Plaintiffs here, for enough lead time to build the complicated systems that would be needed under the No Surprises Act's new legal regime, including the Act's new arbitration procedures.

The Association of Air Medical Services, for its part, challenges a second rule that the Departments issued to set the calculation of the qualifying payment amount. It contends that the Departments acted arbitrarily in various aspects of this rulemaking. To the contrary, the Departments reasonably looked to in-network contracted rates under health plans and health insurance policies—rather than pricing under single case agreements, which may be negotiated for an out-of-network medical service after the fact—as the basis for the qualifying payment amount. The Departments also reasonably concluded that all air ambulance operators perform the same services, no matter their ownership structure or business model, and they further reasonably drew geographic regions for air ambulance operators that would be broad enough to capture enough market data to allow for a meaningful calculation of the qualifying payment amount. Finally, the Departments reasonably

rejected the air ambulance operators' request that they be permitted to charge patients more for out-of-network air ambulance services, and instead adopted a reading of the Act that protects patients from excessive surprise air ambulance bills.

For all these reasons, the Defendants' cross-motion for summary judgment should be granted.

## ARGUMENT

## I.   THE RULE'S ARBITRATION PROCEDURES ARE CONSISTENT WITH THE NO SURPRISES ACT.

### A.  The Departments Reasonably Exercised Their Statutory Authority to Guide the Discretion of Arbitrators.

The No Surprises Act instructs the Departments to "establish by regulation one independent dispute resolution process … under which … [an arbitrator] determines, … in accordance with the succeeding provisions of this subsection, the amount of payment" for an out-of-network medical service. 42 U.S.C. § 300gg-111(c)(2)(A); *see also id.* § 300gg-112(b)(2)(A). The Departments fulfilled this responsibility by issuing a rule to guide the discretion of arbitrators. *See Requirements Related to Surprise Billing; Part II*, 86 Fed. Reg. 55,980 (Oct. 7, 2021). The Plaintiffs contend that the arbitration rule is not "in accordance with" the succeeding provisions of Section 300gg-111(c), but in so doing they misdescribe both the rule and the statute. Properly understood, the rule is fully in keeping with the statutory text.

The Plaintiffs persist in challenging a version of the arbitration rule that does not exist. They contend that the rule "dictate[s] the outcomes of the IDR process," or that the rule "mandate[s] the [qualifying payment amount] as the payment amount." Consol. Reply in Supp. of Pl.'s Mot. for Summ. J. and Opp'n to Cross-Mot. for Summ. J. ("AAMS Reply Br.") at 1, 2, ECF No. 32.[1] But the arbitration rule does no such thing. The rule directs the arbitrator to "tak[e] into account" each of the considerations that are listed in the statute itself. *See* 45 C.F.R. § 149.510(c)(4)(ii)(A), (iii); *see also id.*

---

[1] *See also* Combined Reply of Pls. Am. Med. Ass'n and Am. Hosp. Ass'n, et al., in Supp. of Their Mot. for Stay Pending Judicial Review, or in the Alternative, for Summ. J., and Mem. in Opp'n to Defs.' Cross-Mot. for Summ. J. ("AMA Reply Br.") at 11, 18, ECF No. 40 (misdescribing the rule as setting "one factor as controlling" or "mandating a benchmark rate"). For the sake of clarity, this brief refers to the Plaintiffs in No. 21-cv-3231 as "AMA," except where the context otherwise dictates.

§ 149.520(b)(1).  The arbitrator is also instructed to consider any "[a]dditional information submitted by a party," so long as the information is credible, relates to either party's offer, and does not include information on the factors that the arbitrator is prohibited from considering under the statute.  *Id.* §§ 149.510(c)(4)(iii)(D), 149.520(b)(2).

The rule further instructs the arbitrator, in choosing between the offer presented by the provider and the offer presented by the health insurance issuer or group health plan, to "select the offer closest to the qualifying payment amount" unless the arbitrator "determines that credible information submitted by either party … clearly demonstrates that the qualifying payment amount is materially different from the appropriate out-of-network rate."  *Id.* § 149.510(c)(4)(ii)(A).  This is the portion of the rule that the Plaintiffs object to, but the rule does not stop there.  Critically, the rule defines several of the terms in this clause.  Information is defined to be "credible" if "upon critical analysis [it] is worthy of belief and is trustworthy," *id.* § 149.510(a)(2)(v), and information is defined to show a "material difference" if there is "a substantial likelihood that a reasonable person with the training and qualifications of a certified IDR entity making a payment determination would consider the submitted information significant in determining the out-of-network rate and would view the information as showing that the qualifying payment amount is not the appropriate out-of-network rate," *id.* § 149.510(a)(2)(viii).

The rule thus directs the arbitrator to: (1) begin with the qualifying payment amount; (2) consider all of the additional factors or "any additional information" submitted by the parties that may be credible and relevant; (3) assess whether there is a "substantial likelihood" that the additional information is "significant" in showing that the qualifying payment amount is not the appropriate out-of-network rate; and, after completing that analysis, then (4) select one of the offers as the payment rate, with the offer that is closest to the qualifying payment amount being the offer selected, unless the arbitrator finds that the additional statutory factors point in favor of a different decision.  Unlike the caricature of the arbitration rule that the Plaintiffs attack in their briefing, the rule that the Defendants actually issued leaves wide room for the arbitrator to apply his or her expertise to find that any additional information is relevant in setting the out-of-network payment rate.

The Departments tracked the statute when they structured the arbitrator's analysis in this way to begin with the qualifying payment amount.  The statute lists the qualifying payment amount as the first factor for the arbitrator's consideration, and it is the only factor that the statute requires the arbitrator to consider without the parties specifically bringing the issue to his or her attention.  The statute describes the other factors listed for the arbitrator to consider as "additional information" or "additional circumstances," 42 U.S.C. § 300gg-111(c)(5)(C)(i)(II), (ii); *see also id.* § 300gg-112(b)(5)(C), thereby demonstrating that the statute directs the arbitrator to begin the analysis with the qualifying payment amount before moving on to address "supplemental" information.  *See In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1223 (9th Cir. 2019) ("In simple terms, 'additional' means 'supplemental.'"); *Springer v. Fairfax Cnty. Sch. Bd.*, 134 F.3d 659, 667 (4th Cir. 1998) ("We construe 'additional' in the ordinary sense of the word to mean supplemental.") (internal quotation and alterations omitted).

The Plaintiffs protest that "the word 'additional' appears in only a statutory subheading," AMA Reply Br. 6, but this is not so; the term appears in the body of the statute as well.  42 U.S.C. § 300gg-111(c)(5)(C)(i)(II), *id.* § 300gg-112(b)(5)(C)(i)(II).  In any event, "section headings are tools available for the resolution of a doubt about the meaning of a statute." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008); *see also Friedman v. Sebelius*, 686 F.3d 813, 821 (D.C. Cir. 2012).  The statutory subheading to which the Plaintiffs refer is not an editorial addition to the text.  It is part of the statute as Congress enacted it, *see* Pub. L. No. 116-260, Div. BB, § 103(a), 134 Stat. 1182, 2802 (2020), and Congress's choice of wording should be presumed to be meaningful, in the same way that every other word or phrase that Congress enacted is so presumed, *see United States v. Nordic Village, Inc.*, 503 U.S. 30, 35-36 (1992).

The Plaintiffs acknowledge that Congress's description of "additional" circumstances and information for the arbitrator to consider "implies that some information already exists that is being added to."  AAMS Reply Br. 5.  Or, as AMA puts the matter, these additional circumstances and items of information are "extra," are "supplementary to what is already present or available," or are "added to complete a thing."  AMA Reply Br. 6 (reciting dictionary definitions).  The Plaintiffs offer the caveat

that this doesn't necessarily mean "that the added material is less important."  AAMS Reply Br. 5; *see also* AMA Reply Br. 6.  The Departments don't contend otherwise; under the rule, additional information could indeed prove to be very important, and even dispositive, for the arbitrator's decision.  *See* 45 C.F.R. § 149.510(c)(4)(iv)(B) (example in which arbitrator is required to find in the provider's favor, if additional information shows that the qualifying payment amount is not the appropriate out-of-network payment rate).  One way or the other, however, to qualify as "additional" circumstances or information under Section 300gg-111(c) or Section 300gg-112(b), that information "reasonably should bear some relation" to what came before it in the statute, i.e., the qualifying payment amount.  *Peretz v. United States*, 501 U.S. 923, 930 (1991).

Under the statute, additional circumstances and information would "reasonably … bear some relation" to the first statutory factor—the qualifying payment amount—if that information tends to show that that amount is different from the appropriate out-of-network payment amount.  The No Surprises Act, after all, begins with the assumption that the qualifying payment amount is the reasonable amount of payment for a given medical service in the typical case.  *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iii), (b)(1)(B); *see also id.* § 300gg-111(a)(3)(H).  And the statute instructs the arbitrator to begin his or her analysis with this dollar figure, and to conclude that analysis with a second dollar figure—the appropriate out-of-network payment amount.  What comes in between is a series of "additional" circumstances or "additional" items of information that the parties may submit for the arbitrator to consider.  The Departments, accordingly, have reasonably read the statute to require the arbitrator to address whether any of this supplemental information, when "added to complete" the qualifying payment amount, AMA Reply Br. 6, bears on the question whether the final dollar amount should be different from the dollar figure that is the starting point of the analysis.

The qualifying payment amount already incorporates the statutory factors, at least in the typical case.  This amount, after all, is "the median of the contracted rates recognized" by the plan or issuer for the same or similar item or service within a given geographic region.  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  One would expect providers and plans or issuers, when they are negotiating at arm's length over in-network rates, to take into account factors such as the typical complexity of a medical

service, or the typical acuity of a patient receiving that service. *See id.* §§ 300gg-111(c)(5)(C)(ii), 300gg-112(b)(5)(C)(ii).  Thus, when the Act instructs the arbitrator to consider how a patient's acuity would be "supplementary to [the information that] is already present or available," AMA Reply Br. 7, as embedded in the calculation of the qualifying payment amount itself, the relevant question is whether a particular patient's condition is more or less severe than the typical case, so as to justify a different payment amount.

Contrary to the Plaintiffs' claims, the arbitration rule does not "read those redundancies out of the statute," AAMS Reply Br. 7, nor does it deem additional circumstances or information to be "immaterial," AMA Reply Br. 15.  All of the additional circumstances and information that a party presents to the arbitrator must be considered under the rule.  The question is *how* this additional information is to be considered, and how to determine what the relationship is between this additional information and the qualifying payment amount.  Information such as a particular patient's acuity bears on the arbitrator's decision, then, if it shows that the qualifying payment amount "is materially different from the appropriate out-of-network rate." 45 C.F.R. § 149.510(c)(4)(ii)(A).[2]

The No Surprises Act thus describes a structure for the arbitrator's decision-making that begins with the qualifying payment amount and then moves on to incorporate the additional information that may bear on the question whether the out-of-network payment amount should be higher or lower than the qualifying payment amount.  The Act is therefore nothing like the Clean Air

---

[2]  AMA misreads the regulatory preamble to contend that departures from the qualifying payment amount will be "rare."  AMA Reply Br. 5.  The quoted passage discusses the specific topic of the interplay of the qualifying payment amount and a patient's acuity in the arbitrator's decision. 86 Fed. Reg. at 55,997.  As a general matter, a separate qualifying payment amount is calculated for each medical item or service that has a unique service code or modifier.  *See id.*  Those service codes and modifiers often already incorporate the patient's acuity and the complexity of the service.  For example, anesthesia for a healthy patient may be assigned one code and modifier, but anesthesia for a patient with a severe disease may be assigned a different code and modifier.  *See id.* (citing Medical Billing and Coding Certification, https://www.medicalbillingandcoding.org/cpt-modifiers/).  In cases where the service codes and modifiers have already accounted for patient acuity or service complexity, the Departments anticipated that "there would only be rare instances in which the QPA would not adequately account for the acuity of the patient or complexity of the service."  *Id.*  But it remains within the arbitrator's discretion to choose a different out-of-network payment amount, for example, if "the time or intensity of care exceeds what is typical for a service code," or if the parties disagree as to the appropriate service code or modifier for the service.  *Id.*

Act provision that was at issue in *American Corn Growers Association v. EPA*, 291 F.3d 1 (D.C. Cir. 2002), which involved a statute that had simply listed five statutory factors together in a single clause, without any indication that any one factor should be treated differently.  *See* 42 U.S.C. § 7491(g)(2).  The No Surprises Act is quite different.  Far from setting forth an unadorned list of factors, the Act directs the arbitrator first to the qualifying payment amount, and then instructs the arbitrator to consider "additional information" or "additional circumstances" that may warrant an award of a different amount.  42 U.S.C. § 300gg-111(c)(5)(C)(i)(II), (ii).

The Plaintiffs acknowledge, as they must, that Congress may prescribe a structure for an agency to address a set of statutory factors, and that one way Congress can do so is by setting forth a sequence in which the agency is to address various factors.  AAMS Reply Br. 4-5; AMA Reply Br. 8-10; *see Ramirez v. ICE*, 471 F. Supp. 3d 88, 176-77 (D.D.C. 2020).  Congress did just that in the "wording and apparent logic" of the No Surprises Act, *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1045 (D.C. Cir. 1978), by giving the qualifying payment amount "a level of greater attention and rigor," *id.* at 1045-46, than it did for the other statutory factors.  At the very least, the Departments reasonably read the Act in this way, and deference is owed to their reading.

If Congress had not intended to focus the arbitrator's attention on the qualifying payment amount, it would not have required the Departments to publish reports detailing how often the arbitrator's award exceeds the qualifying payment amount, 42 U.S.C. §§ 300gg-111(c)(7)(A)(v), 300gg-112(b)(7)(A)(iv), and listing the amount of each payment award, expressed as a percentage of the qualifying payment amount, *id.* § 300gg-111(c)(7)(B)(iv), 300gg-112(b)(7)(B)(iv).  These reporting obligations demonstrate Congress's focus on ensuring that the Act's arbitration mechanism would "reduce premiums and the deficit," H.R. REP. NO. 116-615, pt. I, at 58 (2020) (AR 335), a goal that could not be achieved if arbitrators systematically awarded payments higher than median in-network rates.[3]  *See* 86 Fed. Reg. at 56,060 (citing Loren Adler et al., *Understanding the No Surprises Act*, USC-

---

[3]   The Plaintiffs discount the relevance of this committee report, noting that it was adopted in connection with an unenacted bill.  AAMS Reply Br. 9; AMA Reply Br. 18.  They misunderstand the relevance of this report.  The House Education and Labor Committee discussed the various alternative

Brookings Schaeffer Initiative for Health Policy (Feb. 4, 2021) (AR 1372)).  The Plaintiffs theorize that, if Congress had really cared whether health care costs should be higher or lower, it would have also expressly required the parties to report their offers to the arbitrator as a percentage of the qualifying payment amount.  AMA Reply Br. 15.  This is a *non sequitur*.  The arbitrator will already have both the qualifying payment amount and the parties' offers, and it can be presumed that he or she will know how to divide one number into the other.  Without reporting from the Departments, however, neither Congress nor the public would be able to tell if the Act's arbitration process is working in the way that it was intended, which was to reduce the discrepancy between in-network and out-of-network prices and to rein in the cost of health care.

The Plaintiffs complain that the arbitration rule interferes with arbitrators' "complete discretion," AAMS Reply Br. 11, to apply the statutory factors in any way that they wish.  But the No Surprises Act assigns to the Departments, not to individual arbitrators, the responsibility to "establish by regulation one independent dispute resolution process" to resolve payment disputes.  42 U.S.C. §§ 300gg-111(c)(2)(A), 300gg-112(b)(2)(A).  The Act therefore gives the Departments, not arbitrators, the responsibility to resolve any ambiguities as to how the statutory factors are to be applied.  *See Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 152 (1991) (according deference to the agency with rulemaking authority, rather than a separate adjudicative body); *see also Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991) (recognizing agency authority to use rulemaking to "resolve certain issues of general applicability" for individualized adjudications, and to establish "general principles to guide the required case-by-case ... determinations").  Although the Departments explained in their initial briefing that *Martin* and *American Hospital Association* are fatal to the Plaintiffs' theory of unlimited arbitrator discretion, the Plaintiffs have offered no response on this point.

It is not plausible that Congress intended to enact the Plaintiffs' alternative approach, in which arbitrators would hold essentially unconstrained discretion to weigh any factors submitted by the

---

bills then pending in the committees of jurisdiction, including its own compromise version, and explained how all of the various bills then under consideration would "tether payment rates for surprise out-of-network bills directly to market-based prices, curbing cost growth relative to the status quo."  H.R. REP. NO. 116-615, pt. I, at 57 (AR 334).

parties in any way they choose.  Although AAMS forthrightly embraces this result, AAMS Reply Br. 11, AMA at least tries to identify some "guardrails" that would apply to arbitrators under its theory, AMA Reply Br. 10.  But even AMA fails to grapple with the central problem in its reading.  Two of the factors for the arbitrator to consider are any "information as requested by the certified IDR entity relating to such offer," and "any information relating to such offer submitted by either party."  42 U.S.C. §§ 300gg-111(c)(5)(B)(i)(II), (ii), 300gg-112(b)(5)(B)(i)(II), (ii).  These catch-all factors work logically under the Defendants' reading of the statute, as they afford the arbitrator leeway to find that information not expressly listed in the statute might bear on whether the out-of-network payment amount should be higher or lower than the qualifying payment amount.  But, under the Plaintiffs' reading, nothing would constrain the arbitrator from relying on any information he or she might choose—even information that is not "credible," or information that has no "substantial likelihood" of being considered "significant" by a reasonable arbitrator, 45 C.F.R. § 149.510(a)(2)(v), (viii)— according that information any weight that he or she might choose, and then deciding however he or she wishes.  This reading would render the Act's careful delineation of the qualifying payment amount, and its role in the arbitration process, meaningless.  *See Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 878 (D.C. Cir. 2006) (Kavanaugh, J.) ("That plaintiffs interpret [certain statutory provisions] to be an empty gesture is yet another indication that their submission is erroneous.").

### B.  The Departments Are Entitled to *Chevron* Deference.

Congress instructed the Departments to "establish by regulation one independent dispute resolution process … under which" the arbitrator "determines … in accordance with the succeeding provisions of this subsection, the amount of payment" for a disputed out-of-network item or service. 42 U.S.C. § 300gg-111(c)(2)(A); *see also id.* § 300gg-112(b)(2)(A).  The Departments' exercise of this rulemaking authority is entitled to deference under *Chevron*, and easily survives under this standard.

The Plaintiffs renew their assertion that the Defendants lack rulemaking authority to address the factors for the determination of the out-of-network payment amount.  AAMS Reply Br. 10-11; *see also* AMA Reply Br. 24-25.  The Plaintiffs read the statutory reference to a "process" as limiting the Departments' regulatory authority solely to ministerial matters.  But the plain text of Section 300gg-

111(c)(2)(A) is not so constrained. The statute does not refer to a "process" in the abstract, but instead directs the Departments to "establish by regulation" the process under which the arbitrator determines the amount of payment for an out-of-network service. 42 U.S.C. §§ 300gg-111(c)(2)(A), 300gg-112(b)(2)(A). A directive to "establish by regulation" a process is, of course, a delegation of substantive rulemaking authority. *See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 685 F.3d 353, 366 (3d Cir. 2012). The Departments established by regulation the process under which the arbitrator determines the amount of payment by clarifying that the arbitrator should not rely on evidence that is not credible, or on evidence that a reasonable arbitrator would not consider to be significant in determining whether the qualifying payment amount is the appropriate out-of-network payment rate. 45 C.F.R. § 149.510(a)(2)(v), (viii). The rule falls well within the grant of rulemaking authority to the Departments, including the statutory grant of authority to determine which arbitration rules are "in accordance with the succeeding provisions of … subsection" (c) of Section 300gg-111 and subsection (b) of Section 300gg-112. *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).

AMA reiterates its argument that these provisions must not mean what they say, because other statutory provisions grant additional and overlapping rulemaking powers to the Departments over specific parts of the arbitration process. AMA Reply Br. 24 n.15, 25. But the *expressio unius* canon that AMA invokes is a "feeble helper in an administrative setting." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 697 (D.C. Cir. 2014); *see also Cogentrix Energy Power Mgmt., LLC v. FERC*, --- F.4th ---, 2022 WL 258592, at *4 (D.C. Cir. Jan. 28, 2022).[4] Congress frequently grants agencies overlapping statutory authorities to "make assurance double sure." *Adirondack Med. Ctr.*, 740 F.3d at 698; *see also Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1243 (D.C. Cir. 2020), *cert. denied*, 141 S. Ct. 2853 (2021). There is no reason, then, to give Section 300gg-111(c)(2)(A) or Section 300gg-112(b)(2)(A) anything other than

---

[4] For similar reasons, AMA's extended detour into a discussion of the Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act, language in other titles of the Consolidated Appropriations Act, various immigration statutes, and scattered citations of the United States Code, AMA Reply Br. 11-12, is entirely beside the point. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014).

their natural reading.  The Departments have rulemaking authority over the process under which the arbitrator goes about determining the out-of-network payment amount.

AMA also contends that the *Chevron* standard should not apply because the Departments did not "manifest their engagement" in an "interpretive exercise."  AMA Reply Br. 23.  But there is no "'magic words' requirement" that would require the Departments to incant "Chevron" to show that they are reading a statute.  *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 54-55 (D.C. Cir. 2018).  The Departments expressed their view that their reading was the "best interpretation" of Section 300gg-111, in light of the statutory text's elevation of the qualifying payment amount as the initial factor for the arbitrator to consider, the statute's treatment of other factors as "additional circumstances," and the statutory definition of the qualifying payment amount as the proxy for a reasonable out-of-network payment rate.  86 Fed. Reg. at 55,996.  The Departments also applied their subject-matter expertise to conclude that "policy considerations"—namely, protecting patients and taxpayers from inflated charges for out-of-network services, and promoting the regularity and predictability of arbitration outcomes—supported their reading of the rule.  *Id.*  The Departments thus quite plainly brought their "experience and expertise to bear" on the statute.  *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006).

AMA further asserts that *Chevron* deference is not owed here because the arbitration rule is "procedurally defective."  AMA Reply Br. 25.  This contention is meritless, as will be explained in greater detail below.  But even if there were a procedural defect in the rule, the remedy would be for this Court to remand the matter to the Departments to correct that error, not for the Court to resolve ambiguities in the statute on its own.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).  In an APA action under 5 U.S.C. § 706, "[t]he reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed [or] to reach its own conclusions based on such an inquiry."  *Baptist Mem'l Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226, 230 (D.C. Cir. 2009).  AMA's citation to *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016), AMA Reply Br. 25, does not call this principle into doubt; that case arose in private litigation, in which the courts were required to resolve

the statutory dispute one way or the other, rather than in a direct challenge to a rulemaking under 5 U.S.C. § 706.

The *Chevron* test therefore governs here, and the arbitration rule is valid under that standard. The statutory text does not foreclose the Departments' reading at Step One, and at Step Two, the Departments reasonably exercised their rulemaking authority to resolve statutory ambiguities. The Departments reasonably found that the arbitration rule "will aid in reducing prices that may have been inflated due to the practice of surprise billing prior to the No Surprises Act," 86 Fed. Reg. at 56,061, and will protect patients "from excessive costs, either through reduced costs for items and services or through decreased premiums," thereby also "reduc[ing] government expenditures," *id.* In so finding, the Departments followed the lead of the Congressional Budget Office (CBO); that office reasoned that, because arbitrators "would be instructed to look to the health plan's median payment rate for in-network rate care," "average payment rates for both in- and out-of-network care would move toward the median in-network rate," thereby reducing both health insurance premiums and the federal deficit. CBO, H.R. *5826, the Consumer Protections Against Surprise Medical Bills Act of 2020, as Introduced on February 10, 2020* (Feb. 11, 2020) (AR 1757).[5]  AMA contends (newly on reply) that the Departments' finding was irrational, because there is some uncertainty as to what the Act's effects on premiums would be. AMA Reply Br. 28. But the APA does not demand certainty before agencies may act. *See Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005). It is enough for an agency to explain its conclusions in the face of "factual uncertainties." *Growth Energy v. EPA*, 5 F.4th 1, 21 (D.C. Cir. 2021). The Departments acknowledged uncertainties on this score, and chose to follow the approach that furthered Congress's goal of controlling health care costs.

---

[5]  AMA discounts the importance of CBO's findings, asserting that the qualifying payment amount was "the only mandatory factor" in the House Ways and Means Committee bill, H.R. 5826, that CBO was scoring. H.R. 5826, however, had precisely the same structure as the enacted version of the No Surprises Act does. *Compare* H.R. 5826, § 7, 116th Cong. (2020) *with* 42 U.S.C. § 300gg-111(c)(5). CBO scored each of the various Committee's surprise-billing rules in the same way. *See* Br. of 12 Patient and Consumer Advocacy Orgs. as *Amici Curiae* 6-11, No. 21-cv-3121, ECF No. 79-1. The scoring of each of these bills played a central role in Congress's deliberations; the savings that CBO projected were used to fund other priorities in the omnibus appropriations legislation of which the No Surprises Act formed a part. *See Amici Curiae* Br. of Congressional Committee Leaders at 8-9, No. 21-cv-3121, ECF No. 73-1.

The Departments also reasonably found that their rule will promote predictability in the arbitration process, limiting the transaction costs of arbitrations that patients would ultimately bear in the form of higher premiums. *See* 86 Fed. Reg. at 55,996. This is no minor consideration. The experience of states such as Texas and New Jersey has shown a dramatic increase in both the number of arbitrations and their cost in states that impose few constraints on an arbitrator's decision-making. *See* Br. of America's Health Insurance Plans as *Amicus Curiae* at 15-18, No. 21-cv-3231, ECF No. 62-2. If the federal arbitration process followed the lead of these states, arbitrators would likely hear over 1.2 million cases a year under the No Surprises Act—rather than the 17,000 cases annually that the Departments project—and each arbitration would cost more than twice as much to complete, on average. *See id.* at 17.

The Plaintiffs express doubt that Congress sought predictability or regularity in the arbitration process, AAMS Reply Br. 8, AMA Reply Br. 28, but the legislature's preferences on this score are evident from the statute itself. Congress sought to "encourag[e] the efficiency" and "minimiz[e the] costs" of the arbitration process. 42 U.S.C. § 300gg-111(c)(3)(A). Congress would not have created a mandatory 30-day open negotiation period, *id.* 300gg-111(c)(1)(A); encouraged the parties to continue negotiations after the expiration of that period, *id.* § 300gg-111(c)(2)(B); required the losing party to bear the costs of the arbitration, *id.* § 300gg-111(c)(5)(F); or imposed a 90-day moratorium on similar arbitration requests, *id.* § 300gg-111(c)(5)(E)(ii), if its goal was to promote, rather than minimize, the parties' use of the arbitration process. Far from encouraging the parties to gamble on an arbitration process with unpredictable payouts, Congress created a regular and predictable process. Its aim in doing so was to resolve a market distortion by diminishing the discrepancy between out-of-network payments for medical services and the in-network payments for the identical services. *See* 86 Fed. Reg. at 55,996; *see also* Br. of *Amici Curiae* Health Policy Experts at 13-17, ECF No. 35.

### C. The Arbitration Rule Is Procedurally Proper.

Throughout 2021, the Plaintiffs repeatedly met and corresponded with the Departments to express their views regarding the timing and substance of the Departments' forthcoming rulemakings

under the No Surprises Act.[6] They repeatedly warned the Departments that regulated parties would need "substantial lead time" to implement the new legal regime, including the new rules governing the arbitration process. Letter from Stacy Hughes, Exec. Vice-Pres., Am. Hosp. Ass'n, to Xavier Becerra, Secretary, U.S. Dep't of Health & Human Servs., et al., at 3 (Sept. 1, 2021) (AR 6159); *see also* Letter from James L. Madara, CEO, Am. Med. Ass'n, to Elizabeth Richter, Acting Admin'r, Centers for Medicare & Medicaid Servs., at 1 (May 21, 2021) (AR 1918). The Departments honored these requests by issuing the arbitration rule as an interim final rule in September 2021 to afford providers, plans and issuers, and arbitrators sufficient time to hire staff, build technical systems, and prepare for the new dispute resolution process that would go into effect in January 2022. *See* 86 Fed. Reg. at 56,044.

AAMS, for its part, does not contend that notice and comment was required for the Departments' interim final rules. AMA, in contrast, now argues that the arbitration rule is procedurally invalid, despite having previously urged the Departments to publish the rule quickly. AMA had it right the first time.

As an initial matter, the Departments properly exercised their power to "promulgate any interim final rules *as [each] Secretary determines are appropriate* to carry out this subchapter." 42 U.S.C. § 300gg-92 (emphasis added); *see also* 26 U.S.C. § 9833; 29 U.S.C. § 1191c. This grant of authority sets

---

[6] *See* Letter from Thomas P. Nickels, Exec. Vice-Pres, Am. Hosp. Ass'n, to Elizabeth Richter, Acting Admin'r, Centers for Medicare & Medicaid Services (Mar. 16, 2021) (AR 5095); Letter from Thomas P. Nickels, Exec. Vice-Pres, Am. Hosp. Ass'n, to Xavier Becerra, Secretary, U.S. Dep't of Health and Human Servs., et al. (Mar. 29, 2021) (AR 1970); Centers for Medicare & Medicaid Servs., *Report: No Surprises Act Listening Session with Providers* (Apr. 14, 2021) (AR 2490); E-mail from Molly Smith, Group Vice-Pres., Public Policy, Am. Hosp. Ass'n, to Michael Baker, U.S. Dep't of Health and Human Services, et al. (Apr. 20, 2021) (AR 2372); Letter from James Madara, CEO, Am. Med. Ass'n, to Elizabeth Richter, Acting Admin'r, Centers for Medicare & Medicaid Services (May 21, 2021) (AR 1918); Letter from Stacey Hughes, Exec. Vice-Pres., Am. Hosp. Ass'n, to Chiquita Brooks-LaSure, Admin'r, Centers for Medicare & Medicaid Servs. (June 2, 2021) (AR 5087); Letter from James Madara, CEO, Am. Med. Ass'n, to Chiquita Brooks-LaSure, Admin'r, Centers for Medicare & Medicaid Services (June 14, 2021) (AR 1910); E-mail from Molly Smith, Group Vice-Pres., Public Policy, Am. Hosp. Ass'n, to Michael Baker, U.S. Dep't of Health and Human Services, et al. (June 18, 2021) (AR 5073); Letter from James Madara, CEO, Am. Med. Ass'n, to Chiquita Brooks-LaSure, Admin'r, Centers for Medicare & Medicaid Services (Aug. 11, 2021) (AR 2043); Letter from Stacey Hughes, Exec. Vice-Pres., Am. Hosp. Ass'n, to Xavier Becerra, Secretary, U.S. Dep't of Health and Human Servs., et al. (Sept. 1, 2021) (AR 6157); Letter from James Madara, CEO, Am. Med. Ass'n, to Chiquita Brooks-LaSure, Admin'r, Centers for Medicare & Medicaid Services (Sept. 7, 2021) (AR 2246).

forth a different standard than what would ordinarily apply under the APA. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2448-49 (2019) (Kavanaugh, J., concurring) ("broad and open-ended terms like 'reasonable,' 'appropriate,' 'feasible,' or 'practicable' … afford agencies broad policy discretion"); *see also Michigan v. EPA*, 576 U.S. 743, 752 (2015). This separate standard shows the "clear intent [of Congress] that APA notice and comment procedures need not be followed." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1994).

AMA argues that Section 300gg-92 should not displace the usual APA notice-and-comment procedures because that statute does not contain an express statement to that effect. AMA Reply Br. 26. That is not the test in this Circuit, however. Instead, "[t]he question here is whether Congress has established procedures so clearly different from those required by the APA that it must have intended to displace the norm." *Asiana Airlines v. FAA,* 134 F.3d 393, 397 (D.C. Cir. 1998). The Congressional grant of authority to the Departments—which, again, is to issue interim final rules under the Public Health Service Act, ERISA, and the Internal Revenue Code when they determine it to be "appropriate" to do so—sets a legal standard that is "clearly different" from ordinary APA notice-and-comment procedures, so Section 300gg-92 controls here. The Departments found it to be appropriate to issue the arbitration rule as an interim final rule, and that ends the inquiry.

In any event, the Departments also properly invoked the APA's "good cause" exception to the requirement of notice and comment. The interim final rule was necessary to allow interested parties—including providers, plans and issuers, and prospective IDR entities—adequate time to prepare for the new regulatory regime. *See* 86 Fed. Reg. at 56,043-56,045. Health care providers, in particular, needed assurances that the arbitration process would be functional for reimbursement of claims for medical services performed on or after January 1, 2022. As a coalition of providers, including the American Hospital Association, warned the Departments, "if the IDR process [were] not ready on the backend by January 1 when the balance billing protections are implemented, then providers [would] be at the mercy of the insurer for reimbursement." Centers for Medicare & Medicaid Servs., *Report: No Surprises Act Listening Session with Providers* at 3 (Apr. 14, 2021) (AR 2492).

These circumstances "constitute[] the 'something specific' … required to forgo notice and comment." *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022).

AMA acknowledges that it asked the Departments to afford health care providers sufficient lead time to implement new regulations under the No Surprises Act, but it protests that it never specifically asked the Departments to forgo notice and comment. AMA Reply Br. 27 n.16. True enough. But, without an interim final rule, the only other way to address the providers' concerns would have been to delay enforcement of the Act's prohibitions on balance billing. Without an interim final rule and without such a delay, the absence of a functional arbitration process would mean that providers could not recover payment for medical services either from patients or from plans or issuers, resulting in "the possibility that [these providers] will be undercompensated for their services," 86 Fed. Reg. at 56,044. Although AMA may have preferred an alternative under which its members could continue to balance bill their patients, the Departments reasonably chose instead to honor Congress's judgment that this practice should come to an end as of January 2022. *See id.*

In light of the foregoing, AMA seemingly concedes that the Departments had good cause to issue interim final rules for at least certain aspects of the arbitration process, but it suggests that the Departments should have carved out the specific rules that address the arbitrator's consideration of the statutory factors. AMA Reply Br. 27. This Swiss-cheese approach to rulemaking makes no sense. The Departments' rulemaking comprehensively addresses the arbitration process, setting forth rules on the content of open negotiation notices, 45 C.F.R. § 149.510(b)(1)(ii); the content of the notices for the initiation of arbitration, *id.* § 149.510(b)(1)(iii); the treatment of "batched" items for resolution on an aggregate basis by the arbitrator, *id.* § 149.510(c)(3); the content of the offers that the parties will submit to the arbitrator for decision, *id.* § 149.510(c)(4)(i); the content of the arbitrator's written decision, *id.* § 149.510(c)(4)(vi); and the legal effects of the arbitrator's decision, *id.* § 149.510(c)(4)(vii). It defies logic to suggest that the interim final rule could have addressed these subjects, while remaining silent as to any discussion of the statutory factors for the arbitrator's decision.

In addition to arguing that the Departments issued the arbitration rule too early, AMA also accuses the Departments of acting too late. AMA Reply Br. 27. But Congress directed the

Departments to proceed with their rulemaking in a particular order.  The Departments were required to set the methodology for determining the qualifying payment amount by July 1, 2021.  42 U.S.C. § 300gg-111(a)(2)(B).  Having completed that task, *see Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872 (July 13, 2021), the Departments were then required to issue additional rules by December 27, 2021, to address the procedures for resolving payment disputes, 42 U.S.C. § 300gg-111(a)(2)(B), (c)(2)(A).  The arbitration rule "work[s] in concert with the protections against surprise billing already instituted in the July 2021 interim final rules," 86 Fed. Reg. at 56,044, and "build[s] upon the protections in the July 2021 interim final rules," *id.* at 56,047-48.  The Departments could not have addressed the role that the qualifying payment amount plays in the arbitration process in the second rule without first setting forth what the qualifying payment amount was in the first rule.  And the Departments issued the arbitration rule within three months after the issuance of the first set of rules.  This demonstrates that they acted with appropriate dispatch, not that they engaged in any delay. *See Biden v. Missouri*, 142 S. Ct. at 654.

Nor did the Departments issue the interim final rule simply out of "a desire to provide regulatory guidance."  AMA Reply Br. 27.  To the contrary, it was essential for the arbitration rule to be issued early enough in order to afford regulated parties the ability to prepare for the Act's new legal regime.  *See* Br. of America's Health Insurance Plans as *Amicus Curiae* at 5-10, No. 21-cv-3231, ECF No. 62-2.  Group health plans and health insurance issuers needed advance warning of the content of the new regulatory regime—including clarity on the standards that arbitrators would apply in setting out-of-network payment amounts—to set appropriate initial payment amounts for reimbursement claims, and to prepare for open negotiations, beginning in January.  *Id.* at 8.  These entities also needed to set up their own internal systems for claims processing, to be able to make these initial payments on a timely basis.  *Id.* at 8-9.  These preparation efforts included both the creation of automated data systems and the hiring of new staff, as well as the negotiation of new contracts with vendors and employers.  *Id.* at 9-10.  None of these efforts would have been possible "without rules in place specifying how IDR decisions would be made," however.  *Id.* at 9.  In short, "[t]imely implementation of the Act would have been impossible if the rules had not been finalized until after the 60-day

comment period." *Id.* at 10.  This amply demonstrates the Departments' good cause to issue the interim final rule.  *See Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 20 (D.D.C. 2010) (upholding interim rule issued under Section 300gg-92 to implement new statutory requirements on a short timeline).

## II.   THE DEPARTMENTS ADOPTED A REASONABLE METHODOLOGY TO CALCULATE THE QUALIFYING PAYMENT AMOUNT.

Congress instructed the Departments to issue regulations to establish the "methodology … to determine the qualifying payment amount," and to define the boundaries of the geographic regions used to make that determination.  42 U.S.C. § 300gg-111(a)(2)(B)(i), (iii); *see also id.* § 300gg-112(c)(2).  The Departments reasonably exercised this statutory authority to ensure that the qualifying payment amount for a given service is a fair approximation of the amount that would have been paid for that service if the parties had negotiated an in-network price beforehand.  They "acted within a zone of reasonableness" in so doing, and AAMS's challenge to their rulemaking should accordingly be rejected.  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

### A.   The Departments Reasonably Established a Methodology for the Calculation of the Median of Contracted Rates.

The July rule bases the calculation of the qualifying payment amount for a given medical service on the contracted payment rate for that service under each of the plans or policies that the plan sponsor or issuer negotiated in advance with a provider of that service.  45 C.F.R. § 149.140(a)(1).  By limiting the calculation to the generally applicable contract rates under plans and policies that have been negotiated in advance, the rule excludes "single case agreements" that may be negotiated between a provider and a plan or issuer, either at the time that a service is performed, or after the fact.  *See* 86 Fed. Reg. at 36,889.  Because these "single case agreements" have often set payments that are greatly inflated above what the in-network price would have been for a given service, AAMS seeks to include these agreements in the calculation of the qualifying payment amount.  AAMS Reply Br. 12.

As the Departments have explained, the exclusion of single case agreements from this calculation flows from the text of the statute.  The Act does not base the qualifying payment amount on every possible type of contractual agreement that a provider and a payer might enter into.  Instead,

this amount is the "median of the contracted rates," determined with respect to all plans of the plan sponsor or all coverage of the health insurance issuer, recognized as the maximum payment "under such plans or coverage, respectively, on January 31, 2019." 42 U.S.C. § 300gg-111(a)(3)(E)(i); *see also id.* § 300gg-112(c)(2). A payment amount established by a single case agreement is not a "contracted rate" that is recognized "under such plans or coverage." *Id.*

A payment arises "under" a plan or coverage if it is "governed by," or is owed "by reason of the authority of," the terms of the plan or policy. *Ardestani v. INS*, 502 U.S. 129, 135 (1991) (defining "under"). A payment under a single case agreement is not dictated by the generally applicable terms of the plan or policy. If such a payment were so dictated, after all, the provider would be in-network, and no single case agreement would be necessary. Instead, plans and issuers have entered into single case agreements because they have made a business decision that it is a better practice to spare their members, at least some of the time, from surprise bills, and to pay providers at inflated rates for out-of-network services, even in the absence of a legal compulsion to do so. *See* Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. POL. ECON. 3626, 3633 (2020) (AR 3633) (describing insurers' business options to pay all, some, or none of a surprise bill for out-of-network medical services). Given the astronomical charges that providers impose for out-of-network air ambulance services, plans and issuers face even greater pressure to make payment in full to shield their patients from these charges, even when they are not legally required to make such a payment. *See* Erin C. Fuse Brown et al., *Out-of-Network Air Ambulance Bills: Prevalence, Magnitude, and Policy Solutions*, 98 MILBANK QUARTERLY 747, 756 (2020) (AR 2860).

AAMS's observation that ERISA plan sponsors may not dissipate the plan's assets is beside the point, then. AAMS Reply Br. 13. Plans and issuers have a valid reason to pay providers for out-of-network services to avoid at least some of the negative consequences that would result if their customers or participants were routinely denied any assistance with expensive surprise medical bills. But a payment made to an out-of-network provider under a single case agreement is not a payment that is dictated "by reason of the authority of" the plan or policy documents themselves. Payments for in-network services, at rates that are negotiated in advance, are such payments, and so the

contracted rates for those in-network services are what are counted to set the qualifying payment amount.  Payments under single case agreements are not.

AAMS's contrary theory would lead to nonsensical results.  The statute bases the qualifying payment amount on the contracted rates recognized by the plan or issuer for the item or service "under such plans or coverage, respectively, on January 31, 2019," subject to an inflation adjustment.  42 U.S.C. § 300gg-111(a)(3)(E)(i).  The statute thus instructs the plan or issuer to look to all of its plans or policies that were effective during a plan year that includes January 31, 2019, no matter whether the plan or policy operated on a calendar-year basis or over some other time frame.  There is no reason, however, to think that Congress attached any particular significance to single case agreements that had been entered into on one specific day, January 31, 2019.  The Departments pointed to this incongruity in their cross-motion for summary judgment, but AAMS offers no response on this point.

The Departments reasonably adopted a definition of the qualifying payment amount that "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations."  86 Fed. Reg. at 36,889.  Although AAMS refers to "market rates" that may be set by single case agreements, AAMS Reply Br. 14, the preamble's reference was plainly to typical contract negotiations between providers and payers over *in-network* rates.  One of Congress's central purposes in enacting the No Surprises Act, after all, was to ensure that patients would not owe more for out-of-network medical services than what their cost-sharing responsibilities would have been if those services had been provided in-network.  *See* 42 U.S.C. §§ 300gg-111(a)(1), 300gg-112(a)(1).  For air ambulance services, even these in-network prices are inflated above what the fair price would be in a functional market.  *See* Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Affairs Forefront (Mar. 26, 2021) (AR 2844-2845).  But by tying the qualifying payment amount to in-network prices, the Act at least reduces some of the upward pressure on prices for air ambulance services that patients have experienced in recent years.

AAMS also reiterates its argument that the Departments acted inconsistently by excluding single case agreements from the calculation of the median contracted rate, but including the same

agreements as contracts for purposes of determining whether a health care facility is "participating" for the purposes of some of the Act's balance-billing rules.  AAMS Reply Br. 15.  The Departments have explained, however, that this latter definition rests on different statutory language, which establishes that a health care facility is "participating" for the purposes of a given medical item or service—and that the Act's balance-billing protections will apply for that item or service—when the facility "has a direct or indirect contractual relationship with the plan or issuer, respectively, with respect to the furnishing of such an item or service at the facility."  42 U.S.C. § 300gg-111(b)(2)(A)(i).  This definition is different from that of the qualifying payment amount, and does not rest on the payment amounts recognized under a plan or coverage in the way that the qualifying payment amount's definition does.  The Departments agree, of course, with AAMS's observation that "agencies are not entitled to ignore statutory text in favor of their preferred outcomes," AAMS Reply Br. 15; but, then again, neither are the Plaintiffs.

### B.     The Departments Reasonably Treated All Air Ambulance Providers as in the Same or Similar Specialty.

The No Surprises Act instructs that the qualifying payment amount for a particular service is to be calculated as the median contracted rate for the service "that is provided by a provider in the same or similar specialty."  42 U.S.C. § 300gg-111(a)(3)(E)(i).  The Departments reasoned that all providers of air ambulance services "are considered to be a single provider specialty."  86 Fed. Reg. at 36,891.  AAMS contends that its members—independently-owned air ambulance operators—should have been treated as a separate "specialty" from hospital-owned air ambulance operators, because as a general rule they have higher contracted rates for the same services than hospital-owned providers do.  AAMS Reply Br. 16.

This is nonsensical.  The Departments considered this request, and concluded that the business model of an air ambulance provider is irrelevant to the question of what sort of medical "specialty" that provider performs.  86 Fed. Reg. at 36,891.  From the perspective of a patient, an air ambulance performs the same service—transportation to a hospital or to another health care facility— no matter who owns that air ambulance or how that owner goes about negotiating its contracts with

plans and issuers.  *See id.*  Private-equity investors in independent air ambulance services, in recent years, have adopted a deliberate strategy of threatening to remain out-of-network so as to leverage higher in-network prices from plans and issuers.  *See* Br. of Ass'n of Critical Care Transport as *Amicus Curiae* at 4, ECF No. 37.  This strategy has been highly successful; since the arrival of private equity investors into this market, the air ambulance operators that they own have charged almost twice as much as hospital-owned operators do for the same service.  *See* Loren Adler et al., *High Air Ambulance Charges Concentrated in Private Equity-Owned Carriers*, USC-Brookings Schaeffer on Health Policy (Oct. 13, 2020) (AR 4761); *see also* Eileen Applebaum and Rosemary Batt, *Private Equity Buyouts in Healthcare: Who Wins, Who Loses?*, Institute for New Economic Thinking Working Papers 67-68 (Mar. 15, 2020) (AR 1242-43).  But the fact that this new business strategy has been successful does not change the nature of the medical service that air ambulances perform.

AAMS asserts that some plans or issuers must have a general "business practice" of treating hospital-based air ambulance operators separately from independent air ambulance operators, AAMS Reply Br. 17, but it provides no evidence supporting this assertion.  To the contrary, "private insurers use the same billing codes and categories for both" types of air ambulance operators.  Br. of *Amici Curiae* Health Policy Experts at 20, ECF No. 35.[7]  AAMS, in short, provides no reason to believe that the Departments were required to give the statutory phrase "provider in the same or similar specialty" anything other than its obvious meaning.  That phrase refers to providers in the same "practice specialty," 86 Fed. Reg. at 36,891, not providers operating under an identical business model.

AAMS points again to the fact that the Departments have treated hospital-based emergency departments as separate from freestanding emergency departments.  AAMS Reply Br. 18.  The Departments did so, however, as an exercise of specific rulemaking authority to account for relevant differences in "facility type[s]," including "higher acuity settings and the case-mix of various facility types." 42 U.S.C. § 300gg-111(a)(2)(B).  The Departments recognized that the two types of emergency

---

[7]   In contrast, plans and issuers generally do use different coding for fixed-wing and rotary-wing aircraft, so the Departments' methodology accounts for that difference by incorporating the service codes that are unique to each type of aircraft.  *See* 86 Fed. Reg. at 36,891.

facilities may have different case mixes and levels of patient acuity, and thus they permitted (but did not require) plans and issuers to treat the two types of facilities separately. *See* 86 Fed. Reg. at 36,891-36,892. Air ambulance providers are not "facilities" within the meaning of this statutory definition. And in any event, AAMS identifies no reason to believe that private-equity-owned air ambulance operators treat patients with different acuities or have different case mixes than hospital-owned air ambulance operators do. AAMS objects that the Departments found only that there "may" be differences in the case mix or acuities of patients at different types of emergency department facilities. AAMS Reply Br. 19. But, as noted above, the APA does not demand absolute empirical proof before an agency can take action. *See Chamber of Commerce of U.S.*, 412 F.3d at 142. The Departments explained their conclusion in light of "factual uncertainties," *Growth Energy*, 5 F.4th at 21, and that is all that the APA requires.

### C. The Departments Reasonably Defined Geographic Regions for Use in Calculating the Qualifying Payment Amount.

The No Surprises Act directs that the qualifying payment amount for a given service is to be calculated on the basis of the median of contacted rates for the service "provided in the geographic region in which the item or service is furnished," 42 U.S.C. § 300gg-111(a)(3)(E)(i), and it grants rulemaking power to the Departments to issue regulations defining these geographic regions, *id.* § 300gg-111(a)(2)(B)(iii). In their exercise of this rulemaking authority, the Departments defined a "geographic region," for air ambulance services, in the first instance, as "one region consisting of all [metropolitan statistical areas] MSAs in the state, and one region consisting of all other portions of the state." 86 Fed. Reg. at 36,893; *see* 45 C.F.R. § 149.140(a)(7)(ii)(A). The Departments also prescribed a secondary definition of "geographic region" for air ambulance services for circumstances where this primary definition leaves the plan or issuer without enough data to calculate a median of contracted rates. Under this secondary definition, the relevant geographic region is "based on Census divisions—that is, one region consisting of all MSAs in each Census division and one region consisting of all other portions of the Census division." 86 Fed. Reg. at 36,893; *see* 45 C.F.R. § 149.140(a)(7)(ii)(B).

The Departments adopted this backup definition to account for the "lower prevalence of participating providers of air ambulance services." 86 Fed. Reg. at 36,893. Air ambulance transports are relatively rare to begin with, and at least 70% of these transports have been performed by out-of-network providers in recent years. *See* Brown et al., *The Unfinished Business of Air Ambulance Bills* (AR 2845). The Departments accordingly needed to draw regions broadly enough to capture sufficient data on in-network prices to allow for a meaningful calculation of the qualifying payment amount.

AAMS protests that the Departments "intentionally deflated" the qualifying payment amount by setting geographic boundaries in this manner, AAMS Reply Br. 19, but its logic is unclear. The qualifying payment amount is a median, after all; that amount will be higher than in-network prices for lower-than-median providers, and lower than in-network prices for higher-than-median providers, no matter how geographic boundaries are drawn. AAMS further protests that it sees no reason why in-network prices in one state would be meaningful in another state. AAMS Reply Br. 20. But, unlike other medical services, air ambulance transports uniquely operate across state lines, and air ambulance operators are exempt from most forms of state regulation. The market for air ambulance services thus operates across state lines in a way that the market for other medical services does not. *See* Brown et al., *Out-of-Network Air Ambulance Bills: Prevalence, Magnitude, and Policy Solutions*, 98 MILLBANK QUARTERLY at 765-66 (AR 2869-70).

The Departments thus reasonably concluded that the better option would be to collect real-world market data, over a wider geographic scope if necessary, rather than relying on information of uncertain provenance from a commercial database. AAMS provides no reason to believe that these databases would provide better information than the Departments' market-based approach would. Indeed, AAMS has acknowledged that "[t]here is no existing database that contains a representative number of the air ambulance transports in a given state." Letter of Cameron Curtis, Pres., AAMS, et al., to Xavier Becerra, Secretary, U.S. Dep't of Health and Human Servs., et al., at 4 (Dec. 6, 2021), ECF No. 5-8. The Departments were not required to adopt an approach that would have left plans and issuers with no meaningful data from which to calculate the qualifying payment amount.

### D.     The Departments Reasonably Interpreted the Act to Base Patients' Cost-Sharing for Air Ambulance Services on the Qualifying Payment Amount.

Finally, AAMS contends that the Departments arbitrarily limited patients' cost-sharing obligations to the amount "that would apply if such services were provided by such a participating provider." 42 U.S.C. § 300gg-112(a)(1). The association asserts that its members should be able to recover greater amounts from their patients. Under its reasoning, because air ambulance providers have regularly entered into single case agreements with plans and issuers, those single case agreements (which generally call for payments from the plan or issuer at rates that are higher than what would have been paid for an in-network service) should be used to set the patient's cost-sharing obligations. *See* AAMS Reply Br. 21.

The Departments reasonably chose a different approach. The Act specifies that the patient's cost-sharing obligations for air ambulance services should be calculated on the basis of the amount that would apply if the out-of-network services had been provided in-network instead. 42 U.S.C. § 300gg-112(a)(1). The Act does not specify, however, how to determine what that amount would have been. The Departments filled this gap by looking to the Act's parallel structure, in Section 300gg-111(a), for services performed by health facilities and other providers, under which the patient's cost-sharing obligation ultimately turns (absent a statutory exception) on the qualifying payment amount. 86 Fed. Reg. at 36,884. The Departments' selection of this approach serves the statutory purposes of protecting patients from "excessive bills," and removing patients "as much as possible" from payment disputes between providers and group health plans or health insurance issuers. *Id.*

AAMS draws a distinction between Section 300gg-111 and Section 300gg-112. It acknowledges that, in the former section, for other providers of health care services, Congress explicitly equated the qualifying payment amount to the reasonable price for an out-of-network medical service. AAMS invokes the *expressio unius* canon to contend that the absence of this language in Section 300gg-112 means that Congress intended to prohibit the Departments from relying on the qualifying payment amount to set patients' cost-sharing obligations for air ambulance services. AAMS Reply Br. 21.

26

But, as noted above, the *expressio unius* canon "has little force in the administrative setting." *Van Hollen v. FEC*, 811 F.3d 486, 493 (D.C. Cir. 2016). "[A] congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion." *Catwaba Cnty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (emphasis in original). For that reason, Congress's explicit equation of the qualifying payment amount to the reasonable price for an out-of-network medical service in Section 300gg-111, and its silence on that score in Section 300gg-112, "does not suffice for the direct answer that Chevron step one requires." *Fisher v. PBGC*, 994 F.3d 664, 671 (D.C. Cir. 2021); *see also Cogentrix Energy Power Mgmt., LLC*, 2022 WL 258592, at *4.

The Departments' decision to rely on the qualifying payment amount was also reasonable at Chevron Step Two. The use of the qualifying payment amount permits a patient's cost-sharing responsibility to be determined up front. Under AAMS's approach, in contrast, there would be no way for a patient to know how much he or she owes until later, and the patient could end up owing a great deal more if the provider and the plan and issuer end up entering into a single case agreement for a higher payment amount. This would contradict one of Congress's central purposes in enacting the No Surprises Act, which was (as AAMS acknowledges in the first sentence of its reply brief) "to end surprise billing and to remove patients from the middle of payment disputes between insurers and certain emergency and other specialty providers, including air ambulance providers." AAMS Reply Br. 1; *see also id.* at 8. The Departments reasonably rejected a reading of the statute that would have placed patients back into the middle of these payment disputes.

## III.   ANY RELIEF SHOULD BE APPROPRIATELY LIMITED.

Neither AAMS nor AMA disputes that any relief in this case should be limited to the plaintiffs, or identified association members, with standing in this case. *See* Defs.' Mem. in Supp. of Their Cross-Mot. for Summ. J. at 35, ECF No. 10-1; Defs.' Mem. in Supp. of Their Cross-Mot. for Summ. J. at 34-35, No. 21-cv-3231, ECF No. 51-1. Even with respect to these persons, however, if the Court disagrees with the Departments' arguments, it should remand the matter to the Departments without vacating the challenged provisions.

"The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). AMA protests that vacatur is ordinarily required when an agency commits a notice-and-comment violation. AMA Reply Br. 30. But AAMS hasn't alleged such a violation at all, and even AMA hasn't requested vacatur on this ground, raising the issue solely (and wrongly) as an argument going to *Chevron* deference. *See* AMA Reply Br. 25-26. In any event, vacatur is not "a *per se* rule"; the appropriate remedy "will, of course, vary with context, but the starting point [of the *Allied-Signal* test] is the same" for purported notice-and-comment violations as it is for any other alleged defect in a rule. *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 267 (D.D.C. 2015).

Under the *Allied-Signal* test, remand without vacatur would be the right remedy, because the Plaintiffs have not identified any serious deficiencies in either the July or September rule, and vacatur of either rule would be highly disruptive. *First*, if the Departments committed any error in either rule, "there is at least a serious possibility that [they] will be able to substantiate [their rule] given an opportunity to do so." *Temple Univ. Hosp. v. NLRB*, 929 F.3d 729, 736 (D.C. Cir. 2019). The Departments have already taken comments from the public, and have begun preparing a final rule that will take those comments into account. The Departments anticipate that a final rule will be issued no later than May 2022. They accordingly are already "act[ing] with due haste to provide the requisite opportunity for meaningful comment and explanation." *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1135 n. 4 (D.C. Cir. 1995); *see Shands Jacksonville Med. Ctr.*, 139 F. Supp. 3d at 267. The issuance of a final rule would fully remedy any of the Plaintiffs' claimed procedural violations.

*Second*, vacatur would be highly disruptive, upending the Act's efforts to control upward pressure on health care costs, just as arbitrations are set to begin this spring. Health insurance issuers and group health plans, in particular, have relied on the interim final rule. Since the rule was published in September, they have devoted significant resources to build data management systems, hire staff, and negotiate contracts with vendors and employers in order to be ready to process claims under the Act's new legal regime, including initial payments and open negotiations that are already under way.

*See* Br. of America's Health Insurance Plans as *Amicus Curiae* at 5-10, No. 21-cv-3231, ECF No. 62-2. "The egg has been scrambled" here, and vacatur "would disrupt [these] settled transactions." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020). These interests weigh heavily against vacatur. *See, e.g.*, *AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 854 (D.C. Cir. 2021).[8]

## CONCLUSION

For the foregoing reasons, the Defendants' cross-motions for summary judgment in these consolidated cases should be granted.


Dated: February 18, 2022                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            ERIC B. BECKENHAUER
                                            Assistant Branch Director

                                            */s/ Joel McElvain*
                                            JOEL McELVAIN
                                            Senior Trial Counsel
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Phone: (202) 616-8298
                                            Fax: (202) 616-8470
                                            E-mail: Joel.L.McElvain@usdoj.gov
                                            D.C. Bar No. 448431

                                            *Counsel for Defendants*

---

[8]   At all events, 45 C.F.R. § 149.510(c)(4)(vi)(B) should not be vacated, as AMA did not offer any argument in its initial brief to challenge this provision, and offers only a cursory argument in a footnote in reply. AMA Reply Br. 30 n.19. (AAMS, for its part, has not challenged this provision.) The Departments have a separate rulemaking authority to require arbitrators to submit "such information as the [Departments] determine[] necessary to carry out the provisions of this subsection." 42 U.S.C. § 300gg-111(c)(7)(C). AMA offers no reason to question the Departments' judgment that they needed arbitrators to explain their reasoning in order for the Departments to carry out all of their responsibilities under subsection (c) of the statute.