UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSOCIATION OF AIR MEDICAL  )
SERVICES,                   )
                            )
       Plaintiff,           )
                            )
   v.                       )   Civil Case No. 21-3031 (RJL)
                            )
U.S. DEPARTMENT OF HEALTH   )
AND HUMAN SERVICES, et al., )
                            )
       Defendants.          )

## MEMORANDUM OPINION
(August 4th, 2023) [Dkts. 5, 10]

The No Surprises Act was passed in 2020 to end surprise medical billing. The Department of Health and Human Services ("HHS"), the Department of Labor, and the Department of the Treasury, along with the Office of Personnel Management ("OPM") (collectively, the "defendants") promulgated regulations under the authority of the No Surprises Act. Plaintiff, Association of Air Medical Services (AAMS), is a trade association representing most air ambulance providers in the United States and brought this action against the defendants claiming that the regulations implementing the No Surprises Act violate the Administrative Procedure Act. Both sides have moved for summary judgment. For the reasons explained below, the plaintiff's Motion for Summary Judgment is DENIED and the defendants' Cross Motion for Summary Judgment is GRANTED.

1

## I. BACKGROUND

Congress enacted the No Surprises Act on December 27, 2020 to end "surprise billing" for patients and to remove them from the middle of payment disputes between the patient's group health plan or issuer and providers. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. BB, tit. 1, 134 Stat. 1182, 2758-2890 (2020) ("No Surprises Act").[1] The No Surprises Act obligates group health plans and issuers to apply the same cost-sharing levels to out-of-network and in-network emergency services, prevents emergency service providers from holding a patient liable for the balance of a bill, and provides an independent dispute resolution process for group health plans and issuers and out-of-network providers to reach a fair payment amount. *See generally* No Surprises Act; *see also* Compl. ¶57 [Dkt. 1].

Given the unique nature of air ambulance services compared to emergency services generally, Congress addressed air ambulance providers separately in the No Surprises Act. *See e.g.*, 42 U.S.C. § 300gg-112.

The No Surprises Act required HHS, the Department of Labor, the Department of the Treasury, and OPM to issue two sets of rules. *See* 42 U.S.C. §§ 300gg-111(a)(2)(B)(i), -111(c)(2)(A), -112(b)(2)(A). Interim Final Rule Part I ("IFR Part I") was issued in July 2021 and established a methodology to determine the qualifying payment amount ("QPA"). *See* Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July

---

[1] The No Surprises Act was enacted as Title I to Division BB of the Consolidated Appropriations Act of 2021. It was codified as amended in scattered sections of Titles 26, 29, and 42 of the United States Code.

2

13, 2021). Interim Final Rule Part II ("IFR Part II") was issued in October 2021 and established an independent dispute resolution ("IDR") process.[2] *See* Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980 (Oct. 7, 2021).

Plaintiff AAMS, the international trade association that represents over 93% of air ambulance providers in the United States, sued under the Administrative Procedure Act ("APA") on November 16, 2021 to set aside both rules. Compl. ¶¶ 1, 20.

In December 2021, AAMS moved for Summary Judgment. Mot. for Summ. J. by Ass'n of Air Med. Servs. ("AAMS Mot. for Summ. J.") [Dkt. 5]. In January 2022, the defendants in the case against AAMS filed a Cross Motion for Summary Judgment, Def.'s Cross Mot. for Summ. J. ("Defs.' Cross Motion") [Dkt. 10], and a memorandum in opposition to AAMS' Motion for Summary Judgment, Mem. in Opp'n to Mot. for Summ. J. [Dkt. 11]. On February 1, 2022, AAMS replied in support of its Motion for Summary Judgment and in opposition to the Cross Motion. Consolidated Reply in Supp. of Pl.'s Mot. for Summ. J. [Dkt. 31]; Opp'n to Cross Mot. for Summ. J. [Dkt. 32].

On February 2, 2022, the related case of *Ass'n of Air Medical Services v. Dep't of Health & Human Services et al.*, No. 21-cv-3031 was consolidated with *American Medical Association, et al. v. Dep't of Health & Human Services et al.*, No. 21-cv-3231. Minute Order, Feb. 2, 2022. The American Medical Association ("AMA"), Stuart M. Squires, M.D., Victor F. Kubit, M.D., the American Hospital Association, Renown

---

[2] The IDR process arbitrates disputes between a group health plan or health insurance issuer and an out-of-network provider over the payment owed.

3

Health, and UMASS Memorial Health Care, Inc. (collectively the "AMA plaintiffs") only challenged IFR Part II and the QPA Presumption in the IDR process.

While this case was pending, related litigation in the Eastern District of Texas challenging IFR Part II went forward and resulted in portions of IFR Part II being vacated.[3] On August 19, 2022, responding to the two Texas decisions, the departments jointly released final rules under the No Surprises Act that includes language to remove from the regulations the language vacated by the Court in the Eastern District of Texas. *Requirements Related to Surprise Billing*, 87 Fed. Reg. 52,619 (Aug. 26, 2022).

Back in this Court, the AMA plaintiffs and the defendants stipulated to the dismissal of all the claims asserted in Case No. 21-3231 on September 20, 2022. Joint Stipulation of Dismissal of Claims Asserted in Case 21-cv-3231 [Dkt. 76]. Similarly, on September 30, 2022, AAMS and the defendants in Case No. 21-3031 stipulated to dismissal of Count I (the challenge to IFR Part II). Joint Stipulation of Partial Dismissal in Case 21-

---

[3] First, on February 23, 2022, Judge Kernodle of the Eastern District of Texas issued an opinion in *Texas Med. Ass'n. v. U.S. Dep't of Health and Human Servs., et al.*, 587 F.Supp.3d 528 (E.D. Tex. 2022). Texas Medical Association challenged IFR Part II under the APA, arguing in part that it "improperly require[d] arbitrators to give outsized weight to a single statutory factor, the QPA, in conflict with the [No Surprises] Act" and requested the Court to vacate certain provisions of IFR Part II. *Id* at 536. Judge Kernodle held that IFR Part II violated the APA and vacated portions of IFR Part II at issue. *Id*. at 548.

Then, on July 26, 2022, Judge Kernodle issued an opinion in another case, *LifeNet, Inc. v. U.S. Dep't of Health and Human Servs.*, 617 F.Supp.3d 547 (E.D. Tex. July 26, 2022). LifeNet, Inc. challenged the nearly identical sections of IFR Part II which establish a similar IDR process for determining payments to out-of-network providers of air ambulance services. *Id*. at 547-48. Again, Judge Kernodle held that IFR Part II as it relates to the IDR process for air ambulance services violated the APA and vacated portions of IFR Part II at issue. *Id*. at 561-63.

cv-3031 [Dkt. 79]. Therefore, the only remaining claim before the Court is Count II (the challenge to IFR Part I) in the Complaint filed by AAMS. *See* Compl.

## II.   STANDARD OF REVIEW

This case comes before the Court on the parties' cross-motions for summary judgment. In resolving a motion for summary judgment in a challenge to a rule brought under the APA, courts must decide, "as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Coe v. McHugh*, 968 F.Supp.2d 237, 240 (D.D.C. 2013). "[W]hen review is based upon the administrative record… [s]ummary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision." *Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002). In such cases, the district court "sits as an appellate tribunal" and "[t]he entire case … is a question of law." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted).

Under the APA, courts must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001). While review of agency action is generally deferential, *Blanton v. Office of the Comptroller of the Currency*, 909 F.3d 1162, 1170 (D.C. Cir. 2018), courts must "ensur[e] that agencies have engaged in reasoned decision making," *Iaccarino v. Duke*, 327 F. Supp. 3d 163, 173 (D.D.C. 2018) (quotation marks and citations omitted). At a minimum, agencies must "examine the relevant data and articulate a satisfactory explanation for its actions

5

including a rational connection between facts found and the choice made." *Tourus Records, Inc.*, 259 F.3d at 736 (quoting *Motor Vehicle Mfrs.' Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). However, the "scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Iaccarino*, 327 F. Supp. 3d at 173 (internal quotation marks omitted) (citing *State Farm*, 463 U.S. at 43).

### III.  ANALYSIS

The QPA is essentially the median rate the insurer would have paid for emergency care if it had been provided by an in-network provider or facility.  The No Surprises Act defines the QPA as the "median of the contracted rates recognized by the plan or issuer … for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished, consistent with the methodology established by the Secretary …" 42 U.S.C. § 300gg-111(a)(3)(E)(i); *see also id.* § 300gg-112(c)(2). However, determining what the QPA is for a certain item or service requires a precise methodology that involves data gathering and calculations.  As such, the Act instructs the defendants to promulgate regulations that establish the "methodology … to determine the qualifying payment amount," including a definition of the geographic regions used to make that determination. *Id.* § 300gg-111(a)(2)(B)(i), (iii).

The plaintiff contends that the defendants are implementing the definition through a QPA methodology that intentionally lowers the QPA for air ambulance services and runs

contrary to the statute in three ways: (1) excluding most types of contracted rates between air ambulance providers and plans or issuers; (2) treating hospitals and independent air ambulance services as providers in the "same or similar specialty"; and (3) using overbroad geographic regions that generate QPAs wholly divorced from real-world pricing in reasonable geographic markets. AAMS Mot. for Summ. J. 21-22. The plaintiff makes a separate but related argument concerning patient cost-sharing amounts being tied to the QPA. Unsurprisingly, the defendants argue that they reasonably exercised their statutory authority to set the QPA methodology and patient cost-sharing amounts in IFR Part I and reasonably explained their decisions, thereby meeting the requirements of the APA. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). For the reasons discussed below, I find the defendants' position to be eminently reasonable.

### a. Calculation of Median of Contracted Rates

First, the plaintiff argues that the QPA methodology established by the defendants impermissibly excludes single case agreements and other similar agreements from the calculation of the median in a way that is contrary to law and is arbitrary and capricious. AAMS Mot. for Summ. J. 22-27.[4] I disagree. The plain text of the No Surprises Act itself requires the defendants to exclude single case agreements from the QPA calculations. Moreover, doing so most "closely aligns with the statutory intent of ensuring that the

---

[4] Plaintiff contends that the plain meaning of the statute suggests that if the plan or issuer recognizes a rate from an in-network contract as the total maximum payment under a plan or coverage, then the plan or issuer must include that rate in its calculation of the median. *Id.* at 23. Plaintiff claims the same must hold true for any amount paid or charged under any other type of contract, including single case agreements, letter agreements, or similar contractual agreements. *Id.*

QPA reflects market rates under typical contract negotiations" and is not arbitrary and capricious. *See* 86 Fed. Reg. at 36,889. As such, the defendants acted "within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Inteliquent, Inc. v. FCC*, 35 F.4th 797, 802 (D.C. Cir. 2022) (quoting *Prometheus,* 141 S. Ct. at 1158).

Under the No Surprises Act, the QPA is the "median of the contract rates recognized by the plan or issuer." 42 U.S.C. § 300gg-111(a)(3)(E)(i); *see also id*. § 300gg-112(c)(2). The median, in a set of numbers arranged from smallest to largest, can be thought of as the middle value. IFR Part I states that contracted rates do not include "a single case agreement, letter of agreement, or other similar arrangement between a provider, facility, or air ambulance provider and a plan or issuer, used to supplement the network of the plan or coverage for a specific participant, beneficiary, or enrollee in unique circumstances…" 45 C.F.R. § 149.140(a)(1). Therefore, IFR Part I excludes these "single case agreement[s]" from the calculation of the median of the contract rates, the QPA.

The plaintiff claims that under the plain meaning of the statute, all amounts paid or charged under any kind of contract, including single case agreements, should be included in the calculation of the median. AAMS Mot. for Summ. J. 23. However, as the defendants correctly note, the plain text of the statute directs the Departments to include *only* the payment rates that are contracted for under the generally applicable terms of a health plan or health insurance policy. Under the No Surprises Act, the fuller definition of the QPA is as follows: "the median of the contracted rates recognized by the *plan or*

*issuer*, respectively (determined with respect to all such *plans of such sponsor or all such coverage offered* by such issuer that are offered within the same *insurance market* ... as the *plan or coverage*) as the total maximum payment ... under such *plans or coverage*, respectively, on January 31, 2019," adjusted for inflation. 42 U.S.C. § 300gg-111(a)(3)(E)(i) (emphasis added). As the defendants note, "plans" and "coverage" are terms of art under the Public Health Service Act ("PSHA") and the Employee Retirement Income Security Act ("ERISA").[5] A "group health plan" is an employee welfare plan that provides medical care for employees and their dependents. *Id*. § 300gg-91(a)(1). And "health insurance coverage" means benefits consisting of medical care under a policy offered by a health insurance issuer. *Id*. §300gg-91(b)(1). Read together, the plain text of the No Surprises Act directs the Departments to include in the QPA calculation *only* the payment rates that are contracted for under the generally applicable terms of a health plan or health insurance policy. *See also* Br. Of Amici Curiae Health Policy Experts in Supp. of Defs. 19 [Dkt. #35] ("[S]ingle-case agreements should not be included in the calculation of the QPA because they are different in kind from the agreements that air ambulance providers make to join payers' contracted networks.").

The plaintiff also contends that the Departments' choice to exclude single case agreements is arbitrary and capricious because Congress doesn't require the QPA to reflect "market rates" as contained only in "typical" in-network contracts between air ambulance providers and plans and issuers. AAMS Mot. for Summ. J. 24-27. However,

---

[5] The No Surprises Act makes parallel amendments to the PSHA (administered by HHS) and ERISA (administered by the Department of Labor).

9

Congress recognized that a majority of air ambulance services are furnished by out-of-network providers, creating a "market failure" that has permitted air ambulance providers to charge far more than the price they would command if the services were provided in network. *See* H.R. REP. NO. 116-615, at 52-53 ("Economists generally regard the practice of surprise medical billing as arising from a failure in the health care market … These circumstances enable some providers to charge amounts for their services that … result[s] in compensation far above what is needed to sustain their practice."). As a result, Congress sought to limit patients' cost-sharing responsibilities to an amount based on a comparable in-network rate, and providers' payments were calculated based on the same amount. *See* 42 U.S.C. § 300gg-112(a)(1).[6] Thus, the Departments' decision to exclude single case agreements from QPA calculations is reasonable and is in line with Congress's intent to address the market failure stemming from air ambulance providers' ability to remain out-of-network and charge high out-of-network rates.

Finally, the plaintiff contends that the Departments acted arbitrarily by treating single case agreements differently in other contexts. For example, the plaintiff points out that the Departments defined the terms "participating emergency facility" and "participating health care facility" to include any facility with a contractual relationship with a plan or issuer through a single case agreement. *See* AAMS Mot. for Summ. J. 27-29; 45 C.F.R. § 149.30. The defendants adequately justify the different treatment by explaining that the

---

[6] *See also* Br. Of America's Health Insurance Plans as Amicus Curiae in Support of Defs.' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Summ. J. Mot. 9-10 [Dkt. #34] ("The QPA rule interpreted 'contracted rate' (for the purpose of identifying the median) to include only network agreements and to exclude such one-off agreements … [This is] essential to the statutory purpose of protecting consumers from unpredictable and uncontrolled health care costs … Including [single case agreements] would distort the calculation of median market rates the QPA represents.").

10

definition of "participating health care facility" is different than that of the QPA and it serves a different purpose in the statutory scheme. *See* Defs.' Cross Mot. 29-30. In its final analysis, the Departments reasonably determined that a single case agreement could constitute a contractual relationship that would cause a facility to be a "participating facility," thereby triggering the Act's balance-billing protections for other services performed at that facility in that single case, *see* 86 Fed. Reg. at 36,882, even though that agreement is excluded from the calculation of the median of contracted rates under a different statutory definition. *See* Defs.' Cross Mot. 29-30.

### b. Treatment of All Air Ambulance Providers as in the Same or Similar Specialty

Next, the plaintiff contends that treating independent air ambulance providers and hospitals providing air ambulance services as under the same "single provider specialty" for the purposes of QPA calculations is arbitrary and capricious. *See* AAMS Mot. for Summ. J. 27-29; 45 C.F.R. § 149.140(a)(12). I disagree. Under the No Surprises Act, the QPA is the median of the plan's or issuer's contracted rates "for the same or similar item or services that is provided *by a provider in the same or similar specialty*." 42 U.S.C. § 300gg-111(a)(3)(E)(i). According to the plaintiff, hospitals are differently situated than independent air ambulance providers because hospitals can negotiate a wide range of rates with plans and issuers, potentially accepting below market rates for air ambulance transports in order to secure contracts that are economically rational across all service lines. *See* AAMS Mot. for Summ. J. 27-28. Independent air ambulance providers are unable to do the same because they only offer air ambulance transport services. *Id.*

11

Nevertheless, the defendants acted reasonably by providing a well reasoned justification for why the two are considered the same "provider specialty," for purposes of the APA's deferential arbitrary and capricious standard. *See Prometheus Radio Project*, 141 S. Ct. at 1155. The Departments explained that they ultimately concluded it was inappropriate to treat these providers differently solely on the basis of their ownership structure. *See* 86 Fed. Reg. at 36,891. Since patients "frequently do not have the ability to choose their air ambulance provider" the Departments reasoned that they shouldn't be required to pay higher cost-sharing amounts for non-hospital based air ambulance providers simply "because the air ambulance provider assigned to them has negotiated higher contracted rates in order to cover its higher costs, or because it has a different revenue model." *Id*; *see also* Br. of Ass'n of Critical Care Transp. as Amicus Curiae in Partial Supp. of the Gov't 15-19 [Dkt. # 37] ("[B]usiness model is not a medical specialty, no matter how loosely characterized...").

Moreover, the defendants further explained that hospital based air ambulance services and independent air ambulance services should be considered the same specialty because they both perform the same service for patients who require emergency transportation, even though they have different business models. *See* Defs.' Cross Mot. for Summ. J. 30-31. The term "specialty" refers to the "practice specialty of a provider," 86 Fed. Reg. at 36,891, such as cardiology or urology, *see* 42 U.S.C. § 300gg-139(d). Because the patient in an emergency situation frequently has no opportunity to consider what the particular business model of the particular air ambulance provider might be, the Departments

12

justified their decision that the provider's ownership structure was irrelevant for the purposes of determining the "provider specialty" of air ambulance providers. *See* Defs.' Cross Mot. for Summ. J. 30-31. In other words, the defendants provided a "satisfactory explanation for its actions including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

Undaunted, the plaintiff also argues that the Departments' decision to treat hospital emergency departments and freestanding emergency departments as different specialties while treating hospitals and independent air ambulance providers as the same specialties amounts to "apply[ing] different standards to similarly situated entities." *Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 7 (D.C. Cir. 2009); *see also* AAMS Mot. for Summ. J. 27-29. However, the No Surprises Act expressly allows for freestanding and hospital emergency departments, but not providers, to be treated differently as different facilities. *See* Defs.' Cross Mot. for Summ. J. 30-31; *see also* 42 U.S.C. § 300gg-111(a)(2) (allowing the Departments to account for "relevant payment adjustments that take into account quality or facility type (including higher acuity settings and the case-mix of various facility types) that are otherwise taken into account for purposes of determining payment amounts with respect to participating facilities"). The Departments drew this distinction on the basis of evidence demonstrating that there are material differences in the case mix and level of patient acuity between the two types of emergency facilities. *See* Defs.' Cross Mot. for Summ. J. 31; 86 Fed. Reg. 36,892; *see also* Br. of Ass'n of Critical Care Transp. as Amicus Curiae in Partial Supp. of the Gov't 19 ("[M]edian rates

[between freestanding and hospital emergency departments] can differ because the services rendered differ."). The same distinction does not hold true between independent and hospital based air ambulances, which only differ in business models and not quality of care. I therefore easily conclude that the Departments "articulate[d] a satisfactory explanation for" not drawing a distinction between the two in defining which "specialty" these providers perform, and did so after "examin[ing] the relevant data." *State Farm*, 463 U.S. at 43.

### c. Definition of Geographic Regions for Use in Calculating the QPA

Third, the plaintiff argues that the QPA methodology arbitrarily uses overbroad geographic regions that defeat the structure of the statute and will produce irrational outcomes. *See* AAMS Mot. for Summ. J. 29-30. The No Surprises Act directs that the QPA to be calculated in part on the basis of the median of the contracted rates for the services "provided in the geographic region in which the item or services is furnished." 42 US.C. § 300gg-111(a)(3)(E)(i). Moreover, the Act instructs the Departments to issue regulations defining these geographic regions. *See id.* § 300gg-111(a)(2)(B)(iii). The Departments did so by defining a "geographic region" for air ambulance services as "one region consisting of all [metropolitan statistical areas (MSAs)] in the state, and one region consisting of all other portions of the state." *See* 45 C.F.R. § 149.140(a)(7)(ii)(A). If this definition doesn't provide the health insurance issuer or group health plan with enough information to calculate the QPA, then a broader definition is applied of "regions based on Census divisions – that is, one region consisting of all MSAs in each Census

division and one region consisting of all other portions of the Census division." *See id.* § 149.140(a)(7)(ii)(B). The plaintiff contends that the use of Census divisions, relative to the alternative to use third-party databases, to calculate the QPA is "absurdly overbroad." *See* AAMS Mot. for Summ. J. 29-30.

However, Congress deferred to the Departments to define the geographic regions, *see* 42 U.S.C. § 300gg-111(a)(2)(B)(iii), and the Departments reasonably explained their decision. They decided against defining geographic regions for air ambulance services too narrowly because such an approach would more likely "result in more instances of insufficient information" to calculate the QPA. 86 Fed. Reg. at 36,893. This is due to the nature of air ambulance services which operate relatively less frequently compared to other items and services subject to the No Surprises Act as well as the lower prevalence of participating providers of air ambulance services. *Id*. Although the No Surprises Act permits the use of third-party databases of allowed amounts in situations where there is otherwise insufficient information to calculate the QPA, *see* 42 U.S.C. § 300gg-111(a)(3)(E)(iii), the Departments decided against using third-party databases. The Departments did so because they read the statute to mean that the use of third-party databases would only be in "limited circumstances where the plan or issuer cannot rely on its contracted rates as a reflection of the market dynamics in a geographic region." 86 Fed. Reg. at 36,888. Moreover, the Departments reasoned that the use of larger geographic regions will allow plans and issuers to have access to more information and thereby "reduce the likelihood that the median of contracted rates would be skewed by

contracts under which the parties have agreed to particularly high or low payments." *Id.* at 36,892.[7]

### d. Tying Patient Cost-sharing to the QPA

The plaintiffs make a separate but related argument objecting to the defendants' basing of patient cost-sharing obligations for air ambulance services on the QPA as opposed to an amount determined through open negotiation or through the IDR process. *See* AAMS Mot. for Summ. J. 31-33. Plaintiffs argue that doing so is inconsistent with the statutory text and purpose of the No Surprises Act. *Id.* The No Surprises Act imposes individual cost sharing requirements for nonparticipating air ambulance services that are the same as the requirements for "such services [provided by a] participating provider, and any coinsurance or deductible shall be based on rates that would apply for such services if they were furnished by such a participating provider." § 300gg-112(a)(1). In IFR part 1, the defendants have mandated that the cost-sharing requirements "be calculated as if the total amount that would have been charged for the services by a participating provider of air ambulance services were equal to the lesser of the [QPA] or the billed amount for the services." 45 C.F.R. § 149.130(b)(2).

---

[7] The plaintiff makes an additional argument concerning the fact that the geographic regions chosen by the Departments are much broader than the coverage area of an air ambulance base, which is typically less than a 200-mile radius, or the average distance patient-loaded Medicare air ambulance transports travel, which is around 56 miles. AAMS Mot. for Summ. J. 30. However, the defendants explained that the geographic regions were defined not on the basis of how far air ambulances travel or the coverage area of an air ambulance base, but were instead defined based on the relative infrequency of the service and the low prevalence of in-network air ambulance providers. *See* 86 Fed. Reg. at 36,893; *see also* Defs.' Cross Mot. for Summ. J. 33.

16

Contrary to the plaintiff's claims, the statute doesn't "unambiguous[ly]" foreclose the defendants' approach. The No Surprises Act specifies that a patient's cost-sharing obligations should be calculated consistent with what would have been paid if the out-of-network air ambulance service had instead been an in-network service, but it leaves open how the defendants should determine that hypothetical amount. The defendants reasonably explained that they determined this way for calculating this amount by looking to the No Surprises Act's parallel structure for services performed by health facilities and other providers, under which the patient's cost-sharing obligations ultimately turns on the QPA, absent a statutory exception. *See* 86 Fed. Reg. at 36,884. The defendants explained that using the QPA ensures the patient's financial burden would be based on rates that would apply for the services if they were furnished by a participating provider, "given that the QPA is generally based on median contracted rates, as opposed to rates charged by nonparticipating providers." *Id*. Moreover, the defendants explained that the policy is "consistent with the statute's general intent to protect participants ... from excessive bills, and to remove the individuals as much as possible from disputes between plans and issuers and providers of air ambulance services." *Id*. In other words, the defendants "examine[d] the relevant data and articulate[d] a satisfactory explanation for its actions including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. That is the very type of well reasoned analysis the APA requires!

## IV. CONCLUSION

For the foregoing reasons, the plaintiff's Motion for Summary Judgment is DENIED and the defendants' Cross Motion for Summary Judgment is GRANTED.

*[Signature]*

RICHARD J. LEON
United States District Judge